**No. 26-1107**

# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

ANN LEWANDOWSKI, on her own behalf and on behalf of all others similarly situated; ROBERT GREGORY

*v.*

JOHNSON & JOHNSON;
THE PENSION AND BENEFITS COMMITTEE OF JOHNSON & JOHNSON; PETER FASOLO;
WARREN LUTHER; LISA BLAIR DAVIS; DOES 1-20

ANN LEWANDOWSKI,
*Appellant*

On Appeal from the United States District Court
for the District of New Jersey (Quraishi, J.), No. 3:24-cv-00671

## OPENING BRIEF FOR APPELLANT
## AND JOINT APPENDIX VOL. I OF II, PP. 1-37

Michael Eisenkraft
**COHEN MILSTEIN
SELLERS & TOLL, PLLC**
88 Pine Street, 14th Floor
New York, New York 10005
(212) 838-7797
meisenkraft@cohenmilstein.com

Michelle Yau
Daniel Sutter
**COHEN MILSTEIN
SELLERS & TOLL, PLLC**
1100 New York Ave. NW, Eighth Floor
Washington, D.C. 20005
(202) 408-4600
myau@cohenmilstein.com
dsutter@cohenmilstein.com

Michael Lieberman
Jamie Crooks
**FAIRMARK PARTNERS, LLP**
400 7th Street NW, Suite 304
Washington, DC 20004
Phone: (619) 507-4182
michael@fairmarklaw.com
jamie@fairmarklaw.com

Kai Richter
**COHEN MILSTEIN
SELLERS & TOLL, PLLC**
400 South 4th Street #401-27
Minneapolis, MN 55415
(612) 807-1575

*Counsel for Appellant Lewandowski*

April 30, 2026

**TABLE OF CONTENTS**

**Page**

TABLE OF CONTENTS................................................................................i

TABLE OF AUTHORITIES ........................................................................ iii

INTRODUCTION .......................................................................................1

JURISDICTIONAL STATEMENT ..............................................................5

STATEMENT OF THE ISSUES..................................................................5

STATEMENT OF RELATED CASES AND PROCEEDINGS ...........................6

STATEMENT OF THE CASE.....................................................................6

    I.      Statutory Background.................................................................6

    II.     Background on the J&J Plan ......................................................8

    III.    Background on PBMs ...............................................................10

    IV.    Lewandowski's Allegations ......................................................12

    V.     Procedural History...................................................................17

SUMMARY OF ARGUMENT .......................................................................21

STANDARD OF REVIEW ...........................................................................24

ARGUMENT ..............................................................................................25

    I.      Lewandowski Has Standing To Seek Monetary Relief for the Amounts She Directly Overpaid For Her Own Prescriptions.............25

        A.    Lewandowski Plausibly Alleges that She Was Overcharged When She Paid for Her Own Prescriptions........26

        B.    The District Court's Analysis Was Flawed. .............................30

    II.     Lewandowski Has Standing to Seek Relief for Plan-Wide Overcharges.................................................................................35

A.    Plan Participants Have Standing to Recover on Behalf of a Plan Where the Plan's Overpayments Are Passed Through to Them ........................................................35

B.    The Plan's Overpayments Increased Lewandowski's Premiums While She Was Enrolled in the Plan. .......................38

      1.    Lewandowski's Premiums Were Calculated as a Percentage of Overall Plan Spending. ...........................38

      2.    The District Court's Analysis was Flawed. ....................43

C.    The Plan's Overpayments Were Passed Through to Lewandowski in Premiums While She Was Enrolled in COBRA. ...................................................................................53

CONCLUSION ..................................................................................................55

CERTIFICATES OF COMPLIANCE ...............................................................57

CERTIFICATE OF SERVICE ...........................................................................58

**TABLE OF AUTHORITIES**

**Cases**                                                                             **Page(s)**

*AARP v. United States EEOC*,
   226 F. Supp. 3d 7 (D.D.C. 2016)................................................................49

*Acosta v. Bd. of Trs. of Unite Here Health*,
   No. 22-C-1458, 2023 WL 2744556 (N.D. Ill. Mar. 31, 2023)...........................37

*Adam v. Barone*,
   41 F.4th 230 (3d Cir. 2022) ........................................................................34, 48

*Boley v. Universal Health Servs.*,
   36 F.4th 124 (3d Cir. 2022) ..............................................................8, 27, 36, 37

*Brotherston v. Putnam Invs., LLC*,
   907 F.3d 17 (1st Cir. 2018)...........................................................................33, 34

*Chao v. Hall Holding Co., Inc.*,
   285 F.3d 415 (6th Cir. 2002) ..............................................................................34

*CIGNA Corp. v. Amara*,
   563 U.S. 421 (2011)..............................................................................29, 30, 34

*Clemens v. ExecuPharm Inc.*,
   48 F.4th 146 (3d Cir. 2022) ................................................................................35

*Collins v. Yellen*,
   594 U.S. 220 (2021).............................................................................................25

*Connelly v. Lane Constr. Corp.*,
   809 F.3d 780 (3d Cir. 2016) ...............................................................................24

*Constitution Party of Pennsylvania v. Aichele*,
   757 F.3d 347 (3d Cir. 2014) ...............................................................................48

*Cottrell v. Alcon Lab'ys.*,
   874 F.3d 154 (3d Cir. 2017) ........................................................................*passim*

*Cunningham v. Cornell Univ.*,
   604 U.S. 693 (2025)........................................................................................6, 27

*DaimlerChrysler Corp. v. Cuno,*
    547 U. S. 332 (2006)................................................................27

*Danvers Motor Co. v. Ford Motor Co.,*
    432 F.3d 286 (3d Cir. 2005) .................................24, 26, 28, 31

*DiFelice v. U.S. Airways, Inc.,*
    497 F.3d 410 (4th Cir. 2007) ...................................................51

*Finkelman v. NFL,*
    877 F.3d 504 (3d Cir. 2017) .............................................25, 40

*Geissal v. Moore Med. Corp.,*
    524 U.S. 74 (1998)............................................................53, 54

*Gimeno v. NCHMD, Inc.,*
    38 F.4th 910 (11th Cir. 2022) .................................................30

*Graden v. Conexant Sys., Inc.,*
    496 F.3d 291 (3d Cir. 2007) ...................................................52

*Henry v. Wilmington Tr., NA.,*
    72 F.4th 499 (3d Cir. 2023) ....................................................35

*In re Horizon Healthcare Servs., Inc. Data Breach Litig.,*
    846 F.3d 625 (3d Cir. 2017) ...................................................26

*Horvath v. Keystone Health Plan East, Inc.,*
    333 F.3d 450 (3d Cir. 2003) ...................................................47

*Hughes v. Nw. Univ.,*
    595 U.S. 170 (2022).................................................................8

*In re Ins. Brokerage Antitrust Litig.,*
    579 F.3d 241 (3d Cir. 2009) .........................................26, 37, 49

*Knudsen v. MetLife Grp., Inc.,*
    117 F.4th 570 (3d Cir. 2024) ...........................................*passim*

*Kruchten v. Ricoh USA, Inc.,*
    No. 23-1928, 2024 WL 3518308 (3d Cir. July 24, 2024) ..................8

*Loren v. Blue Cross & Blue Shield of Mich.*,
　　505 F.3d 598 (6th Cir. 2007) .......................................................................43

*Lujan v. Defenders of Wildlife*,
　　504 U.S. 555 (1992)....................................................................................36

*Mator v. Wesco Distrib., Inc.*,
　　102 F.4th 172 (3d Cir. 2024) ...................................................................8, 27

*Menkes v. Prudential Ins. Co. of Am.*,
　　762 F.3d 285 (3d Cir. 2014) .......................................................................30

*Navarro v. Wells Fargo*,
　　No. 24-CV-3043, 2025 WL 897717 (D. Minn. Mar. 24, 2025).............19, 31, 32

*Pfeil v. State St. Bank & Tr. Co.*,
　　671 F.3d 585 (6th Cir. 2012) .......................................................................51

*In re Processed Egg Prods. Antitrust Litig.*,
　　881 F.3d 262 (3d Cir. 2018) ........................................................................26

*Sacerdote v. N.Y. Univ.*,
　　9 F.4th 95 (2d Cir. 2021) ............................................................................51

*In re Schering Plough Corp. ERISA Litig.*,
　　589 F.3d 585 (3d Cir. 2009) ........................................................................35

*Stern v. JPMorgan Chase & Co.*,
　　No. 1:25-CV-02097, 2026 WL 654714 (S.D.N.Y. Mar.9, 2026) ................28, 33

*Sweda v. Univ. of Pa.*,
　　923 F.3d 320 (3d Cir. 2019) ...................................................................*passim*

*Thole v. U.S. Bank N.A.*,
　　590 U.S. 538 (2020).............................................................................1, 36, 45

*Tibble v. Edison Int'l*,
　　575 U.S. 523 (2015)......................................................................................8

*TransUnion LLC v. Ramirez*,
　　594 U.S. 413 (2021)....................................................................................21

*United States v. Students Challenging Regulatory Agency Procedures*,
    412 U.S. 669 (1973).................................................................................48

*Wilson v. Centene Mgmt. Co., L.L.C.*,
    168 F.4th 217 (5th Cir. 2026) ..............................................................49

*Winsor v. Sequoia Benefits & Ins. Servs., LLC*,
    62 F.4th 517 (9th Cir. 2023) ................................................................43

**Statutes**

28 U.S.C. § 1291 .......................................................................................5

28 U.S.C. § 1331 .......................................................................................5

29 U.S.C. § 1104(a)(1)...............................................................................8

29 U.S.C. § 1104(a)(1)(A) .........................................................................6

29 U.S.C. § 1104(a)(1)(B) .........................................................................7

29 U.S.C. § 1109(a) ..........................................................................*passim*

29 U.S.C. § 1132(a)(2)..........................................................................7, 35

29 U.S.C. § 1132(a)(3)...............................................................................7

29 U.S.C. § 1132(e)(1)...............................................................................5

29 U.S.C. § 1162(1) .................................................................................53

29 U.S.C. § 1162(3) .................................................................................54

29 U.S.C. § 1163 .....................................................................................53

29 U.S.C. § 1164 .....................................................................................54

29 U.S.C. § 1164(2) .................................................................................54

**Other Authorities**

U.S.Dep't of Labor, MEETING YOUR FIDUCIARY RESPONSIBILITIES
    (Sept. 2021)..........................................................................................7

U.S. Dep't of Labor, Technical Release 2011-04 (Dec. 2, 2011) ...........52

Fed. Judicial Center, *Reference Guide on Estimation of Econ.*
  *Damages, Reference Manual on Scientific Evid.* 432 (3d ed. 2011)..................46

## **INTRODUCTION**

"There is no ERISA exception to Article III." *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 547 (2020). This principle, invoked in *Thole* to reject a novel theory of ERISA standing, works the other way too: when alleged fiduciary imprudence causes financial harm to the plaintiff—taking money out of her pocket—that injury generates Article III standing, as it does in every other context.

The allegations here are straightforward. Plaintiff-Appellant Ann Lewandowski was enrolled in an employee healthcare plan (the "Plan") offered by her former employer, Defendant-Appellee Johnson & Johnson ("J&J"). She alleges that Plan fiduciaries breached their fiduciary duties under the Employee Retirement Income Security Act ("ERISA") by failing to monitor the Plan's pharmacy benefits manager ("PBM") and imprudently agreeing to unreasonably high prices for prescription drugs. For example, when Lewandowski filled a prescription for an antiviral medication, she paid the J&J-negotiated price of $303.68, even though the same drug was widely available to other patients and plans for around $100 (or less). Appx137 (SAC ¶ 221). The same pattern holds across the entire Plan formulary—Defendants agreed to make the Plan and its participants significantly overpay for prescription drugs that were widely available for less. These excessive prices evidence a clear violation of ERISA's duty of prudence, which requires plan fiduciaries to diligently monitor and ensure the reasonableness of plan spending. *See, e.g., Sweda v. Univ. of Pa.*, 923 F.3d 320, 328 (3d Cir. 2019).

1

Remarkably, the District Court dismissed Lewandowski's claims at the outset, without reaching the merits, by ruling that she lacked standing to sue—even though she alleged the paradigmatic Article III injury: financial harm. Lewandowski directly paid the full amount of the allegedly excessive drug prices before meeting her deductible and continued to pay a portion of the charges thereafter through co-insurance payments (collectively, "out-of-pocket" drug payments). She also indirectly footed the bill for the Plan's excessive payments because the Plan's spending is funded, in significant part, by employee premium contributions ("premiums" or "contributions"). These two financial harms—inflated out-of-pocket costs and inflated premiums—independently satisfy Article III's standing requirements.

The District Court's contrary decision misapplied Article III, failed to honor relevant pleading standards, and if affirmed, would eviscerate ERISA's protections for participants in employer-sponsored healthcare plans. It is beyond dispute that when prescription drugs cost more, employees pay more—through both higher payments at the pharmacy counter and higher premiums. The Second Amended Complaint ("SAC") meticulously details both types of cost increases with respect to this Plan specifically, including the precise amounts Lewandowski overpaid for her own prescriptions and the causal chain through which rising costs led to increased premiums. Yet the District Court deemed these accepted financial realities too

speculative to even support standing—a conclusion that no fair application of Article III can sustain.

This is most obvious in the District Court's analysis of Lewandowski's injury from excessive out-of-pocket drug payments. The SAC identified specific overcharge amounts for specific prescriptions Lewandowski obtained as a Plan participant, all of which the District Court was required to accept as true while assessing standing. Appx103-04, 135-40 (SAC ¶¶ 126-27, 213-29). Yet the District Court wiped away these direct financial harms because Lewandowski received other medical benefits in the same Plan year. Appx19. There is no support for this novel offset theory, and the District Court cited none. Article III requires only that a plaintiff suffer a concrete injury—not that the injury exceed other, collateral benefits. If accepted, the District Court's approach would make it impossible for a plan participant to seek relief for overpayments whenever the plan separately spent money on legitimate benefits—which is to say, in every case. That result finds no support in Article III or ERISA's remedial purpose.

The District Court's conclusion that Lewandowski's premium-based injuries were too "speculative" to support standing is flatly inconsistent with this Court's decision in *Knudsen v. MetLife Grp., Inc.*, 117 F.4th 570 (3d Cir. 2024). In *Knudsen*, this Court held that "a participant in a self-funded healthcare plan [may] bring[] an ERISA suit alleging that mismanagement of plan assets increased his/her

[premiums]." *Id.* at 579. Lewandowski alleged exactly that, backed up by extensive allegations about the Plan's premium-setting process, data analysis of the Plan's historical contribution rates, and numerous studies unequivocally finding that prescription-drug overcharges are passed through to plan participants as increased premiums. Indeed, J&J itself has recognized the link between costs and premium contributions. *See* Appx217 (Dkt. 75-2 at ¶ 2) ("[W]hen establishing contribution levels, the Committee considers ... the costs of [] prescription drugs"); Appx142 (SAC ¶ 242) ("In a 2023 'total rewards survey,' J&J admitted a need to increase employee premiums … under the Plans to cover costs."). To hold that this well-documented relationship is too speculative to even pursue on the merits turns the pleading standard on its head.

The District Court's redressability analysis for both alleged harms rested on an equally fundamental misunderstanding of Article III. The District Court held that Lewandowski's injuries were not redressable because a favorable judgment could not guarantee lower drug prices or premiums *in the future*. But Lewandowski does not seek prospective relief; she seeks retrospective monetary relief for amounts she already overpaid. That relief would redress her past harms regardless of what Defendants do in the future. Indeed, Lewandowski is no longer enrolled in the Plan, so future prices do not affect her or the remedies she seeks. The District Court's logic would deny standing in virtually any ERISA case seeking retrospective relief, as

fiduciaries always retain discretion over future plan operations—a result that would make the statute's remedies largely unavailable. *See* 29 U.S.C. § 1109(a).

In summary, the District Court improperly disregarded Plaintiff's well-pled allegations of injury from both excessive out-of-pocket drug payments and inflated premiums, and created an improper ERISA exception with no basis in caselaw or the statute that effectively immunizes the fiduciary breaches alleged here. Its decision should be reversed.

## JURISDICTIONAL STATEMENT

The District Court had subject-matter jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1), but dismissed the case for lack of standing under Rule 12(b)(1). Lewandowski timely appealed. Appx1 (Dkt. 93). This Court has subject-matter jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.     Whether Lewandowski has Article III standing based on her allegations that J&J's fiduciary breaches caused her to pay more out of pocket for her prescription drugs at the point of sale than she otherwise would have paid. *See* Dkt. 77 at 8-15 (Appellant raising issue); Appx15-20 (District Court addressing issue).

2.     Whether Lewandowski has Article III standing based on her allegations that J&J's fiduciary breaches caused to her pay more in healthcare premiums while

she was employed by J&J than she otherwise would have paid. *See* Dkt. 77 at 15-26 (Appellant raising issue); Appx15-20 (District Court addressing issue).

3.        Whether Lewandowski has Article III standing based on her allegations that J&J's fiduciary breaches caused to her pay more in healthcare premiums while she was enrolled in continuation coverage under COBRA than she otherwise would have paid. *See* Dkt. 77 at 26 (Appellant raising issue); Appx12, 15-20 (District Court acknowledging payment of COBRA premiums but failing to address issue).

## STATEMENT OF RELATED CASES AND PROCEEDINGS

This case has not previously been before this Court, and Appellant Lewandowski is unaware of any related case or proceeding.

## STATEMENT OF THE CASE

### I.        Statutory Background

Congress enacted ERISA to address concerns that employee benefit plans were being mismanaged. *See Cunningham v. Cornell Univ.*, 604 U.S. 693, 696 (2025). ERISA protects the interests of employee benefit plan participants and their beneficiaries by subjecting plan fiduciaries to mandatory duties derived from the common law of trusts. *Id.* One is the duty of loyalty, which requires plan fiduiaries to act "solely in the interest of the [plan's] participants and beneficiaries." 29 U.S.C. § 1104(a)(1)(A). Another is the duty of prudence, which requires plan fiduciaries to exercise the "care, skill, prudence, and diligence" that would be expected in

6

managing a plan of similar scope. *Id*. § 1104(a)(1)(B). These twin fiduciary duties are demanding by design; they are considered "the highest known to the law." *Sweda*, 923 F.3d at 333. ERISA provides a cause of action against any plan fiduciary who breaches these duties. *See* 29 U.S.C. §§ 1132(a)(2)-(3); *see also* 29 U.S.C. § 1109(a).

One common type of ERISA claim involves allegations that plan fiduciaries breached their fiduciary duties by failing to "understand and monitor plan expenses." *Sweda*, 923 F.3d at 328. As this Court explained in *Sweda*, plan fiduciaries must be "vigilant in 'negotiation of the specific formula and methodology'" used to determine the plan's payments to third-party service providers. *Id.*; *see also* Dep't of Labor, *Meeting Your Fiduciary Responsibilities* at 6 (Sept. 2021)[1] ("[T]he plan's fees and expenses should be monitored to determine whether they continue to be reasonable."). Thus, in *Sweda*, the plaintiffs pleaded fiduciary breaches by alleging that plan fiduciaries "paid excessive administrative fees, failed to solicit bids from service providers, failed to monitor revenue sharing, failed to leverage the Plan's size to obtain lower fees, and failed to comprehensively review Plan management." 923 F.3d at 330.

---

[1] Available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/archive/meeting-your-fiduciary-responsibilities.pdf (last visited Apr. 28, 2021).

Numerous cases have proceeded on similar allegations about plan fiduciaries' failure to monitor and ensure the reasonableness of plan spending. *See, e.g.*, *Hughes v. Nw. Univ.*, 595 U.S. 170, 172 (2022); *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015); *Kruchten v. Ricoh USA, Inc.*, No. 23-1928, 2024 WL 3518308, at *3 (3d Cir. July 24, 2024); *Mator v. Wesco Distrib., Inc.*, 102 F.4th 172, 189 (3d Cir. 2024); *Boley v. Universal Health Servs.*, 36 F.4th 124, 131-32 (3d Cir. 2022).

## II. Background on the J&J Plan

J&J offers healthcare benefits to its employees, including prescription-drug benefits, through its Plan. Appx59 (SAC ¶¶ 14-15). Both J&J and its Pension & Benefits Committee (the Defendants-Appellees here) are Plan fiduciaries. Appx60 (SAC ¶¶ 17-18). Accordingly, they bear responsibility for administering the Plan in the interest of Plan participants and beneficiaries, ensuring that their agreements with service providers and the amounts paid to those service providers are reasonable, and continuously monitoring Plan expenses to ensure that they remain reasonable and appropriate under the circumstances. 29 U.S.C. § 1104(a)(1).

The J&J Plan is "self-funded." Appx59 (SAC ¶ 16). This is in contrast to a "fully insured" plan, where a third-party insurance company bears the insurance risk and pays all covered expenses. *Id.* Because it is self-funded, the Plan itself pays all covered expenses (*i.e.*, expenses that participants do not directly pay themselves), with no ability to shift costs to a third party. *Id.* at ¶ 16, Appx80 (SAC ¶ 76).

8

The Plan pays these expenses out of a trust (the "Trust"). Appx59-60 (SAC ¶ 16) The Trust is funded not just by J&J, but by a combination of contributions from J&J and monthly premium contributions deducted from employee paychecks. *Id.* The Plan document specifically states: "Benefits under this Plan shall be funded through contributions made by the Company and by enrolled Participants." Appx172 (Dkt.75-2 ¶ 4.02). J&J and its employees thus share responsibility for covering the Plan's expenses. And because all Plan expenses are paid from the Trust, any increase in Plan spending must be matched by a corresponding increase in contributions into the Trust. Appx80 (SAC ¶ 76).

A major percentage of overall spending for healthcare plans is on prescription drugs. Appx132 (SAC ¶ 203). Defendants, as Plan fiduciaries, are responsible for negotiating the prices that Plan participants, and the Plan itself, pay for prescription drugs. Appx68 (SAC ¶ 42), Appx87 (SAC ¶ 94). These prices are determined in negotiations between Defendants and the PBM selected by Defendants, which in this case is Express Scripts. *Id.* ¶¶ 42, 94; Appx136 (SAC ¶ 218).

The costs of prescription drugs are split between the Plan and its participants. This cost-sharing occurs in three stages. First, a Plan participant is responsible for paying the entire cost of her prescriptions until she meets her annual deductible. *See* Appx62, 65, 80, 136 (SAC ¶¶ 22, 32 74, 215). The higher the price of the drug, the more the participant pays. Second, after a Plan participant meets her deductible, she

9

becomes responsible for a coinsurance payment on each prescription (typically 20% of the cost), with the Plan covering the rest of the price. *Id.* ¶¶ 22, 32; Appx136 (SAC ¶¶ 214-17). The higher the price of the drug, the higher the participant's 20% share. Finally, if the participant's out-of-pocket payments exceed a pre-determined amount for the year (an "out-of-pocket maximum"), the Plan starts paying for all covered drugs in full. *Id.* ¶ 216.

Plan participants' financial responsibility is not limited, however, to out-of-pocket drug payments in stages 1 and 2. While the Plan covers all of the costs in stage 3, the Plan's spending is, as noted, partially borne by participants in the form of monthly premium contributions to the Trust. Appx129 (SAC ¶ 193). The higher the prices of prescription drugs, the more money that must be contributed into the Trust. Accordingly, Plan participants are responsible for both (1) out-of-pocket payments for their own prescriptions, and (2) premium contributions into the Trust to fund the Plan's overall prescription-drug spending. Prescription-drug prices negotiated by the Plan fiduciaries bear on participants' costs at both levels.

## III.    Background on PBMs

Employers often contract with PBMs to administer the prescription-drug portion of their health plans. Appx67 (SAC ¶ 38). PBMs handle the day-to-day management of the prescription-drug program and serve as a middleman between the benefits plan and network pharmacies. Appx68 (SAC ¶ 39). When a Plan

10

participant goes to fill a prescription, the pharmacy communicates with the PBM to find out whether the drug is covered under the Plan, and if so, the amount of the participant's out-of-pocket responsibility. *Id.* The PBM pays the pharmacy the difference between the total price and the participant's out-of-pocket payment. *Id.* Then, in a separate transaction, the PBM collects payment from the Plan. *Id.*

Importantly, the amount the PBM pays the pharmacy does not necessarily match the amount the PBM charges the Plan. Appx70 (SAC ¶¶ 46-47). The PBM, in its self-interest, wants to charge as much as possible to the Plan while paying as little as possible to the pharmacy, so that it can pocket the difference, or "spread." *See id.* ¶ 47; Appx72 (SAC ¶ 51). For example, a PBM might negotiate with a pharmacy to pay only $10 for a drug and then try to charge the plan $40 for that same drug. It is thus incumbent on plan fiduciaries to be "vigilant in 'negotiation of the specific formula and methodology'" used to determine how much the plan pays the PBM for each drug. *Sweda*, 923 F.3d at 328. If Plan fiduciaries do not limit or eliminate the "spread" the PBM is allowed to collect, this will cause the Plan and its participants to significantly overpay for prescription drugs. *See, e.g.*, Appx116-22 (SAC ¶¶ 151-72) (extensive industry guidance warning about spread pricing).

Many other aspects of a fiduciary's prescription-drug plan management also have a substantial impact on drug prices and Plan expenses. To name a few, plan fiduciaries should conduct a broad, open bidding process for PBM services so they

11

can survey the landscape of options and obtain the best available pricing, *see* Appx76, 87, 89, 112-15 (SAC ¶¶ 61, 95, 101, 145-149); ensure that any consultants or brokers advising the Plan with respect to prescription drug benefits or PBM selection have no conflicts of interest, Appx77-78, 88 (SAC ¶¶ 63-68, 97); and ensure that drugs are procured from pharmacies offering low source prices (before any "spread" is tacked on), Appx105-07 (SAC ¶¶ 131-36).

## IV.    Lewandowski's Allegations

Lewandowski alleges that Defendants failed to manage the Plan prudently and in the interest of participants and beneficiaries. Most critically, J&J failed to monitor Express Scripts and the prices it charged for prescription drugs to ensure they were reasonable. *See* Appx53-55, 87, 88-104, 111-15, 150, 152 (SAC ¶¶ 3-6, 92, 99-129, 141-50, 274, 280); *see also Sweda v. Univ. of Pa.*, 923 F.3d 320, 328 (3d Cir. 2019) ("Fiduciaries must … understand and monitor plan expenses."). Due to Defendants' failure to monitor the Plan's PBM, Express Scripts charged abnormally high markups on prescription drugs – unnecessary expenses borne by the Plan and its participants.

The SAC alleges these overcharges in detail, discussing all three types of drugs available under the Plan: generic-specialty drugs, generic non-specialty drugs, and brand-name drugs. The SAC compares the prices for drugs purchased through the Plan to the National Average Drug Acquisition Cost ("NADAC") for each drug.

Appx90 (SAC ¶¶ 103-04). NADAC, which is compiled by the federal government's Centers for Medicare and Medicaid Services, represents the average price that pharmacies pay to acquire each drug. *Id.* ¶ 104. NADAC is commonly used by plans and PBMs as a benchmark for prescription-drug prices. *Id.* Prices that are only a modest markup from NADAC (to allow the pharmacy to cover its costs) are considered reasonable, while substantial markups above NADAC are not. *Id.* ¶¶ 103-04.

This comparison reflects quite poorly on Defendants. Generic-specialty drugs typically account for a large percentage of overall spending. Appx84 (SAC ¶ 85). For every generic-specialty drug on the Plan's formulary for which NADAC data were available, the SAC compares the price that Defendants agreed to make the Plan and its participants pay (the "J&J Price") to the NADAC price. Appx90-100 (SAC ¶¶ 103-118). The data show that the J&J Price reflects, on average, a staggering *498%* markup for these drugs. *Id.* ¶ 105. As just one example, the NADAC for a 90-unit prescription of the multiple sclerosis drug Fingolimod is $876.60, but Defendants agreed to make the Plan and its participants pay *$13,325.83*, needlessly enriching Express Scripts. *Id.* ¶ 112. The SAC also compares the J&J Price to the NADAC price for every other generic-specialty drug on the Plan's formulary for which NADAC data is available, showing similarly high markups and the overall 498% average markup. *Id.* ¶ 118.

13

The SAC alleges that major pharmacies sell these same drugs for prices similar to, and sometimes even lower than, their NADAC.[2] *Id.* For example, a 30-pill supply of the drug imatinib had a NADAC of $169.20 and was available from Rite Aid for $155.42 or Wegmans for $249.83. *Id.* ¶¶ 110-11. But if Plan participants presented their J&J insurance card, the price instead was the J&J Price, which was a staggering ***$16,398.17***. *Id.*; *see also id.* ¶¶ 106-09, 112-17 (similar examples). In other words, the J&J Plan—with its massive purchasing power and sophistication—was being charged orders of magnitude more than an individual walking off the street with no ability to negotiate.

Furthermore, the J&J prices for generic-specialty drugs for which NADAC data is *not* available are "just as unreasonable." Appx101 (SAC ¶ 119). For such drugs, the SAC provides several illustrative examples by comparing the J&J Price to the retail price at CVS, Walgreens, Rite Aid, and/or other pharmacies. Appx101-02 (SAC ¶¶ 119-23). For example, anyone could have walked in the door and purchased, without using insurance, a 90-day supply of betaine for $1,315 at Walgreens, $1,517 at Rite Aid, and $1,784 at CVS. *Id.* ¶ 122. But if they presented their J&J insurance, they were instead charged the J&J Price, which was $4,438.24. *Id.*

---

[2] As NADAC is an average, some pharmacies acquire the drugs for less than the NADAC, and thus are able to sell them for less than the NADAC as well.

The J&J Prices were also unreasonably high for generic, *non*-specialty drugs, which typically account for approximately 15-20% of overall prescription-drug spending. Appx103 (SAC ¶ 125); *see also* Appx104 (SAC ¶ 128). To illustrate, the SAC compares the J&J price for Lewandowski's own generic prescriptions to the NADAC price for each drug. Appx103 (SAC ¶ 126). Across the fourteen drugs she purchased, the J&J Price reflects, on average, a ***230%*** markup from the NADAC price (*i.e.*, over three times as much). Appx104 (SAC ¶ 127). For example, when Lewandowski filled a prescription for the generic drug valacyclovir, she had to pay the J&J Price of $303.68, even though valacyclovir has a NADAC of only $82.80 and was available from Walgreens for $105.81, Walmart for $119.34, and Cost Plus Drugs for only $70.26. Appx103 (SAC ¶ 126); Appx137 (SAC ¶ 221). Lewandowski had to pay the inflated J&J Price out-of-pocket. Appx137 (SAC ¶ 221). The markups on Lewandowski's prescriptions are "illustrative of, and consistent with, the markups for other generic medications" under the Plan. Appx104 (SAC ¶ 128).

Finally, with respect to brand-name drugs, the SAC alleges that J&J's prices "are generally consistent with market pricing, and do not reflect special discounts that would offset or justify the atypical and extraordinary overcharges" detailed above for generic specialty and non-specialty drugs. *Id.* ¶ 129.

The SAC alleges that many other companies and healthcare plans have taken prudent steps to avoid these markups. These steps include negotiating better prices

with Express Scripts, Appx124 (SAC ¶ 179), bringing some PBM functions in-house, Appx125, 127 (SAC ¶¶ 180, 185), carving out specialty drugs from the traditional PBM contract, *id.* ¶ 181; Appx126 (SAC ¶ 183), and using a PBM outside of the "big three," *id.* ¶¶ 182, Appx127-29 (SAC ¶¶ 184, 189, 191). These options were "equally available to Defendants, who could have retained the [Plan's] prescription drug features and the level of PBM services while obtaining substantial savings." Appx124 (SAC ¶ 177).

Lewandowski also alleges multiple other fiduciary breaches in addition to J&J's failure to monitor Express Scripts and failure to ensure the Plan's prescription drug charges were reasonable. For example, J&J allowed its PBM selection process to be led by a broker with known conflicts of interest. Appx88 (SAC ¶ 97). Specifically, J&J hired a company called Aon as its broker, even though Aon receives "indirect compensation" (a euphemism) from PBMs when its clients select those PBMs. Aon's SEC filings acknowledge receipt of this compensation and even warn investors that "this revenue may be subject to scrutiny by various regulators under conflict of interest … and anti-bribery laws." *Id.* J&J ignored these warnings, however, allowing its PBM selection to be guided by a broker with a financial interest in steering it toward certain PBMs, regardless of the interests of the Plan and its participants. *Id.*; *see* Appx77-78 (SAC ¶¶ 63-68).

16

In addition, J&J departed from common industry practice by failing to hold an open Request for Proposal process when selecting Express Scripts as its PBM. Appx87 (SAC ¶ 95). Instead of broadly soliciting bids from a variety of PBMs to ensure it was getting the best possible deal for the Plan and its participants—a standard business practice—J&J and its conflicted broker accepted bids from only a handful of PBMs. Appx76, 87, 89 (SAC ¶¶ 61-62, 95, 101). This imprudent process led to an unfavorable PBM contract, and as described above, exorbitant prices borne by the Plan and its participants.

## V.    Procedural History

Lewandowski filed her original Complaint in February 2024, naming as defendants J&J, the Pension & Benefits Committee of Johnson & Johnson (the "Committee"), and three individuals who served as Plan fiduciaries. Dkt. 1. Counts One and Two of the Complaint alleged that Defendants breached their fiduciary duties and sought relief on behalf of the Plan under 29 U.S.C. § 1132(a)(2) (Count One) and on behalf of individual participants under 29 U.S.C. § 1132(a)(3) (Count Two). Count Three alleged that the Committee failed to timely provide Lewandowski with Plan documents she requested, in violation of 29 U.S.C. § 1132(c). After J&J stipulated that it would be responsible for any judgment based on the actions or omissions of any individual fiduciaries, Dkt. 43, Lewandowski filed an Amended Complaint ("AC") dropping the individual defendants, Dkt. 44.

In January 2025, without holding a hearing, the District Court granted Defendants' motion to dismiss Counts One and Two on the basis that Lewandowski lacked Article III standing. Appx23-37 (Dkt. 70). With respect to her alleged harms from paying more out-of-pocket, the District Court ruled that "it is clear … that Plaintiff has suffered an injury-in-fact that is traceable to Defendants' alleged ERISA violations," Appx32, but opined that this injury was not redressable because Lewandowski reached her out-of-pocket maximum each year under the Plan. Appx33. With respect to alleged harms from paying inflated premiums, the District Court called Lewandowski's allegations "conclusory" and ruled that they did "not meet the requirements for Article III standing." Appx31.

Lewandowski filed the operative SAC in March 2025. Appx51-156 (Dkt. 74). An additional plaintiff, Robert Gregory, also joined the case at that time. *Id.* As relevant here, the SAC demonstrated that it was immaterial that Lewandowski reached her out-of-pocket maximum, Appx135-41 (SAC ¶¶ 213-33), alleged that Gregory never reached his out-of-pocket maximum, Appx142 (SAC ¶¶ 234-40), and added factual support for the allegations that the Plan's overspending was passed through to participants in the form of increased premiums, Appx80, 129-135 (SAC ¶¶ 76, 192-212).

In November 2025, again without holding a hearing, the District Court granted Defendants' motion to dismiss Counts One and Two. Appx9-21 (Dkt. 84). The

District Court's opinion cribbed heavily from a different district court opinion addressing similar questions, *Navarro v. Wells Fargo*, No. 24-CV-3043, 2025 WL 897717 (D. Minn. Mar. 24, 2025), and did so to such an extent that it—without comment or seeming awareness—directly contradicted its own prior opinion and purported to address issues not presented in this case.

With respect to Lewandowski's alleged harm from paying more out-of-pocket for her prescriptions, the District Court disregarded, without explanation, its previous ruling that "Plaintiff has suffered an injury-in-fact that is traceable to Defendants' alleged ERISA violations." *See* Appx32 (Dkt. 70). Instead, the Court held that it was "too speculative" that the allegedly excessive drug prices "had any effect at all on Plaintiffs' … out-of-pocket costs," notwithstanding Plaintiffs' allegations that they directly paid those excessive drug prices out-of-pocket. Appx18 (Dkt. 84). The District Court also held that Lewandowski's alleged drug overpayments were non-redressable, opining that even if Defendants made Plan participants whole for past overpayments, Defendants could then increase Plan participants' "contribution" amounts in the future. Appx19-20. But this was a non-sequitur, as the ability to set "contribution" amounts is only relevant (if at all) to employees' share of future healthcare premiums, not their past costs for drug overcharges

With respect to alleged harms from paying inflated premiums, the District Court called it "speculative" that participant contributions would increase as Plan spending increased, even though Plaintiffs alleged exactly that. Appx18. The District Court further opined that *past* harms from inflated premiums were non-redressable because of Defendants' discretion over the Plan in the *future*. According to the District Court, "if Plaintiffs prevailed in this case and received every bit of the relief they request, [Defendants] could *still* increase Plan participants' contribution amounts under the Plan[s'] terms without any violation of ERISA having occurred." Appx19-20. But the District Court did not explain why speculative future adjustments to premiums would matter to the redressability analysis for past harms, much less how they could possibly matter for Lewandowski, who was no longer enrolled in the Plan as of October 1, 2024. App.58 (SAC ¶ 12). Nor did it address the fact that Lewandowski was enrolled in continuing coverage under COBRA for a period of time, and thus bore the full premium amount (both the employee and employer share), regardless of how J&J chose to set the employee share in its "discretion." *See id.*

After the motion to dismiss ruling, plaintiffs voluntarily dismissed Count Three of the Complaint, with prejudice. Dkt. 88, 89. The District Court then entered

judgment on January 12, 2026. Appx5 (Dkt. 91). Lewandowski timely filed her notice of appeal on January 16, 2026. Appx1 (Dkt. 93).[3]

## SUMMARY OF ARGUMENT

Standing requires (1) an injury in fact that is concrete, particularized, and actual or imminent; (2) that was likely caused by the defendant; and (3) that would likely be redressed by judicial relief. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). The allegations here satisfy those requirements. As to injury-in-fact, Lewandowski alleges straightforward monetary harms—she paid more out-of-pocket at the pharmacy counter and more in monthly premiums both during and after her employment with J&J. Those financial harms are traceable to Defendants' conduct, as the excessive prices Lewandowski and the Plan paid were undisputedly the prices to which Defendants agreed. Finally, the alleged harms are redressable through the equitable remedy of surcharge and restoration of losses under 29 U.S.C. § 1109(a).

The District Court's order dismissing Lewandowski's claims for lack of standing is erroneous in several respects. The court dismissed her out-of-pocket injuries from excessive drug payments by finding them "speculative," even though the overcharges she suffered are documented in the SAC as specific dollar amounts in specific past transactions. There is nothing speculative about a past financial harm

---

[3] Plaintiff Gregory declined to appeal.

(especially at the pleading stage where the harm must be accepted as true for purposes of standing). The District Court compounded this error by suggesting that these out-of-pocket harms could be "offset" by the broader Plan benefits she received—a theory that has no legal support in the caselaw or ERISA, and no limiting principle. If accepted, it would mean that a plan participant could never challenge specific fiduciary misconduct so long as the Plan also spent money on other things. That is not the law, and in fact works directly against ERISA's promise of meaningful enforcement of fiduciary obligations. Finally, the District Court held that Lewandowski's injuries were not redressable because a favorable judgment might not reduce *future* drug costs—a speculative and legally impermissible non-sequitur with no bearing on the court's power to award *retrospective* relief.

As to Lewandowski's premium-based injuries, the District Court's analysis was directly at odds with this Court's decision in *Knudsen v. MetLife Grp., Inc.*, 117 F.4th 570 (3d Cir. 2024). Rather than apply *Knudsen*'s framework, the District Court mischaracterized the Plan as a "defined benefit plan" and effectively applied a categorical no-standing rule—precisely the analytical error *Knudsen* corrected.

The District Court's alternative holding that Lewandowski's premium allegations were insufficiently specific fares no better, as Lewandowski alleged that Defendants adhered to the very type of percentage-based methodology to set premiums that *Knudsen* recognized would establish Article III injury. The amount

22

of Lewandowski's monthly premiums was set as a direct function of the level of overall Plan spending, so the more the Plan spent on prescription drugs, the more she had to pay in premiums. J&J itself has acknowledged as much. *See* Appx217 (Dkt. 75-2 ¶ 2) ("[W]hen establishing contribution levels, the Committee considers ... the costs of[] prescription drugs."). If the SAC's extensive allegations about the Defendants' premium-setting process are insufficient to establish standing, then no plaintiff could ever pursue relief under ERISA for fiduciary misconduct that inflated their premiums—a result directly at odds with ERISA's text (granting plan participants an express statutory right to bring suit to redress fiduciary breaches) and remedial purpose.

The District Court's holding that Lewandowski's harms from paying increased premiums were not redressable because Defendants could increase *future* premiums is another legally impermissible non-sequitur—the law requires only that some relief (here, retrospective relief) is available to redress the injury alleged; it does not demand a guarantee against future wrongs.

Finally, after J&J terminated Lewandowski's employment (shortly after she filed this lawsuit), Lewandowski continued her coverage under COBRA. Appx134 (SAC ¶ 208). As required by statute, Lewandowski paid the ***entire*** premium contribution (both the employer and employee share) while enrolled in COBRA coverage through the Plan. *Id.* This means that J&J's discretion to set the employee

23

share is irrelevant for purposes of COBRA and her standing for this time period—an issue the District Court never even addressed.

ERISA exists to protect working people from precisely the kind of fiduciary neglect and misconduct alleged here. The District Court's decision—based on a cramped reading of Article III and an impermissible disregard of the well-pleaded allegations in the Complaint—leaves plan participants without recourse for the real, measurable harm caused by J&J's failure to fulfill its fiduciary duties in violation of ERISA. This Court should reverse.

## STANDARD OF REVIEW

This Court reviews the district court's decision to grant a motion to dismiss *de novo*, applying the same standard as the district court. *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 n.2 (3d Cir. 2016). The court must assume all "factual allegations to be true, construe those truths in the light most favorable to the plaintiff, and then draw all reasonable inferences from them." *Id.* at 790; *see also Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 288 (3d Cir. 2005). Further, when assessing standing at the motion to dismiss stage, courts must "assume … that a plaintiff has stated valid legal claims." *Cottrell v. Alcon Lab'ys.*, 874 F.3d 154, 162 (3d Cir. 2017).

## ARGUMENT

Defendants' fiduciary breaches caused Lewandowski two forms of harm: (1) she paid more out-of-pocket for her prescription drugs, and (2) she paid more in premiums for her healthcare coverage. Such "pocketbook injury" is a "prototypical form of injury in fact," *Collins v. Yellen*, 594 U.S. 220, 222 (2021), and Lewandowski's injury can be straightforwardly redressed through monetary relief. Article III requires nothing more.

## I.   Lewandowski Has Standing to Seek Monetary Relief for the Amounts She Directly Overpaid For Her Own Prescriptions.

Lewandowski has Article III standing to recover the amounts she was overcharged when she paid for her own prescriptions. Article III standing requires: "(1) an injury-in-fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision." *Finkelman v. NFL*, 877 F.3d 504, 510 (3d Cir. 2017). Applying that established test, Lewandowski's Article III standing to seek relief for her out-of-pocket injuries should not have been even a close question. As the District Court itself stated the first time around, it is "clear" that "when Plaintiff spent more money on drugs at the pharmacy, which was allegedly the result of Defendants' breach of fiduciary duties, Plaintiff suffered a cognizable injury." Appx32 (Dkt. 70).

25

### A.   Lewandowski Plausibly Alleges that She Was Overcharged When She Paid for Her Own Prescriptions.

The first element of Article III standing is straightforward: "Monetary harm is a classic form of injury-in-fact," so much so that "it is often assumed without discussion." *Danvers*, 432 F.3d at 293. Here, Lewandowski alleges that she paid $210 more in direct out-of-pocket charges for prescription drugs than she would have paid if Defendants had prudently negotiated and monitored drug prices. *See, e.g.*, Appx103-04, 136-37, 139 (SAC ¶¶ 126-27, 218-21, 227). This overcharge allegation—which must be accepted as true, *see In re Horizon Healthcare Servs., Inc. Data Breach Litig.*, 846 F.3d 625, 632-33 (3d Cir. 2017)—satisfies the injury-in-fact requirement under established Circuit law. *See, e.g.*, *In re Processed Egg Prods. Antitrust Litig.*, 881 F.3d 262, 268 n.6 (3d Cir. 2018) (noting "no dispute that Plaintiffs have met their burden to show constitutional standing" because "they suffered an injury in fact by having to pay overcharges"); *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 264 (3d Cir. 2009) ("This increase in price constitutes a concrete injury in fact."); *Danvers*, 432 F.3d at 293 ("The obvious fact that [plaintiff] was forced to pay money it otherwise would have kept for itself was sufficient to confer Article III standing.").

Countless ERISA cases have proceeded under the same theory of injury, *i.e.*, that the defendants' ERISA violations caused them to pay more money for goods or services. Defendants rarely challenge plaintiffs' standing in such cases given the

obvious financial harms caused by being overcharged. *See, e.g.*, *Mator*, 102 F.4th at 178 (no challenge to standing).

When courts do address standing, the issue does not detain them long. For example, in *Boley v. Universal Health Servs.*, 36 F.4th 124 (3d Cir. 2022), the plaintiffs had standing because they alleged that the defendant's "imprudent investment evaluation process" caused them to they pay an "excessive annual [recordkeeping] fee" and excessive "investment management fees." *Id.* at 131-32 ("Since the Named Plaintiffs allege concrete injuries traceable to the challenged decisions and courses of conduct of the defendants, they have met the requirements for standing."); *see also Sweda*, 923 F.3d at 334 n.10 (addressing and confirming standing in a footnote). Similarly, in the Supreme Court's most recent ERISA case, *Cunningham v. Cornell Univ.*, 604 U.S. 693 (2025), the plaintiffs stated a claim by alleging that the defendant's misconduct caused them to overpay for recordkeeping services by about $150 annually. *Id.* at 698.[4] These cases straightforwardly confirm that ERISA plaintiffs, like plaintiffs in all other areas of law, have standing to

---

[4] While *Cunningham* was not specifically about Article III standing, the Court addressed the issue by stating that courts must, "consistent with Article III standing, dismiss suits that … fail to identify an injury." *Cunningham*, 604 U.S. at 708. Given the Court's "obligation to assure [itself] of litigants' standing under Article III," *DaimlerChrysler Corp. v. Cuno*, 547 U. S. 332, 340 (2006), its specific attention to the Article III issue, and its holding that the plaintiffs' claims should proceed, it necessarily viewed the plaintiffs' alleged overpayments as sufficient for Article III standing.

recover the difference between what they actually paid and what they allege they would have paid absent the violations.

Lewandowski's out-of-pocket allegations here are no different. She alleges that if Defendants acted prudently in monitoring Express Scripts and its prescription-drug prices, she would have paid less for her prescriptions. Appx103-04, 137 (SAC ¶¶ 126-28, 219-21). This is consistent with *Boley*'s, *Sweda*'s and *Cunningham*'s allegations that fiduciary imprudence caused them to overpay for recordkeeping services or investment funds. Lewandowski identified the specific transactions at issue, alleged the prices she paid, and alleged the lower prices at which the same drugs were available elsewhere. *Id.* For example, in February 2023, she paid $303.68 for a drug that was "available from CVS for $72.76, Walmart for $119.34, Walgreens for $105.81, and Cost Plus Drugs online pharmacy for $70.26." *Id.* at ¶ 221. "There can be no doubt that this financial harm counts as injury-in-fact." *Danvers*, 432 F.3d at 292; *see also Stern v. JPMorgan Chase & Co.*, No. 1:25-CV-02097, 2026 WL 654714, at *7 (S.D.N.Y. Mar.9, 2026) (finding allegations of "out-of-pocket overpayments for prescription drugs" were "sufficient to confer standing").

The second requirement for standing—causation—is also fulfilled. Defendants do not dispute that the prices Lewandowski paid were determined in negotiations between Defendants and Express Scripts. *See* Appx136 (SAC ¶ 218)

(alleging that Lewandowski "paid the … prices negotiated by Defendants"); *see also* Appx68 (SAC ¶ 42). It thus follows, as Lewandowski alleged, that "Defendants' unlawful conduct caused [her] to pay more out-of-pocket for prescription drugs than she otherwise would have paid." Appx135 (SAC ¶ 213). To be sure, the merits question of whether Defendants violated ERISA by acceding to these prices remains to be determined. But the standing inquiry is "separate … from any assessment of the merits," and the Court "assume[s] for the purposes of our standing inquiry that a plaintiff has stated valid legal claims." *Cottrell*, 874 F.3d at 162. Assuming the violation, causation is clear: Lewandowski's overpayments are the direct result of Defendants' alleged fiduciary failure to secure reasonable prices for prescription drugs.

The third requirement for standing—redressability—is no more difficult. To remedy her out-of-pocket financial harms, Lewandowski seeks equitable monetary relief in the form of a surcharge. *See* Appx153, 155 (SAC ¶¶ 282, 294); *see also* Appx65 (SAC ¶ 31). Defendants never denied that this relief is available under ERISA—nor could they, as the Supreme Court has ruled that surcharge is one of the equitable remedies available against breaching fiduciaries under 29 U.S.C. § 1132(a)(3). *See CIGNA Corp. v. Amara*, 563 U.S. 421, 442 (2011). As this Court has explained, the Supreme Court held in *Amara* "that 'other appropriate equitable relief' in § [1132](a)(3) may consist of 'monetary compensation for a loss resulting

29

from a trustee's breach of duty,'" *i.e.*, surcharge. *Menkes v. Prudential Ins. Co. of Am.*, 762 F.3d 285, 296 n.11 (3d Cir. 2014) (quoting *Amara*, 563 U.S. 421); *see also Gimeno v. NCHMD, Inc.*, 38 F.4th 910, 914-15 (11th Cir. 2022).

## B.　　The District Court's Analysis Was Flawed.

The District Court's analysis went awry in multiple respects. While the court dutifully "provided a detailed recitation of standing law in its opinion," *Cottrell*, 874 F.3d at 163, it failed to correctly apply that law or even make clear what aspect of standing it was addressing. The court conflated Lewandowski's harm from out-of-pocket drug costs with her harm from increased premiums, copied and pasted large parts of a different district court's opinion instead of conducting its own analysis, applied a speculative and legally improper set-off to negate her injury from increased out-of-pocket drug costs, and confused prospective injunctive relief with redress for past monetary harms.

*First*, the District Court repeatedly conflated Lewandowski's out-of-pocket overpayments for prescription drugs with her allegations about increased premiums. For example, it called Lewandowski's $210 in out-of-pocket overpayments "speculative" because "[t]here are simply too many variables in *how Plan participants' contribution rates are calculated*." Appx19 (emphasis added). But as alleged in the SAC, out-of-pocket overpayments for prescriptions are distinct from premium contribution rates—they are charges that Lewandowski paid directly at the

30

pharmacy counter. The same confusion is evident in the District Court's characterization of Lewandowski's prescription-drug overpayments as "speculative" because Defendants have "discretion to set contribution rates." *See, e.g.*, Appx20; *see also* Appx17. Premium contribution rates have nothing to do with Lewandowski's injury from excessive out-of-pocket drug payments she made directly at the point of sale.

There is nothing "speculative" about this injury. Lewandowski did not allege future harm, intangible harm, or generalized harm. She alleged completed financial transactions in documented amounts: while in the deductible phase, Lewandowski went to the pharmacy and paid money out of her own pocket, at allegedly unreasonable prices agreed to by Defendants. Her "claimed financial harm has *already* occurred, it is not merely possible, or even probable." *Cottrell v. Alcon Labs.*, 874 F.3d at 168. If the prices she paid were excessive—which must be assumed at this stage—"this financial harm counts as injury-in-fact." *Danvers*, 432 F.3d at 292.

*Second*, the District Court carelessly cribbed from a different court's opinion in a different case involving different facts, repeatedly "addressing" allegations that Lewandowski never made. In *Navarro*, the plaintiffs alleged that Wells Fargo's health plan fiduciaries agreed to pay excessive *administrative* fees, separate from drug prices. 2025 WL 897717, at *3. The *Navarro* court held that the link between

31

those excessive administrative fees and the plaintiffs' premium contributions was insufficiently alleged. *Id.* at *9. Here, Lewandowski did not allege excessive administrative fees.[5] Despite the absence of such administrative fee allegations, however, the District Court repeatedly quoted from *Navarro* to "reject" non-existent allegations about administrative fees. For example, the court deemed "unconvincing" Lewandowski's supposed "attempts to establish a direct connection between [her] … out-of-pocket costs and increases in administrative fees paid by the Plan[]." Appx18. It also described the connection between "the administrative fees the Plan was required to pay" and Lewandowski's "out-of-pocket costs" as "tenuous at best." Appx17 (quoting *Navarro*, 2025 WL 897717, at *9). Lewandowski never alleged excessive administrative fees or any connection between administrative fees and her out-of-pocket payments. The District Court's careless copy-paste underscores the error in its overall analysis and conclusion.

*Third*, the District Court created and applied an ill-defined "offset" theory, opining that Lewandowski's $210 in overpayments were somehow negated because she received other benefits through the Plan. *See* Appx19 ("Lewandowski alleges that she overpaid $210 for two prescriptions in 2023. However—in that same year—

---

[5] The *Navarro* plaintiffs alleged that Wells Fargo's health plan paid $136 per participant in annual administrative fees. *Id.* at *3. Here, the Plan's federal filings indicate that it paid only about $36 per participant ($2 million in administrative fees for 55,000 participants). *See* Appx59 (SAC ¶¶ 14-15). Accordingly, Lewandowski did not allege excessive administrative fees in this case.

she received Plan benefits totaling over $200,000."). This reasoning has no basis in logic or law. A plan participant who is overcharged $210 for prescriptions suffers that economic harm regardless of whether she properly received coverage for other medical services—just as an airline customer who is overcharged for one service (checked bag fees) is harmed even if she received other services as promised (travel to her destination, and free wifi, snacks, drinks, and movies). Article III does not require any particular quantum of injury, either in isolation or in reference to other benefits received. *See Cottrell*, 874 F.3d at 162. The District Court cited no authority—and none exists—for the proposition that a straightforward pocketbook injury is negated by the provision of other benefits.

Notably, another court recently rejected the District Court's novel set-off analysis. *See Stern*, 2026 WL 654714, at *9 ("*Lewandowski II* is [] unpersuasive because it incorrectly assumes that receiving other plan benefits offsets the harm from prescription-drug overpayments. … The Court disagrees that receiving other benefits eliminates the economic harm caused by overpaying for a specific benefit."). Other circuits also have rejected setoffs in similar situations. For example, in *Brotherston v. Putnam Invs., LLC*, 907 F.3d 17 (1st Cir. 2018), the First Circuit held that discretionary contributions to a retirement plan for the benefit of plan participants are "irrelevant to the analysis" and a plan sponsor "cannot point to those contributions to offset funds" improperly charged to the plan and its participants. *Id.*

33

at 29. Benefits under an employer-sponsored plan "are not a gratuity, but a form of deferred wages," *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 443-44 (6th Cir. 2002), and employers cannot "claw back" their payment of such benefits to cover up their fiduciary misdeeds. *Brotherston*, 907 F.3d at 29. To hold otherwise would eviscerate the protections that ERISA provides to participants of employee benefit plans.

*Finally*, in ruling that Lewandowski's out-of-pocket harms were not redressable, the District Court confused retrospective relief with prospective relief. Lewandowski seeks equitable monetary relief in the form of a surcharge—a backward-looking "form of monetary 'compensation'" that would make her whole. *Amara*, 563 U.S. at 441-42. Yet the District Court found her out-of-pocket injuries non-redressable because "while Plaintiffs' requested relief *could* result in lower contribution rates and out-of-pocket costs, there is no guarantee that it *would*." Appx20. This makes no sense. Lewandowski is not asking the court to award prospective relief that would change the out-of-pocket costs for drugs going forward—she is not even enrolled in the Plan anymore and has no personal stake in such relief. Instead, she is seeking retrospective monetary relief to make her whole for amounts she already paid in already-completed transactions. Monetary relief would redress this past out-of-pocket injury. *See Adam v. Barone,* 41 F.4th 230, 236

34

(3d Cir. 2022); *see also Clemens v. ExecuPharm Inc.*, 48 F.4th 146, 158 (3d Cir. 2022).

In sum, Lewandowski has Article III standing to seek to recover her allegedly excessive out-of-pocket drug payments. A financial injury is a prototypical injury-in-fact; the excessive prices Lewandowski paid were the result of Defendants' fiduciary misconduct; and the alleged harm can be redressed with equitable monetary relief. The District Court's holding that Lewandowski lacks standing to pursue relief for her direct out-of-pocket harms should be reversed.

## II.    Lewandowski Has Standing to Seek Relief for Plan-Wide Overcharges.

Defendants' fiduciary breaches also inflated the amounts the Plan paid to provide prescription-drug coverage, and those inflated amounts were passed on to Lewandowski and other Plan participants in the form of increased premiums. This financial harm provides a separate and additional basis for Article III standing.

### A.    Plan Participants Have Standing to Recover on Behalf of a Plan Where the Plan's Overpayments Are Passed Through to Them

Under ERISA, plan participants may bring suit "in a representative capacity on behalf of the plan." *Henry v. Wilmington Tr., NA.*, 72 F.4th 499, 506 (3d Cir. 2023); *see also* 29 U.S.C. § 1132(a)(2). Accordingly, when plan fiduciaries cause an employee healthcare plan to overpay for goods or services, plan participants have statutory standing to seek monetary and other equitable relief on behalf of the plan. *See* 29 U.S.C. §1109(a); *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585,

595 (3d Cir. 2009) ("[T]he ERISA § 502(a)(2) claim is brought on behalf of the plan.").

To have Article III standing in addition to statutory standing, a participant must allege that the harm to the plan also harmed them personally. *See generally Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992). Whether a participant can do so depends on whether the plan's losses are passed through to them (in which case they have Article III standing) or whether the plan's losses are borne entirely by the employer (in which case they don't). One example of the latter, no-standing scenario was *Thole*, where the plaintiffs paid no monthly premiums for their pension plan and received a "fixed payment each month" that did "not fluctuate with the value of the plan or because of the plan fiduciaries' good or bad investment decisions." 590 U.S. at 540. This is referred to as "defined benefit" pension plan, because participants' costs and benefits are defined in advance and do not fluctuate with plan spending. *Id.* In such a plan, even when fiduciaries waste the plan's money, the participants do "not sustain[] any monetary injury," so they do not have Article III standing. *Id.*

In contrast, when a plan's losses (*e.g.* from excessive spending or poor investing) *are* passed through to participants, the participants have standing because the fiduciary breaches harmed them personally. For example, in *Boley v. Universal Health Servs.*, 36 F.4th 124 (3d Cir. 2022), the plaintiffs alleged that plan fiduciaries

imprudently agreed to "excessively high recordkeeping and administrative fees for the Plan." *Id.* at 131. The plaintiffs had standing to recover the overpayments on behalf of the plan because, unlike in *Thole*, the plan's overpayments were passed through to them as an "annual recordkeeping and administrative fee." *Id.*; *see also In re Ins. Brokerage Antitrust Litig.*, 579 F.3d at 275 (3d Cir. 2009) (plaintiffs in antitrust case had standing because they alleged that bid-rigging caused them "economic harm in the form of higher premiums."); *Acosta v. Bd. of Trs. of Unite Here Health*, No. 22-C-1458, 2023 WL 2744556, at *3 (N.D. Ill. Mar. 31, 2023) (plaintiffs had standing in case involving health plan expense charges because they "alleged that the conduct of defendants impacted their end of the bargain, including in … higher cost-sharing").

This Court recently applied these same principles in the healthcare space, holding that "a participant in a self-funded healthcare plan [may] bring[] an ERISA suit alleging that mismanagement of plan assets increased his/her [premiums]." *Knudsen*, 117 F.4th at 579. In *Knudsen*, the plaintiffs alleged that plan fiduciaries were required to share certain revenue ("rebates") with plan participants, and that if the fiduciaries had done so, they *may* have shared it by decreasing participant premiums. *Id.* at 576, 578. The district court dismissed the complaint, applying a categorical rule that health plan participants lack standing to sue for fiduciary breaches that increase their premiums. *Id.* at 575. This Court corrected the error,

37

holding that plausible allegations of increased premiums would satisfy Article III. *Id.* at 579-80. The *Knudsen* complaint ultimately fell short of that standard, however, because it did "not include well-pleaded allegations" that revenue from such rebates ever had been, or ever would be, a factor in "calculat[ing] Plan participants' [premiums]."[6] *Id.* at 582. In short, the plaintiffs' unsupported and tepid "may have" allegations were insufficient. But the Court confirmed that if a plaintiff did allege that participant premiums were a function of plan spending, such "a plaintiff may well establish such a financial injury sufficient to satisfy Article III." *Id.* at 580. That is exactly the claim Lewandowski brings here.

### B. The Plan's Overpayments Increased Lewandowski's Premiums While She Was Enrolled in the Plan.

#### 1. Lewandowski's Premiums Were Calculated as a Percentage of Overall Plan Spending.

The SAC does exactly what *Knudsen* requires: it expressly alleges that the Plan's expenses—including its overpayments for prescription drugs—were passed through to participants via higher premiums. Appx129-34 (SAC ¶¶ 192-207). Lewandowski's payment of those inflated premiums—and thus of a portion of the Plan's overcharges—constitutes an injury-in-fact. *See, e.g., id.* ¶ 207 ("While

---

[6] The *Knudsen* court used the term "out-of-pocket costs" to refer collectively to deductibles, co-pays, co-insurance, *and premiums*. *See id.* at 581-82. Here, Lewandowski uses "out-of-pocket costs" to refer only to direct costs for drug purchases (while in the deductible, co-insurance, or co-payment phase), and refers to premiums separately as "premiums" or "contributions."

employed by J&J, Plaintiffs paid the amount of employee contributions required by Defendants each month, and were injured by increases in those premiums. Those premium increases were attributable to rising Plan expenses, including expenses associated with excessive prescription drug costs."). Unlike in a defined-benefit pension plan, Lewandowski was not insulated from wasteful Plan spending.

As an initial matter, it is hardly novel to suggest that employee premiums increase as healthcare costs increase. That is accepted fact in the employee benefits space, and the SAC cites numerous government and academic studies to that effect. For example, the Federal Trade Commission has explicitly found that "inflated drug costs over time also result in higher premiums" for patients on employer-provided insurance, Appx80, 131 (SAC ¶¶ 76, 199), and an independent nonpartisan policy institute likewise found that inflated drug prices "ultimately raise[] costs for consumers through higher cost sharing and premiums," *id.* ¶ 200. Similarly, in a 2024 report commissioned by the Employee Benefits Security Administration, the RAND Corporation found that "[h]igher drug spending" by employers "lead[s] to higher premiums" for employees. Appx132 (SAC ¶ 204).[7]

---

[7] RAND also found that, for employer-sponsored health insurance coverage, "[t]he employer share of the premium remained steady at 82-83 percent per year across 2014-2023." *Id*. In other words, as drug costs rose between 2014 and 2023, they were borne by both plan participants and their employer proportionally relative to the percentage that each contributed to the total insurance premium, which remained stable over time. *Id.* RAND's finding that the employer's share of the

That alone is enough to make Lewandowski's allegations of increased premiums from inflated prescription-drug spending plausible. But the SAC also amply alleges that J&J is no exception to this well-established rule. The SAC expressly alleges that under the J&J Plan, "the amount employees are required to pay in premiums is tied directly to—and increases and decreases with—the Plan's actual and projected spending." Appx130 (SAC ¶ 195). The SAC also details the "causal chain" through which participant premiums were affected by the alleged fiduciary breaches. *See Knudsen*, 117 F.4th at 581 (quoting *Finkelman v. NFL*, 877 F.3d 504, 512 (3d Cir. 2017)).

The SAC first explains that because the Plan is "self-funded," every dollar of Plan expenses must be covered by funds from the Trust. Appx80 (SAC ¶ 76). This includes prescription-drug expenses. As the Plan document makes clear: "[W]hen establishing contribution levels, the Committee considers ... the costs of [] prescription drugs." Appx217 (Dkt. 75-2 ¶ 2).

The SAC further explains that the Trust is funded by a combination of (1) employer contributions from J&J and (2) employee contributions deducted from their paychecks. Appx59, 129 (SAC ¶¶ 16, 193). This is likewise acknowledged in the Plan document. *See* Appx172 (Dkt. 75-2 ¶ 4.02) ("Benefits under this Plan shall

---

premium remained steady at close to 82-83 percent even when healthcare costs went up aligns perfectly with J&J's practice of maintaining employee premiums at approximately 17-18 percent of the total insurance premium. Appx133 (SAC ¶ 205).

be funded through contributions made by the Company and by enrolled Participants.").

While J&J has discretion over how to divide the total contributions between itself and Plan participants, that does not mean it bears the Plan's costs—and cost increases—alone. The SAC expressly alleges that "when Defendants expect higher healthcare costs (including on prescription drugs), they require higher employee contributions to the [] Trust." Appx129 (SAC ¶ 194). Indeed, J&J has *admitted* this relationship: "In a 2023 'total rewards survey,' J&J admitted a need to increase employee premiums … under the Plan[] to cover costs." Appx142 (SAC ¶ 242)

As if that were not enough, the SAC further alleges that Defendants charged employees a consistent (and significant) percentage of the Plan's total expenses each year, steadily increasing their premiums in lockstep with increasing Plan spending. *See* Appx 130-31 (SAC ¶¶ 195-97). This is borne out by the historical data. Over the ten-year period before this case was filed, participants' premium share remained relatively constant (orange line in chart below) as a percentage of overall Plan spending, even as overall Plan spending substantially increased (blue line):



*Id.* ¶ 196. Put another way, J&J did not have a policy of covering all Plan costs itself or of charging participants the same flat amount each year regardless of Plan spending levels. Rather, it steadily and proportionally increased participant premiums to cover the Plan's rising costs. It follows—and is certainly plausible at the motion to dismiss stage—that if the Plan had spent less money on prescription drugs, participants' required contributions would have decreased in proportion to the overall savings.

Lewandowski's allegations that J&J used a percentage-based contribution split, and that she personally "paid the amount of employee contributions required by Defendants," Appx134 (SAC ¶ 207), are exactly the kind of allegations that courts have repeatedly described as sufficient to establish Article III standing in this context. In *Knudsen*, for example, the plaintiffs lacked standing because they *did not*

allege that their premiums were linked to the Plan's revenue from rebates: "the Complaint does not include well-pleaded allegations that drug rebates [are] used to calculate Plan participants' [premiums]." 117 F.4th at 582. Here, in contrast, Lewandowski alleges exactly that—*i.e.*, participant premiums were always a direct function of the Plan's overall spending. Appx129-30 (SAC ¶¶ 194-95).

Another example is *Winsor v. Sequoia Benefits & Ins. Servs., LLC*, 62 F.4th 517 (9th Cir. 2023), where the plaintiffs lacked standing because their employer *did not* "set [participant] contributions based on overall [] costs." *Id.* at 524. The Ninth Circuit made clear, however, that the plaintiffs *would have* had standing if—as is true here—"employee contributions [were] calculated as a *pro rata* share of the total benefits cost." *Id.* at 525. Similarly, in *Loren v. Blue Cross & Blue Shield of Mich.*, 505 F.3d 598 (6th Cir. 2007), the Sixth Circuit held that the plaintiffs would have had standing if they "paid percentage contributions" rather than a "flat-rate." *Id.* at 608. These authorities all establish the same principle: if plaintiffs plausibly allege that participant premiums were calculated as a percentage of plan expenses—as Lewandowski does here—they have standing to recover plan-wide overpayments, as they necessarily bore their proportional share of the overpayments.

### 2.    The District Court's Analysis Was Flawed.

In ruling that Lewandowski lacked Article III standing, the District Court erred in multiple respects. Again relying heavily on the out-of-circuit *Navarro* case,

the District Court applied precisely the rule this Court rejected in *Knudsen*, effectively holding that health plan participants categorically lack standing under § 1132(a)(2) based on premium overpayments. The court then compounded this error by alternatively holding that even if participants could have standing in some cases, Lewandowski's allegations were too speculative. That conclusion failed to accept the detailed facts alleged, prematurely (and incorrectly) assessed the merits, and confused retrospective relief with prospective relief.

*First*, the District Court drew exactly the wrong lesson from this Court's decision in *Knudsen*. In *Knudsen*, this Court rejected the district court's reading of *Thole* as "categorically bar[ring] an ERISA plaintiff's assertion of injury" based on harm to the plan that is passed through to participants in increased premiums. The Court explained that unlike a "defined benefit" pension plan with no monthly premiums and "fixed" payments, participants in a health plan "pay for their benefits through payroll deductions in the form of premiums." 117 F.4th at 579. Accordingly, a "participant in a self-funded healthcare plan [may] bring[] an ERISA suit alleging that mismanagement of plan assets increased" her premiums. *Id*.

The District Court here repeated the *Knudsen* district court's error: it mischaracterized the Plan as a "defined benefit plan"—a category that applies only to pension plans—and then cited *Thole* for the proposition that participants in defined-benefit plans categorically lack standing to sue on behalf of the plan.

44

Appx16-17. Directly contradicting *Knudsen*, the District Court reasoned that participants lack Article III standing to sue on behalf of a health plan because "diminution of [the plan's] assets [does] not affect plaintiffs' entitlement to benefits in any way and therefore [does] not cause plaintiffs any injury." Appx17 (quoting *Thole*, 590 U.S. at 862). That is *exactly* the reasoning this Court rejected in *Knudsen*, where it explained that in a health plan, unlike a defined-benefit pension plan, participants "pay for their benefits through payroll deductions in the form of premiums." 117 F.4th at 579.

*Second*, the District Court compounded its error by finding it too "speculative" that the Plan's overpayments were passed through to participants as increased premiums. Appx18. None of the District Court's reasons for questioning the plausibility of Lewandowski's well-pled premium allegations on a motion to dismiss withstand scrutiny.

The District Court repeatedly noted that Defendants had "sole discretion" to set participant contribution levels however they wanted. Appx17. The existence of discretion, however, does not render implausible well-pleaded allegations about how Defendants *actually exercised* that discretion—*i.e.*, by setting participant contributions as a percentage of Plan spending. *See supra* at 41-42. The question is not what Defendants hypothetically could have done, but what they actually did. Defendants theoretically could have charged no premiums at all, or could have set

premiums as a fixed dollar amount throughout the relevant period. But that is not what happened. Instead, Lewandowski plausibly alleged—with ample factual support, including a detailed analysis of the Plan's data and ample industry literature—that participant premiums increased proportionally with overall Plan spending such that Plan overpayments caused Lewandowski and all Plan participants to pay more in premiums. The fact that a plan sponsor can set contribution levels however it likes doesn't mean it gets a do-over on the choices it actually made—and certainly does not give a district court license to draw speculative inferences in the defendant's favor at the motion to dismiss stage.

The District Court's reasoning would foreclose essentially all ERISA imprudence claims, including ones this Court has already held were adequately pleaded. For example, under the District Court's logic, the plaintiffs in *Sweda*, 923 F.3d 320, should not have had standing to challenge their retirement plan's recordkeeping fees because their employer had "sole discretion" over whether to match plan participants' retirement contributions, and thus could have decreased its matching contributions to offset any savings to participants from lower recordkeeping fees. Allowing such a speculative, counter-factual defense would obliterate ERISA's protections and has no support in the law. *See, e.g.*, Fed. Judicial Center, *Reference Guide on Estimation of Econ. Damages, Reference Manual on Scientific Evid.* 432 (3d ed. 2011) ("[T]he but-for scenario differs from what actually

46

happened only with respect to the harmful act."). And regardless, any such defense cannot possibly apply *at the pleading stage*, where courts "are not permitted to accept [defendant's] account of the facts or draw inferences in [defendant's] favor." *Sweda*, 923 F.3d at 333.

The District Court cited *Horvath v. Keystone Health Plan East, Inc.*, 333 F.3d 450 (3d Cir. 2003), for the proposition that pass-through to participants is "too speculative to serve as the basis for … individual loss." Appx20. But *Horvath* is obviously different because the employees there *did not pay premiums at all*—the employer "pa[id] all premiums … and [did] not make any specific healthcare deductions from employees' paychecks." 333 F.3d at 452. Under those circumstances, as in *Thole*, there can be no individual loss from increased plan spending. But that is not the case here, where participants always paid a share of overall Plan spending—including its prescription-drug overspending.

The District Court also noted that "[p]articipant contribution amounts may be affected by several factors having nothing to do with prescription drug benefits," like "non-drug medical costs." Appx17; *see also* Appx19 (similar). True enough, but the existence of more variables does not fundamentally change the mathematical relationship: even when multiple expense categories exist, overcharges in any one of them inflate the aggregate cost. If you buy eggs, milk, and butter at the store, but only the price of eggs is inflated, your grocery bill is still higher in the aggregate

47

because of the inflated price of eggs. *See, e.g., Adam v. Barone*, 41 F.4th 230, 235 (3d Cir. 2022) ("[T]here may be more than one but for cause of a loss"); *Constitution Party of Pennsylvania v. Aichele*, 757 F.3d 347, 366 (3d Cir. 2014) ("[T]here is room for concurrent causation in the analysis of standing … and, indeed, 'an indirect causal relationship will suffice, so long as there is a fairly traceable connection'").

Prescription drug costs are a major driver of overall Plan spending, and account for approximately 20% of total health insurance premiums. *See* Appx132 (SAC ¶ 201). The fact that they are not the *only* factor in setting employee contributions does not make them a *non*-factor—and certainly, at the pleading stage, does not make it *implausible as a matter of law* that they had even a "trifle" of an impact on contribution levels. *United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 689 n.14 (1973). When fiduciary misconduct inflated this major cost category by tens or hundreds of millions of dollars, it necessarily increased total Plan spending and, in turn, plausibly increased participant premium contributions. The District Court's logic would permit plan fiduciaries to escape scrutiny altogether for inflating any significant cost category simply because the plan also incurred other types of expenses—a rule that would immunize misconduct in any plan with multiple expense categories, which is to say all plans. Such a standard is irreconcilable with ERISA's remedial purpose.

48

Indeed, the District Court's logic would reach far beyond ERISA, foreclosing at the pleading stage *any* case alleging harm from increased premiums given that premiums are invariably affected by multiple inputs. That directly contradicts cases across numerous areas of law. For example, in *Wilson v. Centene Mgmt. Co., L.L.C.*, 168 F.4th 217 (5th Cir. 2026), the plaintiffs alleged that their healthcare premiums were inflated because of the defendant insurance companies' inaccurate provider lists. *Id.* at 221. Even though the list of providers was not the only (or even a major) factor affecting premiums, *id.* at 224, the Fifth Circuit held that the plaintiffs adequately alleged Article III injury: "the Plaintiffs have alleged … an injury in fact (overcharges for a health insurance policy that contained materially inaccurate and insufficient provider lists)." *Id.* at 229. The Fifth Circuit expressly rejected the district court's reasoning—repeated by the District Court here—that harm was insufficiently pled just because there were "other factors which impact the cost of premiums." *Id.* at 224; *see also, e.g.*, *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d at 264 (3d Cir. 2009) (in antitrust case, plaintiffs had standing because they "alleged that they paid supra-competitive prices for their insurance policies" due to kickbacks, even though kickbacks were not the only input into premiums); *AARP v. United States EEOC*, 226 F. Supp. 3d 7, 18 (D.D.C. 2016) (in administrative law case, holding that "[a]n increase in premiums would certainly constitute an injury").

49

The District Court also improperly (and inaccurately) assessed the merits as part of its standing inquiry. The District Court opined that Lewandowski's injury was too speculative because the SAC supposedly alleged that only a "narrow subset of the 'thousands' of drugs in the Plan['s] full formulary" were overpriced. Appx18. Even if that were an accurate description of the operative complaint (it is not), it would at most be a reason to find the *merits* violation insufficiently alleged—not a reason to dismiss for lack of standing. For purposes of standing, the court was required to "assume … that a plaintiff has stated valid legal claims," *i.e.*, that J&J agreed to unreasonably high prices for prescription drugs. *Cottrell*, 874 F.3d at 162. The only question for standing is whether the Plan's payment of the assumed-to-be excessive prices would plausibly increase Plan participants' premiums. As already explained, this is more than plausible – it is a generally accepted proposition, supported by extensive research, and confirmed by the specific facts of this case. *See supra* at 39-42.

Furthermore, while this Court need not reach the merits here, it is worth noting that the District Court misconceived both the SAC's allegations and the governing law. On the facts, the SAC's analysis of drug prices is not limited to a "subset" of drugs; rather, Lewandowski alleges that Defendants agreed to unreasonable prices across the entire formulary. *See supra* at 12-15.

50

Regardless, as a legal matter, allegations related to only a "subset" of drugs would suffice to state a claim. "Fiduciaries cannot shield themselves from liability—much less discovery—simply because the alleged imprudence inheres in fewer than all … options." *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 109 (2d Cir. 2021). Thus, in the retirement plan context, "[a] fiduciary cannot avoid liability for offering imprudent investments merely by including them alongside a larger menu of prudent investment options." *Pfeil v. State St. Bank & Tr. Co.*, 671 F.3d 585, 597 (6th Cir. 2012); *see also DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 423 (4th Cir. 2007) ("[T]he prudence of investments … must be judged individually."). For example, in *Sweda*, the plaintiff stated a claim by alleging that "some"—not all—of the "options in the line-up had layers of unnecessary fees," and that "60%"—not all—"Plan options underperformed appropriate benchmarks." 923 F.3d at 331. What mattered was that the defendant's imprudence inflated costs for certain investments; it did not matter whether all other fees and investments were reasonable.

Likewise here, Defendants cannot avoid liability (much less discovery) for imprudently allowing overcharges for certain drugs merely because reasonable prices may have been charged for certain other drugs. Every overpriced drug causes harm when it incrementally increases overall Plan spending and participant premiums, at no benefit to the Plan or its participants. Further, the SAC expressly alleges that the Plan's "extraordinarily high prices for generic drugs [including those

51

prescribed to Lewandowski] are not offset by special discounts from Express Scripts for other kinds of drugs." Appx104 (SAC ¶ 129).

*Finally*, as it did with respect to Lewandowski's out-of-pocket harms, the District Court confused retrospective relief with prospective relief. The Court reasoned that Lewandowski's injuries from inflated premiums were not redressable because "if Plaintiffs prevailed in this case and received every bit of the relief they request, [Defendants] could *still* increase Plan participants' contribution amounts under the Plan['s] terms." Appx19-20. This reasoning fundamentally misunderstands redressability, which asks whether a favorable judgment would remedy the plaintiff's *past* injury, not whether it would prevent *future* injuries. Lewandowski already paid inflated premiums as a result of Defendants' breaches, and that past economic harm can be redressed through an award of monetary relief to the Plan[8] and equitable distribution to Lewandowski for her proportional share of the Plan's losses, regardless of what Defendants might do with future premiums.

---

[8] This Court has previously held that former plan participants have standing to seek recovery of losses to the plan. *See Graden v. Conexant Sys., Inc.*, 496 F.3d 291, 302 (3d Cir. 2007). Under trust law, "the recovered funds must go to the people actually sustaining losses" suffered by the plan. *Id.*; *see also* U.S. Dep't of Labor, Technical Release 2011-04 (Dec. 2, 2011) ("If the participants and the employer each paid a fixed percentage of the cost, a percentage of the rebate equal to the percentage of the cost paid by participants would be attributable to participant contributions" and "the fiduciary should allocate or apply the plan's portion of a rebate for the benefit of participants and beneficiaries who are covered by the policy to which the rebate relates"), *available at*

Lewandowski seeks only retrospective relief: an order requiring Defendants to "make good to [the] plan any losses to the plan resulting from [their] breach," 29 U.S.C. § 1109(a), and equitable surcharge under 29 U.S.C. § 1132(a)(3).[9] Those retrospective forms of relief would redress the past harms to the Plan and its participants (including Lewandowski). The District Court's logic would deny standing in virtually any ERISA case seeking retrospective relief, as fiduciaries always retain discretion over future plan operations. That is not the law.

### C.    The Plan's Overpayments Were Passed Through to Lewandowski in Premiums While She Was Enrolled in COBRA.

Lewandowski's standing is even more straightforward with respect to the time that she was enrolled in COBRA—an issue the District Court did not even address.

COBRA amended ERISA to allow beneficiaries of employer-sponsored health plans to continue their coverage upon termination of employment or other "qualifying events." *Geissal v. Moore Med. Corp.*, 524 U.S. 74, 79-80 (1998) (citing 29 U.S.C. § 1163). Continuation coverage under COBRA is "identical to what the plan provides to plan beneficiaries who have not suffered a qualifying event." *Id.* at 80 (citing 29 U.S.C. § 1162(1)). However, the beneficiary who makes the election

---

https://www.dol.gov/sites/dolgov/files/EBSA/employers-and-advisers/guidance/technical-releases/11-04.pdf (last visited Mar. 16, 2026).

[9] Former plaintiff Gregory, who remains enrolled in the Plan, requested some forms of prospective relief in the District Court. But Gregory chose not to appeal the judgment below, so prospective relief is not at issue on appeal.

must pay for what she gets, up to 102 percent of the "applicable premium." *Id.* at 80

(citing 29 U.S.C. § 1162(3)). Importantly, for purposes of the present case, the

"'applicable premium' is usually the cost to the plan of providing continuation

coverage, *regardless of who usually pays for the insurance benefit*." *Id.* at 81

(emphasis added) (citing 29 U.S.C. §1164). Consistent with this statutory

framework, Lewandowski paid 100% of the premium contribution for her COBRA

coverage (both the employer and employee share), plus a 2% administrative fee.

Appx134 (SAC ¶¶ 208-09).

Because Lewandowski paid all of the premium, there can be no question

whether her share of the COBRA premium was impacted by Plan costs. As explained

in the SAC, the statute *requires* that costs be factored into the COBRA premium

(which Lewandowski fully paid):

> COBRA premiums for self-insured plans, including the J&J Plan[],
> must be calculated on either an "actuarial basis" or "past cost" basis.
> See 29 U.S.C. § 1164(2). The actuarial basis requires an actuary to
> predict anticipated claims costs based on past costs, plan design, census
> changes, and other factors. By far the largest factor among these
> actuarial criteria is past costs/claims experience. Alternatively, under
> the "past cost" method (which J&J on information and belief utilized),
> the plan looks simply at previous costs for prior plan years and uses a
> statutory formula as a basis for setting COBRA premiums. Under either
> method, it is accepted and understood that the resulting COBRA
> premiums should be based (in whole or in part) on total plan cost.

*Id.* ¶ 209. Thus, higher drug costs contribute to higher premium costs for

Lewandowski and others with COBRA continuation coverage. *Id.*

54

There is no issue regarding whether J&J passed along these costs to the "employee share" of the premium because Lewandowski paid both the employee and employer share under COBRA. And there is no issue regarding whether Plan costs were built into the premium because ERISA requires it and also because the Plan was self-funded. The District Court erred by failing to account for this or even acknowledge the COBRA issue in its opinion.

## CONCLUSION

For the above reasons, the District Court's judgment as to Counts One and Two should be reversed.

Dated: April 30, 2026                    Respectfully Submitted,

/s/ *Kai Richter*
Kai Richter
**COHEN MILSTEIN**
**SELLERS & TOLL, PLLC**
400 South 4th Street #401-27
Minneapolis, MN 55415
Phone: (612) 807-1575
krichter@cohenmilstein.com

Michael Lieberman
Jamie Crooks
**FAIRMARK PARTNERS, LLP**
400 7th Street NW, Suite 304
Washington, DC 20004
Phone: (818) 585-2903
michael@fairmarklaw.com
jamie@fairmarklaw.com

Michael Eisenkraft
**COHEN MILSTEIN**
**SELLERS & TOLL, PLLC**
88 Pine Street, 14th Floor
New York, New York 10005
Phone: (212) 838-7797
meisenkraft@cohenmilstein.com

Michelle Yau
Daniel Sutter
**COHEN MILSTEIN**
**SELLERS & TOLL, PLLC**
1100 New York Ave. NW, Eighth Floor
Washington, D.C. 20005
Phone: (202) 408-4600
myau@cohenmilstein.com
dsutter@cohenmilstein.com

*Counsel for Plaintiff-Appellant*

## <u>CERTIFICATES OF COMPLIANCE</u>

*Bar Membership*. The undersigned hereby certifies pursuant to L.A.R. 28.3(d) and 46.1(e) that all counsel whose names appear on this brief are active members of the bar of the United States Court of Appeals for the Third Circuit.

*Word Count.* This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,662 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

*Typeface and Typestyle*. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally-spaced typeface using Microsoft Word in Times New Roman size 14 font.

*Electronic and Paper Copies Identical.* The undersigned hereby certifies that this brief complies with L.A.R. 31.1(c) because the text of the electronic brief is identical to the text in the paper copies.

*Virus Check.* The undersigned hereby certifies that this brief complies with L.A.R. 31.1(c) because the virus detection program SentinelOne has been run on the file and no virus was detected.

Dated: April 30, 2026           */s/ Kai Richter*
                                          *Counsel for Plaintiff-Appellant*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on this 30th day of April 2026, I electronically filed the foregoing brief (and the accompanying Joint Appendix volume 1) with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: April 30, 2026

/s/ Kai Richter
*Counsel for Plaintiff-Appellant*

**No. 26-1107**

## UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

ANN LEWANDOWSKI, on her own behalf and on behalf of all others similarly situated; ROBERT GREGORY

*v.*

JOHNSON & JOHNSON;
THE PENSION AND BENEFITS COMMITTEE OF JOHNSON & JOHNSON; PETER FASOLO;
WARREN LUTHER; LISA BLAIR DAVIS; DOES 1-20

ANN LEWANDOWSKI,
*Appellant*

On Appeal from the United States District Court
for the District of New Jersey (Quraishi, J.), No. 3:24-cv-00671

## JOINT APPENDIX
## VOL. I of II, pp. 1-37

Michael Eisenkraft
**COHEN MILSTEIN
SELLERS & TOLL, PLLC**
88 Pine Street, 14th Floor
New York, New York 10005
(212) 838-7797
meisenkraft@cohenmilstein.com

Michelle Yau
Daniel Sutter
**COHEN MILSTEIN
SELLERS & TOLL, PLLC**
1100 New York Ave. NW, Eighth Floor
Washington, D.C. 20005
(202) 408-4600
myau@cohenmilstein.com
dsutter@cohenmilstein.com

Michael Lieberman
Jamie Crooks
**FAIRMARK PARTNERS, LLP**
400 7th Street NW, Suite 304
Washington, DC 20004
Phone: (619) 507-4182
michael@fairmarklaw.com
jamie@fairmarklaw.com

Kai Richter
**COHEN MILSTEIN
SELLERS & TOLL, PLLC**
400 South 4th Street #401-27
Minneapolis, MN 55415
(612) 807-1575
krichter@cohenmilstein.com

*Counsel for Appellant Ann Lewandowski (further counsel listed on inside cover)*

Scott D. Stein
Eric S. Mattson
Caroline A. Wong
Kristen Seeger
**SIDLEY AUSTIN LLP**
One South Dearborn Street
Chicago, IL 60603
Telephone: (312) 853-7000
Fax: 312-853-7036
sstein@sidley.com
emattson@sidley.com
caroline.wong@sidley.com
kseeger@sidley.com

Kwaku A. Akowuah
Victor T. Hiltner
Manuel Valle
**SIDLEY AUSTIN LLP**
1501 K Street, NW
Washington, DC 20005
Telephone: 202-736-8000
Fax: 202-736-8711
kakowuah@sidley.com
vhiltner@sidley.com
manuel.valle@sidley.com

David R. Kott
**MCCARTER & ENGLISH, LLP**
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
Telephone: (973) 622-4444
dkott@mccarter.com

*Counsel for Defendants/Appellees*

# TABLE OF CONTENTS
## Joint Appendix

### Volume I

Plaintiff Lewandowski's Notice of Appeal, filed January 16, 2026 (Dkt. 93)....Appx1

Order of Judgment, filed January 12, 2026 (Dkt. 91) .........................................Appx5

Order, filed November 26, 2025 (Dkt. 85) .........................................................Appx8

Opinion, filed November 26, 2025 (Dkt. 84) ......................................................Appx9

Order, filed January 24, 2025 (Dkt. 71)............................................................Appx22

Opinion, filed January 24, 2025 (Dkt. 70)........................................................Appx23

### Volume II

Civil Docket for Case No. 3:24-cv-671-ZNQ-RLS (D.N.J.)..............................Appx38

Second Amended Class Action Complaint, filed March 10, 2025 (Dkt. 74)....Appx51

Certification of David R. Kott in Support of Defendants' Motion to Dismiss
Counts One and Two of the Second Amended Complaint, filed April 22, 2025
(Dkt. 75-2).......................................................................................................Appx157

Michael Eisenkraft
COHEN MILSTEIN SELLERS &
TOLL, PLLC
88 Pine Street, 14th Floor
New York, New York 10005
(212) 838-7797
meisenkraft@cohenmilstein.com

Michelle Yau (*pro hac vice*)
Daniel Sutter (*pro hac vice*)
1100 New York Ave. NW, 8th Floor
Washington, D.C. 20005
(202) 408-4600
myau@cohenmilstein.com
dsutter@cohenmilstein.com

Kai Richter (*pro hac vice*)
400 South 4th Street #401-27
Minneapolis, MN 55415
(612) 807-1575
krichter@cohenmilstein.com

Jamie Crooks (*pro hac vice*)
Michael Lieberman (*pro hac vice*)
FAIRMARK PARTNERS, LLP
400 7th Street NW
Suite 304
Washington, DC 20004
(619) 507-4182
jamie@fairmarklaw.com
michael@fairmarklaw.com

Michael Casper
WHEELER, DIULIO & BARNABEI
P.C.
1650 Arch Street, Suite 2200
Philadelphia, PA 19103
(215) 971-1000
mcasper@wdblegal.com

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ANN LEWANDOWSKI AND ROBERT GREGORY, on their own behalf and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> **v.** <br><br> JOHNSON AND JOHNSON, THE PENSION & BENEFITS COMMITTEE OF JOHNSON AND JOHNSON, PETER FASOLO, WARREN LUTHER, LISA BLAIR DAVIS, and DOES 1-20. <br><br> Defendants. | Case No. 3:24-cv-00671-ZNQ-RLS <br><br> **PLAINTIFF LEWANDOWSKI'S NOTICE OF APPEAL** |

Appx1

Plaintiff Ann Lewandowski hereby appeals, to the United States Court of Appeals for the Third Circuit, from the final judgment in the above-captioned action entered on January 12, 2026 (ECF No. 91), and the Court's Opinions and Orders dated November 26, 2025 (ECF Nos. 84 & 85) and January 24, 2025 (ECF Nos. 70 & 71).

Dated: January 16, 2026

Respectfully Submitted,

*/s/ Michael Eisenkraft*
Michael Eisenkraft (NJ Bar No. 016532004)
COHEN MILSTEIN SELLERS & TOLL, PLLC
88 Pine Street, 14th Floor
New York, New York 10005
(212) 838-7797
meisenkraft@cohenmilstein.com

Michelle Yau (admitted *pro hac vice*)
Daniel Sutter (admitted *pro hac vice*)
COHEN MILSTEIN SELLERS & TOLL, PLLC
1100 New York Ave. NW, Eighth Floor
Washington, D.C. 20005
(202) 408-4600
myau@cohenmilstein.com
dsutter@cohenmilstein.com

Kai Richter (admitted *pro hac vice*)
COHEN MILSTEIN SELLERS & TOLL, PLLC
400 South 4th Street #401-27
Minneapolis, MN 55415
(612) 807-1575
krichter@cohenmilstein.com

Jamie Crooks (admitted *pro hac vice)*
Michael Lieberman (admitted *pro hac vice)*
FAIRMARK PARTNERS, LLP
400 7th Street NW
Suite 304

1

Appx2

Washington, DC 20004
(619) 507-4182
jamie@fairmarklaw.com
michael@fairmarklaw.com

Michael Casper
WHEELER, DIULIO & BARNABEI, P.C
1650 Arch Street, Suite 2200
Philadelphia, PA 19103
(215) 971-1000
mcasper@wdblegal.com

*Attorneys for Plaintiffs and the Proposed Class*

2

Appx3

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of January, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

/s/ Michael Eisenkraft
Michael Eisenkraft

Appx4

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

ANN LEWANDOWSKI AND
ROBERT GREGORY, on their own
behalf and on behalf of all others
similarly situated,

Plaintiffs,

v.

JOHNSON AND JOHNSON, THE
PENSION & BENEFITS
COMMITTEE OF
JOHNSON AND JOHNSON, PETER
FASOLO, WARREN LUTHER, LISA
BLAIR DAVIS, and DOES 1-20.

Defendants.

Case No. 3:24-cv-00671-ZNQ-RLS

**ORDER OF JUDGMENT**

WHEREAS, this Court dismissed Plaintiffs' claims in Counts I and II of the

Second Amended Complaint in an Opinion and Order dated November 26, 2025,

*see* ECF Nos. 84-85; and

WHEREAS, Plaintiffs filed a Notice of Voluntary Dismissal of Count III of

Second Amended Complaint and Request to Enter Final Judgment ("Notice") on

December 18, 2025, *see* ECF No. 88; and

WHEREAS, the Notice indicates that Plaintiff Ann Lewandowski

voluntarily dismisses her claim in Count III of the Second Amended Complaint,

1

Appx5

with prejudice, pursuant to Fed. R. Civ. P. 41(a)(1)(A)(i);[1] and

WHEREAS, the Notice further indicates that Plaintiffs Ann Lewandowski and Robert Gregory do not intend to amend their Second Amended Complaint in response to the Court's Opinion and Order dismissing Counts I and II of the Second Amended Complaint; and

WHEREAS, Plaintiffs and Defendants have requested that a final judgment be entered consistent with the foregoing, *see* Dkt. 90;

**IT IS** on this **12th** day of **January 2026**,

**ORDERED** that Counts I and II of the Second Amended Complaint are dismissed without prejudice for lack of subject matter jurisdiction, consistent with this Court's Opinion and Order dated November 26, 2025 (ECF Nos. 84-85);

**ORDERED** that Count III of the Second Amended Complaint is dismissed with prejudice consistent with Plaintiffs' Notice of voluntary dismissal of the same dated December 18, 2025 (ECF No. 88);

**ORDERED** that **JUDGMENT** is entered accordingly in favor of Defendants and against Plaintiffs without costs or fees to either party; and

---

[1] The claim in Count III was asserted solely by Ms. Lewandowski and was not asserted by co-Plaintiff Robert Gregory.

Appx6

**ORDERED** that the Clerk is instructed to mark this matter **CLOSED**.


_____
HON. ZAHID N. QURAISHI
UNITED STATES DISTRICT JUDGE

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **ANN LEWANDOWSKI** and **ROBERT GREGORY**, *on their own behalf, on behalf of all others similarly situated, and on behalf of the Johnson & Johnson Group Health Plan and its component plans*,<br><br>               Plaintiffs,<br><br>          v.<br><br>**JOHNSON AND JOHNSON,** *et al.*,<br><br>           Defendants. | Civil Action No. 24-671 (ZNQ) (RLS)<br><br>**ORDER** |

**QURAISHI, District Judge**

**THIS MATTER** comes before the Court upon a Motion to Dismiss Counts One and Two of the Second Amended Complaint filed by Defendants Johnson and Johnson and the Pension & Benefits Committee of Johnson and Johnson. ("Motion," ECF No. 75.) For the reasons set forth in the accompanying Opinion,

**IT IS** on this **26th** day of **NOVEMBER 2025**,

**ORDERED** that Defendants' Motion (ECF No. 75) is hereby **GRANTED**; and it is further

**ORDERED** that Counts One and Two will be dismissed without prejudice for lack of Article III standing; and it is further

**ORDERED** that this case be terminated pending submission of a Third Amended Complaint.

s/ Zahid N. Quraishi
**ZAHID N. QURAISHI**
**UNITED STATES DISTRICT JUDGE**

Appx8

<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **ANN LEWANDOWSKI** and **ROBERT GREGORY**, *on their own behalf, on behalf of all others similarly situated, and on behalf of the Johnson & Johnson Group Health Plan and its component plans,* | Civil Action No. 24-671 (ZNQ) (RLS) |
| Plaintiffs, | **OPINION** |
| v. | |
| **JOHNSON AND JOHNSON, *et al.*,** | |
| Defendants. | |

<u>QURAISHI, District Judge</u>

**THIS MATTER** comes before the Court upon a Motion to Dismiss Counts One and Two of the Second Amended Complaint (the "Motion," ECF No. 75) filed by Defendants Johnson and Johnson ("J&J") and the Pension & Benefits Committee of Johnson and Johnson (collectively, "Defendants[1]"). Defendants submitted a Brief in support of their Motion. ("Moving Br.," ECF No. 75-1.) Plaintiffs Ann Lewandowski and Robert Gregory, individually, on behalf of all others similarly situated, and on behalf of the J&J Group Health Plan and its component plans (hereinafter, "Plaintiffs"), filed a Brief in Opposition ("Opp'n Br.," ECF No. 77), to which Defendants submitted a Reply ("Reply Br.," ECF No. 81).[2]

---

[1] The Motion to Dismiss does not challenge Count Three of the SAC in which Plaintiff Lewandowski asserts a claim for failure to provide certain plan documents upon request.

[2] Amy B. Monahan, an unrelated third party, filed a Motion for Leave to File a Brief of Amicus Curiae in Support of Plaintiffs' Opposition Brief. ("Amicus Brief Motion," ECF No. 80.) Defendants filed a Brief in opposition. (ECF No. 82.) The Court notes that it considered the proposed Amicus Brief in drafting this Opinion.

1

Appx9

The Court has carefully considered the parties' submissions and decides the Motion without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1.[3] For the reasons set forth below, the Court will **GRANT** the Motion.

I.       **BACKGROUND AND PROCEDURAL HISTORY**

This case arises from various alleged breaches of fiduciary duties and other violations of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001–1461, stemming from purported mismanagement of prescription drug benefits for J&J employees who were participants in its health benefit plans.  (Second Am. Compl. (hereinafter, "SAC") ¶ 3, ECF No. 74.)  Plaintiffs, individually and on behalf of a proposed class, seek: (1) damages to enforce Defendants' liability under 29 U.S.C. § 1109 and "to make good to the plans and their participants and beneficiaries;" and (2) an injunction enjoining Defendants from breaching their fiduciary duties.  (*Id.* ¶ 11.)

A.       **FACTUAL BACKGROUND**

J&J is a medical technologies and pharmaceutical company that sponsors the Salaried Medical Plan and Salaried Retiree Medical Plan (the "Plans") for its current and former employees.  (*Id.* ¶ 15.)  Plaintiffs are former employees of J&J and are current participants in the Plans.  (*Id.* ¶¶ 12–13.)  The Pension & Benefits Committee of J&J is the administrator of the Plans.  (*Id.* ¶ 17.)

Plaintiffs allege that "Defendants breached their fiduciary duties and mismanaged [J&J]'s prescription-drug benefits program, costing their ERISA plans and their employees millions of dollars in the form of higher payments for prescription drugs, higher premiums, higher out-of-pocket costs, higher deductibles, higher coinsurance, [and] higher copays." (*Id.* ¶ 3.)  For example, Plaintiffs cite the pricing of a multiple sclerosis generic drug, for which the Plans pay substantially

---

[3] Hereinafter, all references to the Rules refer to the Federal Rules of Civil Procedure unless otherwise noted.

Appx10

more than large retail pharmacies charge without insurance. (*Id.*) Plaintiffs allege that "[n]o prudent fiduciary would agree to make its plan and participants/beneficiaries pay a price that is *two-hundred-and-fifty* times higher than the price available to any individual who just walks into a pharmacy and pays out-of-pocket." (*Id.* (emphasis in original).) Plaintiffs cite to other large discrepancies in the Plans' pricing for certain "specialty" drugs, both branded and generic. (*Id.* ¶ 5.) Plaintiffs say no prudent fiduciary would have agreed to these terms. (*Id.* ¶ 6.) Instead of using more reasonable, "cost-effective" options for its participants, Defendants "force[d] its benefits plans and covered employees and retirees to acquire drugs via some of the most expensive methods conceivable." (*Id.* ¶ 9.)

Through the SAC, Plaintiffs again target generic drugs, alleging that "Defendants imprudently managed the Plans' generic drug program, and failed to act in the best interest of participants/beneficiaries and ensure that expenses were reasonable" for its participants and beneficiaries. (*Id.* ¶ 92.) Plaintiffs cite examples of drugs that were subject to a significant markup. (*See, e.g., id.* ¶¶ 107, 110, 112, 114, 116, 120, 121, 122, 123.) Plaintiffs include a chart illustrating how much the Plans paid for a selection of drugs as compared to a pharmacy acquisition cost. (*Id.* ¶ 118.)

Plaintiffs also accuse Defendants of mismanagement insofar as they: (1) agreed to steer beneficiaries toward a mail-order pharmacy that charges higher prices than retail pharmacies for the same drug (*id.* ¶ 131); (2) failed to incentivize the use of high-priced branded drugs in favor of lower-priced generic drugs (*id.* ¶ 137); (3) failed to engage in a prudent and reasoned decision-making process before agreeing to a PBM contract that required participants to pay a higher price for drugs (*id.* ¶ 141); and (4) failed to adequately negotiate the Plans for lower prices (*id.* ¶ 142).

3

Appx11

## B.    PROCEDURAL HISTORY

Lewandowski filed the initial Complaint on February 5, 2024. (ECF No. 1.) Defendants submitted a Motion to Dismiss (ECF No. 40) that was later withdrawn after Lewandowski filed an Amended Complaint. (ECF No. 44.) Thereafter, Defendants filed a second Motion to Dismiss on June 28, 2024. (ECF No. 51.) The Court granted in part and denied in part the second Motion to Dismiss on January 24, 2025. (ECF Nos. 70, 71.) On March 10, 2025, Lewandowski and Gregory filed the SAC. (ECF No. 74.)

## C.    SECOND AMENDED COMPLAINT

Plaintiffs made several alterations to their SAC.

First, the SAC adds Robert Gregory as a plaintiff. (*Id.* ¶ 13.) Gregory is a J&J retiree and is enrolled in J&J's Group Health Plan as a retiree. (*Id.*)

Next, the SAC adds new allegations pertaining to premiums. Plaintiffs assert that "employee contributions in the form of premiums will increase when plans overspend on prescription drugs," (*id.* ¶ 198) and cites to several reports and articles to support this statement (*id.* ¶¶ 199–205). Furthermore, Lewandowski insists that she was "required to pay more in both employee premium contributions and COBRA premiums than she would have been required to pay absent Defendants' fiduciary breaches." (*Id.* ¶ 210.) Similarly, Gregory asserts that, since his retirement, his "premium contributions are even greater than the amount he paid as an employee." (*Id.* ¶ 211.)

Additionally, the SAC adds new allegations pertaining to out-of-pocket costs. Lewandowski asserts that, "even though she nominally hit her 'out-of-pocket maximum[,]'" "Defendants' unlawful conduct caused [her] to pay more out-of-pocket for prescription drugs than she otherwise would have paid." (*Id.* ¶ 213.) Lewandowski notes that she utilized a co-pay

4

Appx12

assistance card to help pay for her out-of-pocket costs for an infusion.  (*Id.* ¶ 224.)  Gregory similarly asserts that he paid more out-of-pocket for a generic drug in October 2024.  (*Id.* ¶¶ 234–240.)

## II.     SUBJECT MATTER JURISDICTION

The Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e) and (f) as Plaintiffs bring this action pursuant to ERISA.

## III.    DISCUSSION

The SAC contains nearly the same three counts asserted in the Amended Complaint.  First, Plaintiffs allege that Defendants breached their fiduciary duties under 29 U.S.C. §§ 1104(a) and 1132(a)(2).  (*See generally* SAC.)  Second, Plaintiffs allege that Defendants breached their fiduciary duties in violation of 29 U.S.C. §§ 1104(a) and 1132(a)(3).  (*Id.*)  Third, Lewandowski alleges that Defendants failed to provide documents upon request in violation of 29 U.S.C. §§ 1024(b)(4) and 1132(c).  (*Id.*)

In the Motion, Defendants challenge both Plaintiffs' standing and the adequacy of the pleading as to Counts One and Two.  Because Plaintiffs' standing is a jurisdictional issue, the Court considers this issue first.  *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007).

### A.     STANDING

The Motion again challenges Plaintiffs' standing on the basis that they do not allege a concrete harm or injury-in-fact.  In Defendants' view, Plaintiffs still lack Article III standing as to their premium allegations, as the act of setting premiums is a non-fiduciary function that cannot support standing for fiduciary claims.  Additionally, Defendants reiterate that Plaintiffs' higher premiums theory and their out-of-pocket theories are speculative.

Appx13

Plaintiffs argue that the SAC cures any deficiencies and maintain that they have standing to pursue their claims.

### 1.     Legal Standard

Article III of the United States Constitution confines the federal judicial power to the resolution of "Cases" and "Controversies."  U.S. Const. Art. III.  For there to be a controversy under Article III, the plaintiff must have a "'personal stake' in the case—in other words, standing. *TransUnion v. Ramirez*, 594 U.S. 413, 423 (2021) (quoting *Raines v. Byrd*, 521 U.S. 811, 820 (1997)).  To have standing, a plaintiff must show: (1) that he or she suffered an injury in fact that is concrete, non-hypothetical, particularized, and actual or imminent; (2) that the injury was likely caused by the defendant; and (3) that the injury would likely be redressed by judicial relief.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).  In order "[t]o establish [an] injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (internal quotations omitted).  "For an injury to be particularized, it must affect the plaintiff in a personal and individual way."  *Id.*  The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements as to each claim.  *FW/PBS, Inc. v. Dallas*, 492 U.S. 215, 231 (1990).[4]

In addition to having Article III standing, an ERISA plaintiff must also have statutory standing."  *Edmonston v. Lincoln Nat'l Life Ins. Co.*, 725 F.3d 406, 419 (3d Cir. 2013).  "'Statutory standing is simply statutory interpretation,' and [courts] ask whether the remedies provided for in ERISA allow the particular plaintiff to bring the particular claim."  *Id.* (quoting *Graden v. Conexant Sys. Inc.*, 495 F.3d 291, 295 (3d Cir. 2007)).

---

[4] "In the context of a class action, Article III must be satisfied by at least one named plaintiff."  *Neale v. Volvo Cars of N. Am.*, 794 F.3d 353, 359 (3d Cir. 2015); *see also O'Shea v. Littleton*, 414 U.S. 488, 494 (1974) ("[I]f none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class.").

Appx14

When a party challenges standing, the Court's analysis depends on whether the challenge is based on a "factual attack" or a "facial attack." *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977). "[A] facial attack 'contests the sufficiency of the pleadings,' 'whereas a factual attack concerns the actual failure of a [plaintiff's] claims to comport [factually] with the jurisdictional prerequisites.'" *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014) (quoting *CNA v. United States*, 535 F.3d 132, 139 (3d Cir. 2008)). Here, Defendants raise a facial challenge to Plaintiffs' standing, so the Court applies the standard for reviewing motions to dismiss under Rule 12(b)(6).[5] *Gould Elec. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000). Although Plaintiffs bear the burden of establishing jurisdiction, upon reviewing a facial attack, a "court must consider the allegations of the complaint as true." *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977). To overcome a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint need not contain "detailed factual allegations," but it must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id.* at 555.

> 2.     Analysis

For the reasons set forth below, the Court finds that Plaintiffs lack Article III standing to pursue their claims under Counts One and Two. Plaintiffs' alleged injuries are that they suffered economic harms in the form of higher premiums and out-of-pocket costs. Although economic

---

[5] Generally, courts may not consider matters outside the pleadings on a motion to dismiss under Rule 12(b)(6). *See Gould Elec. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000). However, a "court must only consider the allegations of the complaint and documents referenced therein and attached thereto." *Id.* Here, the Court need not look beyond the pleadings and the Plan documents submitted by Defendants, which are referenced within the SAC. *See id.* Thus, the Court construes Defendants' Motion as a facial attack on Plaintiffs' standing.

Appx15

harms are the "most obvious concrete harms," *TransUnion*, 594 U.S. at 425, Plaintiffs' alleged injuries fail to meet the requirements for Article III standing.

Since this Court's decision granting in part and denying in part Defendants' prior Motion to Dismiss, a district court in the District of Minnesota issued a decision in *Navarro v. Wells Fargo & Co.*, Civ. No. 24-3043, 2025 WL 897717 (D. Minn. Mar. 24, 2025). In that case, former Wells Fargo employees and participants in the company's health plan alleged that Wells Fargo mismanaged the plan's employee prescription drugs benefit program, resulting in higher premiums and out-of-pocket costs for participants. *Id.* at *1. The court found that plaintiffs were "unable to show concrete individual harm, causation, and redressability," and, as such, lacked standing. *Id.* The court did however agree with plaintiffs that the harms they alleged "could constitute injury-in-fact for standing purposes," but ultimately plaintiffs' alleged harm was speculative and thus not redressable. *Id.* at *5.

This Court finds *Navarro* persuasive and applies that court's reasoning. The *Navarro* court identified the plan as a "defined-benefits plan." *Id.* at *6. "Such plans are typically 'funded by employer or employee contributions[] or a combination of both,' and consist of 'a general pool of assets rather than individual dedicated accounts.'" *Id.* (quoting *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999)). The court noted that "'[t]he structure of a defined benefit plan reflects the risk borne by the employer. Given the employer's obligation to make up any shortfall, no plan member has a claim to any particular asset that composes a part of the plan's general asset pool.'" *Id.* (citing *Hughes Aircraft*, 525 U.S. at 440)). "'[B]enefits under a defined-benefit plan "do not fluctuate with the value of the plan or because of the plan fiduciaries' good or bad investment decisions."'" *Id.* (quoting *Scott v. UnitedHealth Grp., Inc.*, 540 F. Supp. 3d 857, 862 (D. Minn. 2024)) (quoting *Thole v. U.S. Bank N.A. ("Thole II")*, 590 U.S. 538, 540 (2020))). The court

8

Appx16

explained that "the plaintiffs relinquished any individual interest in their contributions once those contributions became part of the plan's 'general pool of assets,' and that a "diminution of those assets [did] not affect plaintiffs' entitlement to benefits in any way and therefore [did] not cause plaintiffs any injury.'" *Id.* (quoting *Thole II*, 590 U.S. at 862) (alterations in original).

The *Navarro* court compared the facts before it to those in *Knudsen v. MetLife Group Inc.*, a case this Court relied upon when issuing its decision related to Defendants' prior Motion to Dismiss. 117 F.4th 570 (3d Cir. 2024). As explained in *Navarro*:

> The underlying argument Plaintiffs advance, while different in the specifics, is essentially the same as in *Knudsen*: had Wells Fargo more closely monitored the Plan's prescription drug costs and negotiated a better deal with ESI, replaced ESI with a different PBM, or adopted a different model altogether, the Plan would have paid less in administrative fees and other compensation to ESI, which would have resulted in lower participant contributions and out-of-pocket costs. Plaintiffs' theory appears tempting at first blush, but it withers upon closer scrutiny.

*Navarro*, 2025 WL 897717, at *8.

Here, as in *Navarro*, "the connection between what plan participants were required to pay in contributions and out-of-pocket costs, and the administrative fees the Plan was required to pay [the PBM], is tenuous at best." *See id.* at *9. Like Wells Fargo's plan, the Plans here also vest Defendants with "sole discretion" to set participant contribution rates. (*See* ECF No. 75, Ex. A, Plan Doc. § 4.01 ("The Sponsor shall establish each year the amount of Participant contributions . . ."); *see also* SAC ¶ 194.) Participant contribution amounts may be affected by several factors having nothing to do with prescription drug benefits, such as: group health plan market trends; administrative expenses; non-drug medical costs; the costs of other prescription drugs and categories of drugs; historical cost-sharing levels under the Plan; and other internal or external factors impacting employees. (*See* Moving Br. at 14; ECF No. 75, Ex. D, Declaration of Douglass

9

Appx17

Grant, ¶ 2.)  *See also Navarro*, 2025 WL 897717, at *9 ("The Plan's terms are clear that participant contribution amounts may be affected by several factors having nothing to do with prescription drug benefits, like whether a participant uses tobacco, whether a participant obtains coverage for her spouse or children in addition to herself, and a participant's 'compensation category.'").  And, like Wells Fargo's plan, the Plans here authorize Defendants to require participants to fund *all* plan expenses, not just expenses related to their own individual benefits.  (*See* ECF No. 75, Ex. A, Plan Doc. § 4.02 ("Benefits under this Plan shall be funded through contributions made by the Company and by enrolled Participants.").)  *See also Navarro*, 2025 WL 897717, at *9.

Put simply, it is too speculative that the allegedly excessive fees the Plan paid to its PBM "had any effect at all" on Plaintiffs' contribution rates and out-of-pocket costs for prescriptions.  *See Knudsen*, 117 F.4th at 582.  And, once again, Plaintiffs' attempts to establish a direct connection between their increased premium and out-of-pocket costs and increases in administrative fees paid by the Plans to the PBM are unconvincing.  For example—just like in *Navarro*—Plaintiffs offer comparisons between the purchase prices for certain prescription drugs under the plan to the prices an uninsured person would pay at retail pharmacies for the same prescriptions or the acquisition costs paid by the pharmacies to obtain those drugs.  (*See* SAC ¶¶ 105–118, 235–240.)  Specifically, Plaintiffs point to the prices of 42 generic specialty drugs and 15 generic non-specialty drugs out of thousands of health services and drugs covered by the Plans.  (*See id.*)  These 57 comparisons pale in comparison to the 260 comparisons made in *Navarro*.  *See Navarro*, 2025 WL 897717, at *9.  The 57 comparisons here are a "narrow subset of the 'thousands' of drugs in the Plan[s'] full formulary."  *Id.*  And Plaintiffs are "only responsible for the full out-of-pocket costs for prescription drugs—whether preferred alternative, generic-specialty, or otherwise—until [they] meet[] their annual deductible, after which the Plan[s] cover[]

10

Appx18

most of the costs for [Plaintiffs'] prescription drugs for the remainder of the year." *Id.* (*See also* Moving Br. at 4–5.)

Here, Lewandowski alleges that she overpaid $210 for two prescriptions in 2023. (SAC ¶¶ 141, 218–229.) However—in that same year—she received Plan benefits totaling over $200,000. (*Id.*) Similarly, Gregory claims he overpaid about $10 for one drug in 2024—a year he received more than $121,000 worth of benefits for both himself and his family members. (SAC ¶¶ 141, 235–237.) These selective allegations are not enough to establish the necessary causal connection. "There are simply too many variables in how Plan participants' contribution rates are calculated to make the inferential leaps necessary to elevate Plaintiffs' allegations from merely speculative to plausible." *Id.* (citing *Harris*, 729 F. Supp. 3d at 877).[6] Plaintiffs offer nothing but supposition to "fill in the necessary inferential gaps" and, as such, lack standing because their purported injury is not fairly traceable to Defendants. *See Knudsen*, 117 F.4th at 582.

Like the plaintiffs in *Navarro*, Plaintiffs here also attempt to avoid *Knudsen*'s finding as to redressability. *See id.* For example, Plaintiffs allege that "any reduction in overall healthcare spending—*e.g.*, if Defendants stopped causing the Plans to overspend on prescription drugs by millions of dollars each year—would result in proportionally lower employee contributions in accordance with the established contribution ratio. And, similarly, because Defendants caused the Plan[s] to overspend on prescription drugs, overall healthcare spending increased, and employee contributions in the form of premiums increased in tandem." (SAC ¶ 197.) As in *Navarro*, "Plaintiffs' argument fundamentally misses the point: if Plaintiffs prevailed in this case and received every bit of the relief they request, [Defendants] could *still* increase Plan participants'

---

[6] The SAC cites several reports and articles that indicate a pattern of higher employee contributions where plans spend more on prescription drugs. (SAC ¶¶ 198–205.) This theory still requires that all else be held constant—which is not feasible given the sheer size of the Plans, the multitude of factors affecting premium pricing, and Defendants' discretion to change those premiums. (*See id.* ¶ 204); *see also Finkelman v. NFL*, 810 F.3d 187, 201 (3d Cir. 2016).

11

Appx19

contribution amounts under the Plan[s'] terms without any violation of ERISA having occurred." *Id.*; *see also Horvath v. Keystone Health Plan E., Inc.*, 333 F.3d 450, 457 (3d Cir. 2003) (concluding that whether plan savings would have passed to plan participants was "too speculative to serve as the basis for . . . individual loss").

Here, Defendants have the sole discretion to set participant contribution rates. Plaintiffs cannot articulate how this Court could alter the terms of the Plans to expressly require Defendants to reduce or maintain participants' contribution amounts. Whether "removal of the current fiduciaries, appointment of an independent fiduciary, replacement of the Plans' PBMs, surcharge, restitution," or other remedies (SAC ¶ 282), "Plaintiffs' theory of redressability stumbles on the same obstacle"—Defendants' discretion to set participant contribution rates. *Navarro*, 2025 WL 897717, at *10. "Simply put, while Plaintiffs' requested relief *could* result in lower contribution rates and out-of-pocket costs, there is no guarantee that it *would*, and 'pleadings must be something more than an ingenious academic exercise in the conceivable' to meet the standing threshold." *Id.* (quoting *United States v. Students Challenging Regul. Agency Procs.*, 412 U.S. 669, 688 (1973)).[7] Accordingly, the Court separately finds that Plaintiffs also lack standing based on the lack of redressability.

For the foregoing reasons, the Court finds that Plaintiffs lack standing to assert Counts One and Two of the SAC.

---

[7] Although creative, Lewandowski's argument pertaining to the copay assistance card she used to offset her out-of-pocket maximum does not cure the First Amended Complaint's defects. (*See* SAC ¶¶ 228–229, 213, 220–229.) Ultimately, it does not matter whether a plan participant reaches his or her deductible—the theory that alleged fiduciary breaches increased out-of-pocket costs is too speculative to support standing. *See Navarro*, 2025 WL 897717, at *10.

## IV.    CONCLUSION

For the reasons stated above, the Court will **GRANT** Defendants' Motion (ECF No. 75).

Counts One and Two will be dismissed without prejudice for lack of Article III standing.  Plaintiffs

will be given leave to file a Third Amended Complaint within 30 days, limited to addressing the

deficiencies identified in this Opinion.  An appropriate Order will follow.

Date: November 26, 2025

s/ Zahid N. Quraishi
**ZAHID N. QURAISHI**
**UNITED STATES DISTRICT JUDGE**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **ANN LEWANDOWSKI,** *on her own behalf, on behalf of all others similarly situated, and on behalf of the Johnson & Johnson Group Health Plan and its component plans*,<br><br>Plaintiff,<br><br>v.<br><br>**JOHNSON AND JOHNSON,** *et. al.*,<br><br>Defendants. | Civil Action No. 24-671 (ZNQ) (RLS)<br><br>**ORDER** |

**QURAISHI, District Judge**

**THIS MATTER** comes before the Court upon a Motion to Dismiss filed by Defendants Johnson and Johnson and the Pension & Benefits Committee of Johnson and Johnson (collectively, "Defendants") (the "Motion," ECF No. 51.)  For the reasons set forth in the accompanying Opinion,

**IT IS** on this **24th** day of **January 2025**,

**ORDERED** that Defendants' Motion (ECF No. 51) is hereby **GRANTED-IN-PART** and **DENIED-IN-PART** as follows:

- **GRANTED** as to Counts One and Two.  Those counts are dismissed without prejudice for lack of Article III standing.

- **DENIED** as to Count Three.

- Plaintiff has **30 days** to file a Second Amended Complaint to remedy the issues identified in the Opinion.

s/ Zahid N. Quraishi
**ZAHID N. QURAISHI**
**UNITED STATES DISTRICT JUDGE**

Appx22

<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| **ANN LEWANDOWSKI,** *on her own behalf, on behalf of all others similarly situated, and on behalf of the Johnson & Johnson Group Health Plan and its component plans*,<br><br>             Plaintiff,<br><br>             v.<br><br>**JOHNSON AND JOHNSON,** *et al.*,<br><br>             Defendants. | Civil Action No. 24-671 (ZNQ) (RLS)<br><br>**OPINION** |

<u>**QURAISHI, District Judge**</u>

      **THIS MATTER** comes before the Court upon a Motion to Dismiss filed by Defendants Johnson and Johnson and the Pension & Benefits Committee of Johnson and Johnson (collectively, "Defendants") (the "Motion," ECF No. 51.)  Defendants submitted a Brief in support of their Motion.  ("Moving Br.," ECF No. 52.)  Plaintiff Ann Lewandowski, individually, and on behalf of all others similarly situated (hereinafter, "Plaintiff"), filed a Brief in Opposition ("Opp'n Br.," ECF No. 55), to which Defendants submitted a Reply ("Reply Br.," ECF No. 59).  The Court has carefully considered the parties' submissions and decides the Motion without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1.[1]  For the reasons set forth below, the Court will **GRANT-IN-PART** and **DENY-IN-PART** the Motion.

---

[1] Hereinafter, all references to Rules refer to the Federal Rules of Civil Procedure unless otherwise noted.

1

Appx23

## I.     <u>BACKGROUND AND PROCEDURAL HISTORY</u>[2]

This case arises from various alleged breaches of fiduciary duties and other violations of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001-1461, stemming from purported mismanagement of prescription drug benefits for Johnson and Johnson's employees who were participants in its health benefit plans. (Am. Compl. ¶ 3, ECF No. 44.) Plaintiff, individually and on behalf of a proposed class,[3] seeks (1) damages to enforce Defendants' liability under 29 U.S.C. § 1109 and "to make good to the plans and their participants and beneficiaries," and (2) an injunction enjoining Defendants from breaching their fiduciary duties. (*Id.* ¶ 11.)

### A.     FACTUAL BACKGROUND

Johnson and Johnson is a medical technologies and pharmaceutical company that sponsors the Salaried Medical Plan and Salaried Retiree Medical Plan (the "Plans") for its current and former employees. (*Id.* ¶ 14.) Plaintiff is a former employee of Johnson and Johnson and is a current participant in the Plans. (*Id.* ¶ 12.) The Pension & Benefits Committee of Johnson and Johnson is the administrator of the Plans. (*Id.* ¶ 16.)

As alleged, "Defendants breached their fiduciary duties and mismanaged Johnson and Johnson's prescription-drug benefits program, costing their ERISA plans and their employees millions of dollars in the form of higher payments for prescription drugs. . . higher premiums . . . higher deductibles . . . higher coinsurance . . . [and] higher copays." (*Id.* ¶ 3.) By way of example of a higher payment for prescription drugs, Plaintiff cites the pricing of a generic drug for multiple

---

[2] For the purposes of considering this Motion, the Court accepts all factual allegations in the Complaint as true. *See Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).

[3] The proposed class is defined as: "All persons who were participants in or beneficiaries of any of the Plans from the beginning of the statute of limitations period through judgment in this matter (the "Class Period"). (*See* Am. Compl. ¶ 222.)

sclerosis, for which the Plan pays substantially more than large retail pharmacies charge without insurance.  (*Id.*)  Plaintiff alleges that "[n]o prudent fiduciary would agree to make its plan and participants/beneficiaries pay a price that is *two-hundred-and-fifty times* higher than the price available to any individual who just walks into a pharmacy and pays out-of-pocket."  (*Id.* (emphasis in original)).  Plaintiff cites in the Amended Complaint to other large discrepancies in the Plans' pricing for certain "specialty" drugs, both branded and generic.  (*Id.* ¶ 5.)  Plaintiff says no prudent fiduciary would have agreed to these terms.  (*Id.* ¶ 6.)  Instead of using more reasonable, "cost-effective" options for its participants, Defendants "force[d] its benefits plans and covered employees and retirees to acquire drugs via some of the most expensive methods conceivable." (*Id.* ¶ 9.)

More specifically, Plaintiff, through the Amended Complaint, targets generic drugs, alleging that "Defendants imprudently managed the Plans' generic drug program, and failed to act in the best interest of participants/beneficiaries and ensure that expenses were reasonable" for its participants and beneficiaries.  (*Id.* ¶ 91).  Plaintiff cites examples of drugs that were subject to a significant markup.  (*See, e.g.*, *id.* ¶¶ 104, 106, 108, 110, 112, 114, 118, 119, 120, 121.)  It includes a detailed chart illustrating how much the Plans paid for a selection of forty-two drugs as compared to a pharmacy acquisition cost.  (*Id.* ¶ 116.)

Plaintiff also accuses Defendants of mismanagement insofar as they (1) agreed to steer beneficiaries towards a mail-order pharmacy that charges higher prices than retail pharmacies for the same drug, (*id.* ¶ 129), (2) failed to incentivize the use of high-priced branded drugs in favor of lower-priced generic drugs, (*id.* ¶ 135), (3) failed to engage in a prudent and reasoned decision making process before agreeing to a PBM contract that required participants to pay a higher price for drugs, (*id.* ¶ 139), and (4) failed to adequately negotiate the Plans for lower prices, (*id.* ¶ 140).

Appx25

With respect to Plaintiff herself, Plaintiff alleges that since August 2022, she has filled prescriptions for several generic non-specialty drugs and has been subject to significant cost markups for those drugs, simply because she was a participant in the Plans. (*Id.* ¶¶ 124, 125.) Plaintiff asserts she paid more in premiums and paid more for drugs than she would have paid absent Defendants' alleged fiduciary breaches and other ERISA violations. (*Id.* ¶ 190.) For example, the Amended Complaint states that Plaintiff paid $303.68 for a generic drug, when that drug was also available from stores like Rite Aid and Wegmans for approximately $90.00. (*Id.* ¶ 198; *see also id.* ¶ 199.) Furthermore, Plaintiff alleges that until Defendants' breaches are cured, Plaintiff will be required to pay more in premiums in the future. (*Id.* ¶¶ 196, 201.)

## B.  PROCEDURAL HISTORY

Plaintiff filed her initial Complaint on February 5, 2024. (ECF No. 1.) Defendants submitted a Motion to Dismiss (ECF No. 40), that was later withdrawn in light of the filing of an Amended Complaint. (ECF No. 44.) Thereafter, Defendants filed the instant Motion on June 28, 2024. (ECF No. 51.)

## II.  SUBJECT MATTER JURISDICTION

This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e) and (f) because Plaintiff brings this action pursuant to ERISA.

## III.  DISCUSSION

The Amended Complaint contains three counts. First, Plaintiff alleges that Defendants breached their fiduciary duties under 29 U.S.C. §§ 1104(a) and 1132(a)(2). (*See generally* Am. Compl.) Second, Plaintiff alleges that Defendants breached their fiduciary duties in violation of 29 U.S.C. §§ 1104(a) and 1132(a)(3). (*Id.*) Third, Plaintiff alleges that Defendants failed to provide documents upon request in violation of 29 U.S.C. §§ 1024(b)(4) and 1132(c). (*Id.*)

4

Appx26

In the Motion, Defendants challenge both Plaintiff's standing and the adequacy of her pleading. Insofar as Plaintiff's standing is a jurisdictional issue, the Court considers this issue first. *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007).

### A.    Whether to Dismiss Counts One and Two for Lack of Standing

The Motion challenges Plaintiff's standing on the basis that she does not allege a concrete harm or injury-in-fact. In Defendants' view, Plaintiff fails to allege that she was improperly denied benefits under the plan; she simply claims the drug prices were too expensive. (Moving Br. at 8.) More specifically, Defendants argue that Plaintiff fails to meet the constitutional standing requirements for Counts One and Two because (1) those claims show no personal harm to Plaintiff, (2) Plaintiff did not suffer any injury from the prescription drug costs, and (3) there are no allegations that Plaintiff was prescribed any of the generic specialty drugs that she claims are too expensive. (*Id.* at 12, 21.) Defendants also argue that Plaintiff did not "suffer any injury from the prices of prescription drugs obtained under the prescription drug benefit because she would have paid the exact same amount in total out-of-pocket costs each year she has participated in the Plan, regardless of the cost of the drugs. (*Id.* at 18.)

Plaintiff argues that the Amended Complaint properly alleges that she has standing because the Plans' overpayments were passed to her in the form of monthly payments that were higher than they would have been but for Defendants' breach. (Opp'n Br. at 1.) In terms of injuries, she cites her allegations that she paid more in monthly premiums and paid greater out-of-pocket expenses. (*Id.* at 13 (citing Am. Compl. ¶¶ 75, 139, 190–95, 198–200), 15, 19)).[4] Plaintiff responds to

---

[4] Defendants refute this argument in its Reply, noting that Plaintiff cannot rely on an "alleged injury from non-fiduciary conduct (setting premiums) to conjure up standing for fiduciary claims," and any connection between her premiums and the alleged breaches are speculative. (Reply Br. at 1.) Defendants also claim that Plaintiff "paid the same out-of-pocket amount each year that she would have paid even if the Plan's PBM had agreed to charge $0 for prescription drugs." (*Id.*)

Appx27

Defendants' argument that she received what she was entitled by pointing out that this is a suit for breach of fiduciary duties not for denial of benefits. (*Id.*) Plaintiff maintains that she suffered a concrete injury once she was overcharged for her first prescription, (*id.* at 20), and that her standing is not limited to the drugs she purchased because Defendants' breach of their duty resulted in plan-wide overcharges.[5]

### 1. Legal Principles

Article III of the United States Constitution confines the federal judicial power to the resolution of "Cases" and "Controversies." U.S. Const. Art. III. For there to be a case or controversy under Article III, the plaintiff must have a "'personal stake' in the case—in other words, standing." *TransUnion v. Ramirez*, 594 U.S. 413, 423 (2021) (quoting *Raines v. Byrd*, 521 U.S. 811, 820 (1997)). To have standing, a plaintiff must show, (1) that he or she suffered an injury in fact that is concrete, non-hypothetical, particularized, and actual or imminent; (2) that the injury was likely caused by the defendant; and (3) that the injury would likely be redressed by judicial relief. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). In order "[t]o establish [an] injury-in-fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (internal quotations omitted). "For an injury to be particularized, it must affect the plaintiff in a personal and individual way." *Id.* The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements as to each claim. *FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 231 (1990).[6]

---

[5] In its Reply, Defendants argue that simply because Plaintiff reached her maximum out-of-pocket limit earlier than she otherwise would does not amount to standing because the lost time value of money is not a cognizable injury-in-fact. (Reply Br. at 8.)

[6] "In the context of a class action, Article III must be satisfied by at least one named plaintiff." *Neale v. Volvo Cars of N. Am.*, 794 F.3d 353, 359 (3d Cir. 2015); *see also O'Shea v. Littleton,* 414 U.S. 488, 494 (1974) ("[I]f none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class.").

Appx28

"In addition to having Article III standing, an ERISA plaintiff must also have statutory standing." *Edmonson v. Lincoln Nat'l Life Ins.* Co., 725 F.3d 406, 419 (3d Cir. 2013). "Statutory standing is simply statutory interpretation,' and [courts] ask whether the remedies provided for in ERISA allow the particular plaintiff to bring the particular claim." *Id.* (quoting *Graden v. Conexant Sys. Inc.*, 496 F.3d 291, 295 (3d Cir. 2007)).

When a party challenge standing, the Court's analysis depends on whether the challenge is based on a "factual attack" or a "facial attack." *Mortensen v. First Fed. Sav. & Loan Ass'n,* 549 F.2d 884, 891 (3d Cir. 1977). "[A] facial attack 'contests the sufficiency of the pleadings,' 'whereas a factual attack concerns the actual failure of a [plaintiff's] claims to comport [factually] with the jurisdictional prerequisites.'" *Constitution Party of Pa. v. Aichele,* 757 F.3d 347, 358 (3d Cir. 2014) (quoting *CNA v. United States*, 535 F.3d 132, 139 (3d Cir. 2008)). Here, Defendants' argument that Plaintiff did not "suffer any injury from the prices of prescription drugs obtained under the prescription drug benefit because she would have paid the exact same amount in total out-of-pocket costs each year she has participated in the Plan, regardless of the cost of the drugs," (*id.* at 18), is a factual challenge because such an argument challenges Plaintiff's standing based on facts outside the pleading rather than the sufficiency of the pleading itself. Defendants' remaining arguments are facial attacks that challenge the ability of the allegations in the Amended Complaint to support Plaintiff's Article III standing.

### 2. Analysis

For the reasons set forth below, the Court finds that Plaintiff lacks Article III standing to pursue her claims under Counts One and Two. Plaintiff's alleged injuries are that she suffered economic harms in the form of higher premiums and out-of-pocket costs. Although economic harms are the "most obvious concrete harms," *TransUnion*, 594 U.S. at 425, Plaintiff's alleged injuries fail to meet the requirements for Article III standing. The Court will first address

Appx29

Plaintiff's alleged injury of paying higher premiums, and then continue with whether her out-of-pocket losses support Article III standing.

a)    <u>Injury in the form of higher premiums</u>

A plaintiff suing for breach of fiduciary duty under ERISA § 502(a)(2) does so as a plan representative and hence must identify an injury to the Plan and seek relief that "inures to the benefit of the plan as a whole." *Smith v. Medical Benefit Admin, Group, Inc.*, 639 F.3d 277, 282–83 (7th Cir. 2011) (citing *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 140 (1985)); *Varity Corp. v. Howe*, 516 U.S. 489, 515 (1996) (Section 502(a)(2) "does not provide a remedy for individual beneficiaries"). However, plaintiffs who themselves have not suffered an injury in fact cannot assert standing as plan representatives based on injuries to the plan. *See Thole v. U.S. Bank N.A.*, 590 U.S. 538 (2020) (finding plaintiffs had no standing to sue as representatives of the plan because "in order to claim the interests of others, the litigants themselves still must have suffered an injury in fact"); *see Perelman v. Perelman*, 793 F.3d 368, 375–76 (3d Cir. 2015) (rejecting plaintiff's claim that he need not prove individualized injury insofar as he seeks monetary equitable remedies in a "derivative" capacity on behalf of plan).

ERISA § 502(a)(3) is a "catchall" provision that "authorizes lawsuits for individualized equitable relief for breach of fiduciary obligations." *Varity*, 516 U.S. at 490. "[C]laims demanding a monetary equitable remedy [under § ERISA 502(a)(3)] . . . require the plaintiff to allege an individualized financial harm traceable to the defendant's alleged ERISA violations." *See Perelman*, 793 F.3d at 373.

Here, Plaintiff has not suffered an injury-in-fact by alleging that "[h]arms to participants/beneficiaries have taken the form of higher premiums, higher deductibles, higher coinsurance, higher copays, and lower wages or limited wage growth." (Am. Compl. ¶¶ 190. 233.) Such an injury, at best, is speculative and hypothetical. In *Knudsen v. MetLife Grp., Inc.*, 117

8

Appx30

F.4th 570 (3d Cir. 2024), the Third Circuit determined whether a plaintiff had standing when she alleged that MetLife's illegal conduct caused her to "pay higher out-of-pocket costs, mainly in the form of insurance premiums." *Id.* at 573. In that case, while the Third Circuit cautioned against reading *Thole* and *Perelman* broadly as to "categorically bar an ERISA plaintiff's assertion of injury based on increased out-of-pocket costs," the court of appeals nevertheless held that the plaintiff lacked standing because such claims alleging that there is injury in the form of higher premiums or periodic payments are entirely speculative. *Id.* at 578–79.

*Knudsen* is both controlling and dispositive. Accordingly, the Court similarly finds that Plaintiff's alleged injury—that she paid more in premiums due to Defendants' purported breach of fiduciary duty during the negotiation process of the Plans—does not support Article III standing because the "outcome of th[e] suit would not affect [Plaintiff's] future benefit payments." *See Thole*, 590 U.S. at 561. That is, the allegations about higher premiums are speculative and "stand on nothing more than supposition." *Finkelman v. Nat'l Football League*, 810 F.3d 187, 201 (3d Cir. 2016). Plaintiff alleges that she pays premiums "equivalent to 102% of the combined employer and employee contributions for similarly situated individuals under the Plans," without any allegation or evidence of premiums on other plans or that Defendants' specific conduct resulted in the higher premiums. (*See* Am. Compl. ¶ 12.) Every mention in the Amended Complaint that Plaintiff paid more in premiums is a conclusory allegation that does not meet the requirements for Article III standing. (*See e.g., id.* ¶¶ 139, 190, 194.) Because the Court finds that Plaintiff lacks Article III standing, it does not reach ERISA standing.

Accordingly, in light of the Third Circuit's decision in *Knudsen*, the Court finds that Plaintiff lacks standing to raise Counts One and Two on the basis of her alleged payment of higher insurance premiums.

b)      Injury in the form of out-of-pocket costs for medication

Plaintiff next claims that she suffered an injury-in-fact by paying higher prices for drugs under the Plans, thus, causing her to pay more out-of-pocket.  More specifically, the Amended Complaint alleges that Plaintiff was (1) charged $303.68 for a drug available for $90.50, (Am. Compl. ¶ 198), (2) charged $18.72 for a drug available for $6.38, (*id.* ¶ 199), and (3) charged $37.19 for a drug available for $14.28.  (*Id.* ¶ 200.)  The Amended Complaint also states that Plaintiff has taken additional financial burdens to save money as a result of Defendants' breaches, (*id.* ¶ 217), and that Plaintiff has received fourteen prescriptions for generic drugs that were marked up by 230.05 percent above pharmacy acquisition costs.  (*Id.* ¶¶ 6, 199.)

It is clear to the Court based on these allegations that Plaintiff has suffered an injury-in-fact that is traceable to Defendants' alleged ERISA violations.  *See Knudsen*, 117 F.4th at 580 (noting that courts "need only apply ordinary Article III standing analysis to determine whether ERISA plaintiffs have standing." (internal quotation marks and citations omitted)); *see also TransUnion*, 594 U.S. at 425 ("The most obvious [concrete harms] are traditional tangible harms, such as physical harms and monetary harms.  If a defendant has caused physical or monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III."); *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'").  In plain terms, when Plaintiff spent more money on drugs at the pharmacy, which was allegedly the result of Defendants' breach of fiduciary duties, Plaintiff suffered a cognizable injury.

Notwithstanding, for the reasons set forth below, the Court finds that Plaintiff herself lacks standing based on this injury because it is not redressable by an order from this Court.  *See Lujan*, 504 U.S. at 560–61 (noting that to have standing, a plaintiff must show, (1) that he or she suffered an injury in fact that is concrete, non-hypothetical, particularized, and actual or imminent; (2) that

10

Appx32

the injury was likely caused by the defendant; and (3) that the injury would likely be redressed by judicial relief).  The redressability prong of the standing analysis "looks forward" to determine whether "the injury will be redressed by a favorable decision."  *Toll Bros., Inc. v. Twp. of Readington*, 555 F.3d 131, 138 (3d Cir. 2009) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't. Servs., Inc.*, 528 U.S. 167, 181 (2000)).  "Redressability is not a demand for mathematical certainty," but it does require "a 'substantial likelihood'" that the injury-in-fact can be remedied by a judicial decision.  *Id.* at 143 (quoting *Vt. Agency of Natural Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000)).

Plaintiff's injury is not redressable because, as Defendants raise in their factual challenge to her standing, she has reached her prescription drug cap for each year she asserts in the Amended Complaint.  In straightforward terms, a favorable decision would not be able to compensate Plaintiff for the money she already paid.  Even if Defendants were to reimburse Plaintiff for her out-of-pocket costs on a given drug—that is, the higher amount of money she spent as a result of Defendants' breaches—that money would be owed to her insurance carrier to reimburse it for its expenditures on *other* drugs that same year.  In short, there is nothing the Court can do to redress Plaintiff's alleged injury.[7]

In conclusion, the Court will **GRANT** Defendant's Motion as to Counts One and Two.  Because the Court finds that Plaintiff lacks standing to bring Counts One and Two, the Court need not reach whether the Amended Complaint states a claim under Rule 12(b)(6) for those counts.  Counts One and Two will therefore be dismissed without prejudice.

---

[7] The Court expresses no opinion as to the standing of a hypothetical plaintiff in the same situation who has *not* reached its annual out-of-pocket cap for expenditures.

Appx33

**B.      Whether to Dismiss Count Three for Failure to State a Claim**

Count Three asserts a claim for failure to provide documents under 29 U.S.C. §§ 1024(b)(4) and 1132(c).  Defendants argue that Count Three should be dismissed because it does not adequately state a disclosure claim under ERISA insofar as it does not allege that Plaintiff made a written request for the documents.  (Moving Br. at 25.)  Plaintiff maintains that she states a claim because Defendants failed to timely provide documents after she repeatedly requested them in writing, and Plaintiff made a typewritten request through an online portal for the documents. (Opp'n Br. at 37–38.)

1.      <u>Legal Principles</u>

Generally, Rule 8(a)(2) "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (abrogated on other grounds)).

A district court conducts a three-part analysis when considering a motion to dismiss pursuant to Rule 12(b)(6).  *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011).  "First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'"  *Id.* (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)).  Second, the court must accept as true all of the plaintiff's well-pled factual allegations and "construe the complaint in the light most favorable to the plaintiff."  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citation omitted). The court, however, may ignore legal conclusions or factually unsupported accusations that merely state the defendant unlawfully harmed the plaintiff.  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).  Finally, the court must determine whether "the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'"  *Fowler*, 578 F.3d at 211

12

Appx34

(quoting *Iqbal*, 556 U.S. at 679).  A facially plausible claim "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 210 (quoting *Iqbal*, 556 U.S. at 663).  On a Rule 12(b)(6) motion, the "defendant bears the burden of showing that no claim has been presented."  *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)).

      2.      Analysis

Section 502(c)(1)(B) of ERISA provides a statutory penalty of up to $100 a day on "[a]ny administrator . . . who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary . . . by mailing the material requested within [thirty] days after such request. . . ."  29 U.S.C. § 1132(c)(1)(B).  Upon receiving a written request from any participant or beneficiary, an administrator "shall . . . furnish a copy of the latest updated summary, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated."  29 U.S.C. § 1024(b)(4).

> [T]o state a claim under § 502(c)(1) of ERISA, a plaintiff must allege that 1) it made a [written] request to a plan administrator, 2) who was required to provide the requested material, but 3) failed to do so within 30 days of the request. As a penal statute, the terms of § 502(c)(1) must be construed strictly, and thus, a plaintiff seeking relief under § 502(c)(1) must demonstrate compliance with each of these statutory requirements.

*Plastic Surgery Ctr., P.A. v. Cigna Health and Life Ins. Co.*, Civ. No. 17-2055, 2018 WL 2441768, at *9 (D.N.J. May 31, 2018) (alteration in original) (citation and internal quotation marks omitted).

Here, Plaintiff has plausibly alleged a failure to provide documents claim.  The Amended Complaint states that "[o]n December 20, 2023, Plaintiff sent a typewritten request through the Alight online portal messaging system established by Defendants, asking that all plan documents, including the 'General/Administrative Information Plan Details' document, be mailed to her."

Appx35

(Am. Compl. ¶ 204.)   The Amended Complaint then provides that Defendants "received and accepted Plaintiff's request," (*id.* ¶ 205), and "after this lawsuit was filed—counsel for Defendants belatedly sent Plaintiff's counsel the 'General/Administrative Information Plan Details' document, but no other documents."   (*Id.* ¶ 207.)   Plaintiff then sent another written letter to counsel on February 20, 2024 that requested:

> "all instruments under which the Salaried Medical Plan is established or operated, including the formal plan document(s), all documents constituting the summary plan description, the latest annual report, and any other document falling within the terms of § 1024(b)(4)."   The letter also requested "all instruments under which the Johnson & Johnson Group Health Plan is established or operated, including the master plan document, all documents constituting the full summary plan description, the latest annual report, and any other document falling within the terms of § 1024(b)(4)."

(*Id.* ¶ 208.)   According to the Amended Complaint, Defendants "failed to timely and completely comply with Plaintiff's written requests for documents."   (*Id.* ¶ 245.)

The Court finds that these allegations support a claim that a written request from a participant or beneficiary was made, and that Defendants failed to respond within thirty days.   (*See id.* ¶ 246 (Defendants "only belatedly provided Plaintiff with the 'General/Administrative Information Plan Details' document on February 19, 2024, more than 30 days after [Plaintiff] initially requested it and only after this suit was filed.")).   As such, the Court finds that Plaintiff has stated a claim under ERISA 502(c).   *See McDonough v. Horizon Blue Cross Blue Shield of New Jersey, Inc.*, Civ. No. 09-571, 2011 WL 4455994, at *7 (D.N.J. Sept. 23, 2011) (noting that a plaintiff must allege two essential elements to establish a violation of the duty to provide requested documents: that the plaintiff made a written request, and that the defendant failed to respond to the request within thirty days); *see also Kollman v. Hewitt Assoc.,* 487 F.3d 139, 144 (3d Cir. 2007).

14

Appx36

Accordingly, the portion of Defendants' Motion seeking to dismiss Count Three of the Amended Complaint will be **DENIED**.

## IV.   CONCLUSION

For the reasons stated above, the Court will **GRANT-IN-PART** and **DENY-IN-PART** Defendants' Motion (ECF No. 51).  Counts One and Two will be dismissed without prejudice for lack of Article III standing.  Plaintiff will be given leave to file a Second Amended Complaint within 30 days to address the deficiencies identified in this Opinion.  An appropriate Order will follow.


Date: January 24, 2025

s/ Zahid N. Quraishi

**ZAHID N. QURAISHI**
**UNITED STATES DISTRICT JUDGE**

Appx37