# 26-1107

# United States Court of Appeals for the Third Circuit

ANN LEWANDOWSKI, on her own behalf and on behalf of all others similarly situated; ROBERT GREGORY

v.

JOHNSON & JOHNSON; THE PENSION & BENEFITS COMMITTEE OF JOHNSON & JOHNSON; PETER FASOLO; WARREN LUTHER; LISA BLAIR DAVIS; DOES 1–20

ANN LEWANDOWSKI,
*Appellant*

On Appeal from the United States District Court
for the District of New Jersey (Quraishi, J.), No. 3:24-cv-00671

**ANSWERING BRIEF FOR APPELLEES
JOHNSON & JOHNSON AND THE PENSION & BENEFITS
COMMITTEE OF JOHNSON & JOHNSON**

David Kott
MCCARTER & ENGLISH, LLP
100 Mulberry Street
Four Gateway Center
Newark, NJ 07102
(973) 622-7444 (tel.)
(973) 624-7070 (fax)
dkott@mccarter.com

Kristen Seeger
Scott Stein
Caroline Wong
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
(312) 853-7000 (tel.)
(312) 853-7036 (fax)
kseeger@sidley.com

Kwaku Akowuah
Manuel Valle
Victor Hiltner
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC 20005
(202) 736-8000 (tel.)
(202) 736-8711 (fax)
kakowuah@sidley.com

*Counsel for Appellees*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Johnson & Johnson discloses that it does not have a parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................. i

TABLE OF CONTENTS ....................................................................... ii

TABLE OF AUTHORITIES ................................................................. iv

INTRODUCTION ................................................................................. 1

JURISDICTIONAL STATEMENT ....................................................... 6

COUNTERSTATEMENT OF THE ISSUES ......................................... 7

STATEMENT OF RELATED CASES .................................................. 8

STATEMENT OF THE CASE .............................................................. 8

      A.    The J&J Plan and the Prescription Drug Benefit ......... 8

      B.    The Role of ESI ........................................................... 11

      C.    Lewandowski's Participation in the Plan .................... 13

      D.    Procedural History ...................................................... 16

SUMMARY OF ARGUMENT .............................................................. 20

STANDARD OF REVIEW .................................................................... 23

ARGUMENT ........................................................................................ 24

      I.    PLAINTIFF FAILS TO ALLEGE A NON-SPECULATIVE INJURY TRACEABLE TO J&J. ......................................... 24

      A.    Merely Asserting Overpayment Does Not Establish Injury or Causation. ................................................... 25

      B.    The Premium-Overcharge Theory Is Speculative. ....... 30

            1.    J&J's broad discretion to set premiums defeats standing under *Knudsen* ..................................... 30

2. The premiums theory relies on an attenuated chain of contingencies involving independent third parties. .....................................................39

3. COBRA does not save Lewandowski's speculative premiums theory. ...............................................42

C. The Prescription-Overcharge Theory Fails for Multiple Independent Reasons. ...............................................45

1. Lewandowski's total expenses far exceeded her out-of-pocket maximum, foreclosing her claim of injury from alleged prescription overcharges..... 46

2. Lewandowski's prescription-overcharge theory rests on speculation and conjecture....................49

a. Lewandowski provides no basis to conclude that more "prudent" negotiations would have lowered the two drug prices at issue.50

b. Lewandowski's reliance on inapposite comparators cannot save her prescription-overcharge theory. ....................................54

II. PLAINTIFF'S ALLEGED INJURIES ARE NOT REDRESSABLE..................................................................58

CONCLUSION ...................................................................................67

COMBINED CERTIFICATIONS OF COMPLIANCE ...........................68

CERTIFICATE OF SERVICE...............................................................69

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aldridge v. Regions Bank,*
144 F.4th 828 (6th Cir. 2025) ..................................................... 63, 66

*Argay v. Nat'l Grid USA Serv. Co.,*
503 F. App'x 40 (2d Cir. 2012) ...................................................... 33

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ....................................................................... 30

*Bator v. Dist. Council 4,*
972 F.3d 924 (7th Cir. 2020) ......................................................... 33

*Boley v. Universal Health Servs., Inc.,*
36 F.4th 124 (3d Cir. 2022) ..................................................... 54, 61

*Carr v. Jefferson Defined Benefit Plan,*
2025 WL 2888014 (3d Cir. Oct. 10, 2025) ..................................... 64

*CIGNA Corp. v. Amara,*
563 U.S. 421 (2011) ....................................................................... 64

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) ................................................................. 28, 43

*Cottrell v. Alcon Lab'ys,*
874 F.3d 154 (3d Cir. 2017) .......................................................... 29

*Cunningham v. Cornell Univ.,*
604 U.S. 693 (2025) ....................................................................... 61

*DaimlerChrysler Corp. v. Cuno,*
547 U.S. 332 (2006) ....................................................................... 23

*Davis v. FEC,*
554 U.S. 724 (2008) ....................................................................... 59

*Diamond Alt. Energy, LLC v. EPA,*
606 U.S. 100 (2025)..................................................................41

*Draper v. Baker Hughes Inc.,*
892 F. Supp. 1287 (E.D. Cal. 1995) ...................................44

*Edmonson v. Lincoln Nat'l Life Ins.,*
725 F.3d 406 (3d Cir. 2013) .................................................62

*FDA v. All. for Hippocratic Med.,*
602 U.S. 367 (2024)....................................................... 27, 41, 51

*Finkelman v. NFL,*
810 F.3d 187 (3d Cir. 2016) ...................................... *passim*

*Geissal v. Moore Med. Corp.,*
524 U.S. 74 (1998)..................................................................44

*Gimeno v. NCHMD, Inc.,*
38 F.4th 910 (11th Cir. 2022) .............................................66

*Glanton ex rel. ALCOA Prescription Drug Plan v.*
*AdvancePCS Inc.,* 465 F.3d 1123 (9th Cir. 2006).........................38, 62

*Gonzalez de Fuente v. Preferred Home Care of N.Y. LLC,*
858 F. App'x 432 (2d Cir. 2021) .........................................39

*Graden v. Conexant Sys., Inc.,*
496 F.3d 291 (3d Cir. 2007) .........................................60, 61

*Great-West Life & Annuity Ins. Co. v. Knudson,*
534 U.S. 204 (2002).........................................................65, 66

*Harris v. Amgen, Inc.,*
573 F.3d 728 (9th Cir. 2009).............................................61

*Horvath v. Keystone Health Plan E., Inc.,*
333 F.3d 450 (3d Cir. 2003) .........................................25, 32

*Hughes Aircraft Co. v. Jacobson,*
525 U.S. 432 (1999)..........................................................33, 60

*Hughes v. Nw. Univ.*,
595 U.S. 170 (2022) ................................................................. 61

*In re Johnson & Johnson Talcum Powder Prods. Mktg.,*
*Sales Pracs. & Liab. Litig.*, 903 F.3d 278 (3d Cir. 2018) ....... 26, 27, 57

*In re Schering Plough Corp. Intron/Temodar Consumer*
*Class Action*, 678 F.3d 235 (3d Cir. 2012) ............................ 33, 48, 51

*Knudsen v. MetLife Grp., Inc.*,
117 F.4th 570 (3d Cir. 2024) ..................................................... *passim*

*Kruchten v. Ricoh USA, Inc.*,
2024 WL 3518308 (3d Cir. July 24, 2024) ......................................... 61

*Lewis v. Casey*,
518 U.S. 343 (1996) ................................................................. 58

*Lockheed Corp. v. Spink*,
517 U.S. 882 (1996) ................................................................. 32

*Loren v. Blue Cross & Blue Shield of Mich.*,
505 F.3d 598 (6th Cir. 2007) ....................................................... 39

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ................................................................. 27

*Mator v. Wesco Distrib., Inc.*,
102 F.4th 172 (3d Cir. 2024) ....................................................... 61

*Mertens v. Hewitt Assocs.*,
508 U.S. 248 (1993) ........................................................... 6, 64, 65

*Montanile v. Bd. of Trs. of Nat'l Elevator Indus. Health*
*Benefit Plan*, 577 U.S. 136 (2016) ........................................... 64, 65, 66

*Navarro v. Wells Fargo & Co.*,
2026 WL 591454 (D. Minn. Mar. 3, 2026) ................................... 43, 58

*Pa. Prison Soc'y v. Cortes*,
508 F.3d 156 (3d Cir. 2007) ................................................... 58, 67

*Paulsen v. CNF Inc.*,
  559 F.3d 1061 (9th Cir. 2009) ............................................................. 62

*Pegram v. Herdrich*,
  530 U.S. 211 (2000) ........................................................................... 33

*Rose v. PSA Airlines, Inc.*,
  80 F.4th 488 (4th Cir. 2023) ...................................................... 64, 66

*Santomenno v. John Hancock Life Ins.*,
  2013 WL 3864395 (D.N.J. July 24, 2013) .......................................... 32

*Sereboff v. Mid Atl. Med. Servs., Inc.*,
  547 U.S. 356 (2006) .................................................................... 65, 66

*Smith v. Med. Benefit Adm'rs Grp., Inc.*,
  639 F.3d 277 (7th Cir. 2011) .............................................................. 62

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) ........................................................................... 27

*Steel Co. v. Citizens for a Better Env't*,
  523 U.S. 83 (1998) ............................................................................. 29

*Stern v. JPMorgan Chase & Co.*,
  2026 WL 654714 (S.D.N.Y. Mar. 9, 2026) .................................... 56, 57

*Sweda v. Univ. of Pa.*,
  923 F.3d 320 (3d Cir. 2019) ........................................................ 60, 61

*Thole v. U.S. Bank N.A.*,
  590 U.S. 538 (2020) .................................................................... 27, 61

*Tibble v. Edison Int'l*,
  575 U.S. 523 (2015) ........................................................................... 61

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) .................................................................... 27, 29

*United States v. Students Challenging Regul. Agency Procs.*,
  412 U.S. 669 (1973) ........................................................................... 57

*Varity Corp. v. Howe,*
516 U.S. 489 (1996) ..................................................................63

*Winsor v. Sequoia Benefits & Ins. Servs., LLC,*
62 F.4th 517 (9th Cir. 2023) ...................................... *passim*

**Constitutions, Statutes, and Regulations**

U.S. Const. art. III, § 2 .............................................................6

29 U.S.C. § 1109 ......................................................................63

29 U.S.C. § 1132(a)(2)..............................................................63

29 U.S.C. § 1132(a)(3)....................................................... 8, 22, 64

29 U.S.C. § 1162(3) ..................................................................43

29 U.S.C. § 1164(2)(A) ..............................................................44

29 U.S.C. § 1164(2)(B)(i)............................................................44

HHS Notice of Benefit & Payment Parameters for 2021, 85
Fed. Reg. 29164 (May 14, 2020) ..........................................48

**Other Authorities**

*FAQs on COBRA Continuation Health Coverage for
Employers and Advisors*, U.S. DEP'T OF LAB. (Sept. 2025),
https://tinyurl.com/yuh5ct86 ............................................44

*Publication 969: Health Savings Accounts and Other Tax-
Favored Health Plans*, INTERNAL REVENUE SERV. (2025),
https://www.irs.gov/pub/irs-pdf/p969.pdf ...........................11

## INTRODUCTION

Article III standing does not arise from simply paying money as part of a voluntary commercial transaction. Instead, a plaintiff alleging that she was harmed by a voluntary transaction must carry her burden of plausibly pleading that the transaction left her worse off than she would have been but for the defendant's unlawful conduct.

Appellant Ann Lewandowski fails to carry that burden. She opted in to the Johnson & Johnson Group Health Plan (the "Plan") and received the full scope of benefits she was owed under the terms of the Plan. Now seeking to serve as the named plaintiff in a putative ERISA class action, her theory of standing to sue Johnson & Johnson ("J&J") boils down to four words: "I paid too much." Yet as much as Lewandowski insists that her alleged overpayments "must be assumed at this stage" (Opening Br. 31), that is not the law. She must instead support her theory with well-pleaded facts that (1) demonstrate that J&J's alleged Plan mismanagement caused her to pay more than she otherwise would have paid for her healthcare, and (2) establish a substantial likelihood that a victory in this case will redress her supposed pocketbook injury. Lewandowski does neither, and the

District Court thus correctly dismissed her claims for lack of Article III standing.

**The claimed overcharges are speculative.** Lewandowski claims that if J&J[1] had managed its prescription drug benefit program more "prudently," she would have paid less for premiums and for two prescription drugs she purchased in 2023. Those theories fail to show standing because both rest on multiple layers of conjecture.

Although Lewandowski insists a more "prudent" plan sponsor would have sought lower prices in negotiations with pharmacy benefit managers, her allegations fail to show that such conduct would have yielded the benefits she claims. She posits that J&J should have "used [its] bargaining power to demand and obtain substantially better contractual terms" from pharmacy benefit managers. App. 111 (SAC ¶ 142). But that assertion depends on conjecture about how independent third parties would have responded to J&J's hypothetical demands. Other reductionist assertions throughout her complaint

---

[1] J&J and its Pension & Benefits Committee are the only two defendant-appellees in this matter. Throughout this brief, "J&J" refers to both defendant-appellees.

2

similarly rest on the implausible assumption that J&J could have unilaterally extracted millions in decreased costs in complex multiparty negotiations about pharmacy networks, rebates, administrative fees, medical services, and the prices of thousands of prescription drugs.

And that's just the start. Even if Lewandowski had adequately pleaded that J&J would have amassed millions in savings from "prudent" negotiations, her premium-overcharge theory would still be foreclosed by *Knudsen v. MetLife Group, Inc.*, 117 F.4th 570 (3d Cir. 2024), as the District Court correctly recognized. There, this Court rejected a virtually identical theory as too speculative. Here, as in *Knudsen*, Lewandowski's conclusory assertion that J&J has historically set premiums at a fixed percentage of overall Plan costs does not overcome J&J's unequivocal discretion to define benefits—including by setting premiums—"under the Plan." *Id.* at 574, 582. Lewandowski's alternative argument about the premiums she paid under COBRA fares no better. Those premiums, too, depend on J&J's discretionary decision-making. That discretion, exercised in J&J's settlor (i.e., non-fiduciary) capacity, both renders Lewandowski's alleged injury-in-fact too

3

speculative and breaks the purported causal connection between that injury and any alleged fiduciary breach.

The prescription-overcharge theory is just as speculative, and the District Court was right to reject it too. After three years of participation in the Plan, during which J&J paid over $400,000 in medical expenses on Lewandowski's behalf (for which her total annual cost-sharing was capped by the Plan at $3,500), she complains that through better negotiation, J&J could have saved her $210 on two prescriptions she purchased in early 2023. That is speculative at two levels. It first requires a speculative assumption that J&J could have extracted lower prices overall from a pharmacy benefit manager across the groups of covered drugs and medical services for which it negotiates. On top of that, it requires the further speculation that *if* J&J had extracted lower prices *in general*, J&J would have *specifically* obtained better prices on Lewandowski's two prescriptions out of the thousands available under the Plan.

In all events, even if Lewandowski could plausibly allege that her two prescriptions were overpriced because of alleged mismanagement, she still cannot show Article III standing on her prescription-overcharge

4

theory. The Plan terms capped Lewandowski's total annual out-of-pocket expenditures at $3,500, after which point the Plan paid for *all* costs in excess of that figure. This is not a close case: in 2023 alone, the Plan paid $197,882 in covered expenses on Lewandowski's behalf— more than 50 times her out-of-pocket maximum. Having far exceeded her 2023 out-of-pocket maximum due to other medical expenses she incurred in 2023, her total out-of-pocket charges that year would have been *exactly the same* even if J&J had negotiated the prices for her two prescriptions down to $0.

**The claimed overcharges are not redressable.** Lewandowski seeks only one remedy on appeal: "retrospective monetary relief." Opening Br. 4. She cannot obtain this relief under either of the ERISA provisions she invokes, thus providing an additional basis to affirm the District Court's judgment. *First*, she has no claim to funds "restor[ed]" to the Plan (Opening Br. 21) under 29 U.S.C. § 1132(a)(2). The Plan does not hold assets for individual participants. Instead, participants' premiums and benefits are fixed annually, based on the specific coverage option they elect, and paid from a general fund as covered expenses occur. Lewandowski, as a *former* Plan participant, does not

and cannot claim any right to future benefits. A loss in Plan assets would not reduce her contractually defined entitlements, and a restoration of assets would not increase them. *Second*, she has no claim to an "equitable surcharge" (Opening Br. 53) under 29 U.S.C. § 1132(a)(3). What Lewandowski "in fact seek[s] is nothing other than compensatory *damages*," which is outside the bounds of the "appropriate equitable relief" authorized by (a)(3). *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 255 (1993).

At bottom, Lewandowski's creative attempt to link assertions of mismanagement to speculative cost increases many steps down the line can be rejected at any step of the Article III standing analysis. The judgment of the District Court should be affirmed.

## JURISDICTIONAL STATEMENT

Lewandowski lacks standing to bring this action, so there is no "[c]ase" or "[c]ontrovers[y]" over which an Article III court may exercise jurisdiction. U.S. Const. art. III, § 2. The District Court nonetheless possessed subject matter jurisdiction over this matter under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1) to determine that Article III standing

was lacking, and this Court has appellate jurisdiction under 28 U.S.C. § 1291 to review that determination.

## COUNTERSTATEMENT OF THE ISSUES

1.    Whether Lewandowski failed to allege an Article III injury from payment of Plan premiums that is fairly traceable to J&J's negotiations with its pharmacy benefit manager, given J&J's broad discretion over premium-setting and the many independent non-party actors affecting Plan costs.

2.    Whether Lewandowski failed to allege an Article III injury from payment for two prescriptions in 2023 that is fairly traceable to J&J's negotiations with its pharmacy benefit manager, when (i) she alleges no facts showing that any negotiations would have reduced the prices of the two prescriptions and (ii) she would have incurred the same out-of-pocket costs even if those prescriptions had cost $0.

3.    Whether Lewandowski fails Article III's redressability requirement because her alleged injury cannot be redressed through: (i) a monetary award under 29 U.S.C. § 1132(a)(2) to the Plan, which holds no assets for individual participants; or (ii) "appropriate equitable

relief" under 29 U.S.C. § 1132(a)(3), which generally excludes retrospective monetary relief.

## STATEMENT OF RELATED CASES

There are no related cases or proceedings. This case has not been before this Court previously.

## STATEMENT OF THE CASE

### A.    The J&J Plan and the Prescription Drug Benefit

Johnson & Johnson is a medicine and medical technology company that provides an array of health benefits to its employees around the world. In the United States, J&J sponsors the Johnson & Johnson Group Health Plan, which offers participants a generous suite of medical, vision, dental, and prescription drug benefits to its more than 50,000 U.S. employees, their family members, and J&J retirees. App. 59, 89 (SAC ¶¶ 14–15, 101); *see also* App. 165, 182.

The Plan is self-funded, which means J&J itself—rather than a third-party insurance carrier—is responsible for paying benefits and administrative expenses. App. 59–60 (SAC ¶¶ 16–17). All Plan assets are held in (and all expenses are paid from) an employer-sponsored trust (the "Trust"), which comprises participant contributions, J&J

contributions, and some investment income. App. 59–60, 129 (SAC ¶¶ 16, 193).

J&J pays the lion's share of Plan costs. In 2022 alone, J&J contributed nearly $820 million (roughly 85% of Plan costs for the year), compared to $148 million in participant contributions (roughly 15%). App. 59–60, 130 (SAC ¶¶ 16, 196); App. 185. As the Plan sponsor, J&J does "not share the actuarial risk with a third-party insurance carrier" but instead *itself* bears responsibility to ensure the Plan is funded. App. 60 (SAC ¶ 16); *cf. Knudsen*, 117 F.4th at 578 n.51 ("[U]nder self-funded ERISA plans … the employer … bear[s] the financial risk.").

The Plan documents provide that J&J has discretion to "establish, each year, the amount of Participant contributions … as well as any other cost-sharing measures that apply." App. 172, § 4.01. Consistent with the Plan terms, J&J sets all Plan coverage options, benefits levels, and cost-sharing obligations "in its settlor (non-fiduciary) capacity," retaining "complete discretion" to design the bounds of Plan costs and benefits as it sees fit. App. 217.

"No formula or agreement governs the setting of premiums." App. 218. Instead, several complex factors influence J&J's non-fiduciary

9

exercise of this discretion. For example, in setting premiums (i.e., the amount a participant must contribute to the Trust for coverage in the upcoming year), J&J may "consider[] factors such as (but not limited to) group health plan market trends, administrative expenses, non-drug medical costs, the costs of other prescription drugs and categories of drugs, historical cost-sharing levels under the Plan, and other internal or external factors impacting employees." App. 217–18. Because participant contributions "are established before each Plan year and do not change during the course of the year," App. 217, and J&J has "no ability to shift costs" to anyone else, App. 81 (SAC ¶ 76), J&J alone must cover the shortfall when annual costs are higher than anticipated in a given year.

To meet the diverse needs of its employees, retirees, and their families, J&J offers many coverage choices. Premiums, deductibles, co-insurance levels, out-of-pocket maximums, network options (e.g., PPO vs. HMO), and availability of tax-preferred options like health savings accounts ("HSAs") vary across those offerings. *See* App. 182, 189–214. Even within one coverage choice, benefits may vary based on the "family status category" (e.g., "You Only," "You + Family," "You +

Child(ren)," etc.) and employee salary level. App. 194, 196, 201. Each health plan option covers both medical services and prescription drugs, including virtually any prescription drug approved for use in the United States. *See* App. 189–214, 229–47. All drugs manufactured or marketed by J&J are covered free of charge for all Plan participants, except that those enrolled in tax-advantaged HSA coverage must satisfy any applicable deductibles. App. 240; *see Publication 969: Health Savings Accounts and Other Tax-Favored Health Plans* 5, INTERNAL REVENUE SERV. (2025), https://www.irs.gov/pub/irs-pdf/p969.pdf (participant with a prescription drug plan remains HSA-eligible only "if the plan doesn't provide benefits until the minimum annual deductible of the [plan] has been met. If you can receive benefits before that deductible is met, you aren't an eligible individual.").

## B.    The Role of ESI

Like many health plan sponsors, J&J contracts with a pharmacy benefit manager ("PBM") to administer the Plan's prescription-drug benefits. App. 67–68, 87 (SAC ¶¶ 38–39, 94). The Plan's PBM is Express Scripts, Inc. ("ESI"), one of the "big three" PBMs, Opening Br. 16, which together serve roughly 80% of the national market for prescription

11

claims. Like the other members of the "big three," ESI is a "traditional PBM" that negotiates drug prices with pharmacies, secures rebates from drug manufacturers, and processes claims for prescription drugs. App. 67–69 (SAC ¶¶ 38–39, 42). When a participant obtains a prescription, ESI pays the pharmacy (minus any participant-paid amount) and then receives payment from the Plan according to the mutually agreed-upon terms negotiated by J&J and ESI. *See* App. 65–68 (SAC ¶¶ 32–33, 38, 42).

Plan sponsors and PBMs may negotiate drug prices "for groups of drugs by reference to a specific benchmark price, rather than negotiating a separate price for each drug." App. 69 (SAC ¶ 43). One widely used benchmark price is Average Wholesale Price ("AWP"). For example, plan sponsors and PBMs like ESI might negotiate prices equal to "AWP minus 85%" for generic drugs, "AWP minus 20%" for branded drugs, and "AWP minus 15%" for specialty drugs. App. 69 (SAC ¶ 45). As an alternative, plan sponsors and PBMs sometimes instead use the National Average Drug Acquisition Cost ("NADAC") database as a basis for prescription-drug pricing. App. 69, 90–91 (SAC ¶¶ 44, 103–04). The "benchmark" of choice, however, is just one consideration within

broader negotiations surrounding prescription-drug benefits, including drug costs, drug categorization, rebate sharing, and administrative fees owed to the PBM. App. 67–69 (SAC ¶¶ 38–39, 41, 43).

### C.   Lewandowski's Participation in the Plan

From 2022 until early 2024, Lewandowski opted into the Plan as a J&J employee, electing the "Premier HSA Medical Plan" for individual-only coverage ("Premier HSA Individual"). App. 218. When her employment with J&J ended, she chose to continue her coverage pursuant to the Consolidated Omnibus Budget Reconciliation Act ("COBRA") from May 7 through October 1, 2024. App. 58 (SAC ¶ 12).

The Premier HSA Individual plan included an annual deductible, health savings account, co-insurance, and out-of-pocket maximum. For all relevant periods, Lewandowski's $1,500 deductible (i.e., the amount she had to pay out-of-pocket before cost-sharing began each year) was set by J&J to the lowest permitted under law, and Lewandowski could offset that amount by drawing on the $500 J&J automatically contributed to her health savings account. App. 196, 218–19. Her co-insurance was 20%, meaning that after reaching her deductible, Lewandowski would pay only 20% of the cost of most drugs at any in-

network pharmacy (and no more than $125 per prescription per 30-day supply). The Plan covered the rest. The Plan also generally covered "100% for drugs that are manufactured or marketed by [J&J]." App. 238, 240. All of this was subject to an annual out-of-pocket maximum of $3,500, after which Lewandowski paid nothing for covered expenses, including prescription drugs, for the rest of the year. App. 221.

Lewandowski made full use of the benefits to which she was entitled under her Premier HSA Individual plan. Every year she participated in the Plan, Lewandowski reached and far exceeded her $3,500 out-of-pocket limit. The Plan paid her remaining annual medical expenses—$168,035, $197,882, and $88,789, in 2022, 2023, and 2024, respectively. App. 221. Of Lewandowski's covered healthcare costs, her total prescription drug costs represented less than one half of one percent: 0.26% in 2022, 0.17% in 2023, and 0.26% in 2024. App. 222.

Despite Lewandowski's insistence that she "overpaid" for certain prescription drugs under the Plan, she says almost nothing about her actual expenditures. She does not identify, for example, the amount of premiums (as an employee or under COBRA) she paid in 2022, 2023, or 2024, nor whether (or how) those premiums changed year over year.

14

And for 2022 and 2024, she does not identify a single prescription drug expense she incurred and paid out of pocket.

Lewandowski instead focuses on two prescriptions she obtained in 2023 and claims that she overpaid for these prescriptions. She allegedly purchased two generic prescription drugs in January and February of 2023: one $18.72 prescription for tizanidine, and one $303.68 prescription for valacyclovir. App. 137–38 (SAC ¶¶ 220–21). She then underwent a $79,000 infusion procedure, which was covered separately from the prescription drug benefit. App. 138 (SAC ¶ 223). Due to her $3,500 out-of-pocket maximum (and because she had paid $916.74 on prior covered expenses before her infusion), she had to pay only $2,583 of the $79,000 cost of the procedure. App. 138–39 (SAC ¶ 224). Because the cost of the infusion alone would have caused Lewandowski to reach her out-of-pocket maximum, her payment for the two prescriptions had no impact on her total out-of-pocket expenses. *See, e.g.*, App. 220–223.

Moreover, a third-party "co-pay assistance card" covered $2,520 of the $2,583 that Lewandowski was charged for her infusion. App. 138 (SAC ¶ 224). J&J credited the full amount of the $2,520 from the copay assistance card toward Lewandowski's deductible and out-of-pocket

15

maximum, just as if Lewandowski had paid that amount herself. SAC ¶¶ 224–26. As a result, Lewandowski's actual out-of-pocket payments for 2023 were only $980—well below her $3,500 out-of-pocket maximum. The bottom line: Lewandowski claims that if her prescriptions had cost less, the third-party copay card would have paid more for her infusion, thus allowing her to hit her $3,500 out-of-pocket maximum after personally paying only $770 instead of $980. App. 139–40 (SAC ¶¶ 227–29).

### D.    Procedural History

Lewandowski initiated this lawsuit in February 2024 and filed a First Amended Complaint ("FAC") in May 2024. App. 46, 50. The FAC asserted three counts against J&J, though only Counts One and Two are relevant on appeal.[2] In these counts, Lewandowski asserted similar claims for breach of the fiduciary duty of prudence under ERISA. Count One was asserted on behalf of the Plan under 29 U.S.C. § 1132(a)(2), and Count Two on behalf of Lewandowski as a plan participant under

---

[2] Lewandowski later dismissed with prejudice her claim that J&J refused to provide certain documents upon request (Count Three). App. 6.

29 U.S.C. § 1132(a)(3). Both claims were based on the theory that J&J failed to negotiate lower prices for 95 generic-specialty prescription drugs and 14 generic non-specialty prescription drugs, out of the thousands of medications covered by the Plan.

The District Court dismissed both claims, without prejudice, for lack of Article III standing. App. 37. Lewandowski claimed that she suffered a cognizable economic injury "in the form of higher premiums and out-of-pocket costs," App. 29, but the District Court rejected both strains of this overcharge theory. First, citing this Court's ruling in *Knudsen* as "controlling and dispositive," the District Court deemed the "higher premiums" theory too speculative because Lewandowski offered no "allegation or evidence of premiums on other plans or that Defendants' specific conduct resulted in the higher premiums." App. 31. Second, the District Court addressed the theory that Lewandowski had paid "higher prices for drugs under the Plan[]" and held that this purported injury was not redressable. Because Lewandowski had reached her out-of-pocket maximum, any repayment for the supposed "higher amount of money she spent … would be owed to [the Plan] to

17

reimburse it for its expenditures on *other* drugs that same year." App. 33.

Lewandowski then filed a Second Amended Complaint ("the complaint"), which added new allegations—and a new plaintiff—to rehabilitate the standing theory the District Court had rejected. First, the complaint added Robert Gregory as a co-plaintiff; unlike Lewandowski, he was still a Plan participant and had "not hit his out-of-pocket maximum." App. 58–59, 142 (SAC ¶¶ 13, 239). Second, the complaint alleged that her third-party copay assistance payment nevertheless might have been larger if tizanidine and valacyclovir had cost less. App. 140 (SAC ¶ 229) (chart summarizing Lewandowski's personal out-of-pocket payments and payments from the third-party copay card); *see also* App. 138–39 (SAC ¶¶ 222–28). Third, the complaint alleged that J&J sets premiums based on a fixed "contribution ratio." App. 131 (SAC ¶ 197). Finally, the complaint alleged that Lewandowski—despite having already sued the Plan for allegedly inflated healthcare costs—nonetheless chose to remain on the Plan after her employment ended, thereby incurring allegedly inflated "COBRA premiums." App. 134–35 (SAC ¶¶ 208–10).

The District Court again dismissed both claims for lack of Article III standing. As in its first ruling, the District Court started by rejecting the "higher premiums" overcharge theory as "too speculative." App. 15, 18. The District Court reasoned that the complaint's speculative allegations about an "established contribution ratio" did not override unambiguous Plan documents that "vest Defendants with 'sole discretion' to set participant contribution rates" or the "several factors having nothing to do with prescription drug benefits" that affect the exercise of this discretion. App. 17–19. Turning next to her "prescription drugs" theory, it found that the complaint's "selective allegations" about a small sampling of drug prices "out of thousands of health services and drugs covered by the Plan[]" failed to "establish the necessary causal connection" between any alleged misconduct by J&J and Lewandowski's purported "overpa[yment]" for certain prescriptions. App. 18–19.

Plaintiffs declined to amend the complaint a third time, and Lewandowski timely filed a notice of appeal. Her co-plaintiff Gregory did not appeal.

19

## SUMMARY OF ARGUMENT

Lewandowski's case fails at both ends of the Article III standing inquiry. Her theory that J&J's alleged mismanagement caused her to pay more for healthcare than she otherwise would have rests on a chain of speculative assumptions that cannot establish injury or causation. And her requested relief—retrospective monetary relief for past alleged overpayments—is not available to her under ERISA.

**I.** The complaint does not plausibly allege injury or causation. Lewandowski claims that she overpaid for her premiums and prescription drugs. But the standing inquiry does not end once a plaintiff utters the word "overcharge." Rather, Lewandowski's "price-inflation theory" of standing requires well-pled facts establishing a plausible difference between the "price with and without the defendant's illegal [alleged conduct]." *Finkelman v. NFL*, 810 F.3d 187, 200 (3d Cir. 2016). Neither Lewandowski's premium theory nor her prescription theory meets this standard, as the District Court correctly concluded.

***Premiums.*** Lewandowski's claim that she overpaid in premiums is foreclosed by this Court's decision in *Knudsen. See* 117 F.4th at 574,

20

580. The *Knudsen* plaintiffs—like Lewandowski—tried to show a causal link between plan costs and participant premiums by alleging that plan members paid a consistent ratio of total plan expenses in their annual premiums. *Id. Knudsen* rejected those allegations as insufficient because the plaintiffs failed to show that "*under the Plan documents*" an increase in plan assets would reduce premiums. *Id.* at 582 (emphasis added). Under the plan documents, the plan sponsor "may" have reduced premiums after an increase in plan assets, but also "*may not have*" reduced them. *Id.* The same is true for J&J. And even if such discretion were lacking, Lewandowski's alleged causal chain from "plan management" to "lower premiums" depends on the hypothetical conduct of multiple independent actors over which J&J has no control and, thus, is even more speculative than the one *Knudsen* rejected.

*Prescriptions.* Lewandowski's claim that she paid an "inflated amount" for two prescriptions (App. 137–38 (SAC ¶¶ 220–21)) fares no better. Lewandowski offers nothing but conjecture to suggest that more prudent management of the Plan would have led to lower prices on those two specific drugs (out of thousands available under the Plan)— much less without countervailing cost increases for any other drugs or

21

medical services. And even if this Court nonetheless assumes J&J would have "obtain[ed] better rates" (App. 56–57 (SAC ¶ 9)) for these two prescriptions in a more prudent negotiation, Lewandowski would still have no Article III injury. Her medical expenses vastly exceeded her out-of-pocket maximums. So even if the two prescriptions she challenges had cost her *zero* dollars, her out-of-pocket charges would have remained the same.

**II.** Redressability provides an independent basis to affirm, as the District Court correctly recognized. Despite asking for prospective relief in the District Court, Lewandowski pursues only her request for retrospective monetary relief on appeal. But she has no entitlement to such relief under the ERISA provisions she invokes. An award to the Plan under Section 1132(a)(2) will not redress her purported pocketbook injury. As a former participant, Lewandowski did not and still does not have an individual right to the general assets from which her pre-defined health benefits were paid (in full). Plan assets could double or drop to zero tomorrow, but neither event would impact Lewandowski. Nor has she plausibly alleged entitlement to "appropriate equitable relief" under Section 1132(a)(3). The "surcharge" she seeks would be

just money damages by another name. And retrospective money damages are not available under (a)(3).

## STANDARD OF REVIEW

This Court exercises de novo review over the dismissal of a complaint under Federal Rule of Civil Procedure 12(b)(1) for lack of jurisdiction. *Knudsen*, 117 F.4th at 576. "[T]he party asserting federal jurisdiction when it is challenged has the burden of establishing it." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006). To survive dismissal for lack of standing, a plaintiff must "allege facts that affirmatively and plausibly suggest that [she] has standing to sue." *Finkelman*, 810 F.3d at 194. That means she "must demonstrate (1) an injury-in-fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision." *Id.* at 193. And while the complaint's allegations must be accepted as true, this Court's review still "must rest on 'well-pleaded factual allegations' and not 'mere conclusory statements.'" *Knudsen*, 117 F.4th at 576.

# ARGUMENT

## I.    PLAINTIFF FAILS TO ALLEGE A NON-SPECULATIVE INJURY TRACEABLE TO J&J.

Lewandowski asks this Court to "assume" the existence of an overcharge resulting from an alleged fiduciary breach. *See, e.g.*, Opening Br. 50. But Article III does not permit courts to assume away the requisite injury and traceability analysis. And here neither the premium nor the prescription-overcharge allegations withstand Article III scrutiny.

As to premiums, her allegations cannot overcome J&J's broad discretion to set premiums in its non-fiduciary capacity, which—as this Court held in *Knudsen*—renders her supposed "overcharges" entirely speculative. Her attempt to overcome this by pointing to supposed cost-sharing ratios and COBRA premium percentages fails, as it too rests on contradictory and unsupported assertions, and ultimately does not change the reality that J&J has discretion under the Plan to establish premiums. As to prescriptions, her overcharge theory fares no better. It similarly relies on implausible conjecture about the hypothetical conduct of nonparties, fails to identify a single legitimate price comparator suggesting that Lewandowski would have paid less under a

prudently managed plan, and ignores that Lewandowski's out-of-pocket maximum insulated her from any supposed injury.

## A.    Merely Asserting Overpayment Does Not Establish Injury or Causation.

Both of Lewandowski's theories of standing rest on the assertion that she paid too much, either for premiums or for two prescription drugs. Lewandowski claims that her overcharge allegations—that is, her allegations that she was injured by J&J's conduct—"must be accepted" at the pleading stage. Opening Br. 26. But merely claiming that J&J was imprudent and that she thus paid too much money does not, under this Court's precedent, suffice to show injury or traceability.

This Court has addressed similar theories of overpayment before. And it has repeatedly held that courts look underneath assertions of economic harm to assess whether they "stand on well-pleaded facts and allegations [or] … nothing more than speculation." *Finkelman*, 810 F.3d at 201; *see also, e.g.*, *Knudsen*, 117 F.4th at 580 ("[A]llegations that stand on nothing more than supposition cannot establish financial harm."); *Horvath v. Keystone Health Plan E., Inc.*, 333 F.3d 450, 457 (3d Cir. 2003) (pleadings deemed "far too speculative to serve as the basis for a claim of individual loss"). Though courts may "credit allegations of

25

injury that involve no more than application of basic economic logic," they "need not accept as true unsupported conclusions and unwarranted inferences." *Finkelman*, 810 F.3d at 201–02.

In particular, this Court's rulings make clear that the existence of *over*payment is not, as Lewandowski suggests, a standalone allegation that "must be accepted as true" (Opening Br. 26) but a conclusion that must be supported by well-pled facts plausibly demonstrating *lesser* (or *zero*) payment in plaintiff's but-for world. Plaintiffs "must do more than simply characterize [their] … purchases as economic injuries." *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Liab. Litig.* ("*In re J&J*"), 903 F.3d 278, 285 (3d Cir. 2018) (affirming dismissal for lack of standing despite plaintiff's out-of-pocket payment). A plaintiff might, for example, "plead an economic injury by alleging that, absent the defendant's conduct, she would have purchased an alternative product that was less expensive." *Id.* at 282. Or she might allege that the defendant misled her into paying an unfair "premium" for the product "in excess of [its] face value." *Finkelman*, 810 F.3d at 200. But no matter the theory of economic loss, it *must* be grounded in reality—not conjecture—and connected to the defendant's alleged

26

unlawful actions. *Id.* at 201. The claim "I paid too much" must be supported by a credible "economic theory of harm," *In re J&J*, 903 F.3d at 285, and by "commonsense" facts supporting the plaintiff's assertion that she would have paid less but for the defendant's challenged conduct, *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 547 (2020).

The rigorous scrutiny this Court applies to allegations of overpayment flows directly from basic Article III principles. "[M]onetary harms" are, of course, among the "traditional tangible harms," *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021), that qualify as "an invasion of a legally protected interest," *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). But a claim of "financial harm" (App. 135 (SAC ¶ 213)) can still be "conjectural or hypothetical" rather than "actual or imminent." *Spokeo*, 578 U.S. at 339. Moreover, economic injury must also be "traceable to the challenged action of the defendant." *Lujan*, 504 U.S. at 560 (citation omitted). That "line of causation … must not be too speculative or too attenuated." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024) (citation omitted). Standing is therefore lacking when an economic injury—just like any other injury—rests on

27

"speculation about the decisions of independent actors," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013). In sum, a plaintiff alleging that a voluntary transaction caused her financial harm bears the burden of pleading that she is *in fact* economically worse off *because* of the defendant's unlawful actions.[3]

Against this legal backdrop, Lewandowski's invitation to assume that she suffered a traceable injury in the form of overpayment should be declined. She first waves off injury, suggesting the Court "must … accept" that she paid more "than she would have." Opening Br. 26. As for causation, once the Court "[a]ssum[es] the [ERISA] violation itself," she says, the Court must also accept that her "overpayments are the

---

[3] For an "overcharge" theory of Article III injury, whether a plaintiff "paid more" in a voluntary transaction (injury in fact) is intertwined with whether a defendant's "alleged misconduct" caused an inflated price (traceability). *Finkelman*, 810 F.3d at 202–03; *see also, e.g.*, *Knudsen*, 117 F.4th at 582 (addressing "injury in fact" by asking whether "the purported violative conduct was the but-for-cause" of allegedly increased premiums). Here, because Lewandowski's theory is that J&J's "alleged breach of fiduciary duty led to [her] paying higher" healthcare prices, the speculation on which her theory rests may be framed as a failure to plead an overcharge *injury* but "can also be understood as a failure to plead *causation.*" *Winsor v. Sequoia Benefits & Ins. Servs., LLC*, 62 F.4th 517, 524–25 (9th Cir. 2023) (emphasis added). This brief therefore addresses injury and causation together.

direct result of Defendants' alleged [misconduct]." Opening Br. 29. But although a court must "assume for the purposes of [its] standing inquiry that a plaintiff has stated valid legal claims," *Cottrell v. Alcon Lab'ys*, 874 F.3d 154, 162 (3d Cir. 2017), it cannot "assume" Article III injury or causation (or redressability, for that matter) any more than it could assume subject matter jurisdiction generally, *see Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998). Nor can a bare "legal violation" establish standing on its own. *TransUnion*, 594 U.S. at 427. Put simply, although this Court may assume plaintiff's claimed breach of J&J's duty of prudence under ERISA for purposes of a standing inquiry, it cannot assume that such conduct *in fact* caused Lewandowski economic harm.

Lewandowski's "theory of standing," *Knudsen*, 117 F.4th at 578, is that she paid "excessive" healthcare costs beyond what "she would have … if Defendants had prudently negotiated and monitored drug prices," Opening Br. 26. But as this Court has repeatedly affirmed in cases featuring similar assertions of financial injury, the claim that "I paid too much" must be supported by "nonspeculative allegations" showing "economic harm," *Knudsen*, 117 F.4th at 580, and by well-pled facts that

29

push that theory over "the line between possibility and plausibility,"

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### B. The Premium-Overcharge Theory Is Speculative.

The allegation that Lewandowski "paid more in premiums … than [she] would have absent the [alleged] fiduciary breaches" (App. 129 (SAC ¶ 192)) is unmoored from any economically plausible chain of events. This Court rejected a near-identical "higher premiums" theory of injury two years ago in *Knudsen*, 117 F.4th 570, and Lewandowski's theory fails for the same reasons and then some. Her effort to circumvent *Knudsen* and "fill in the necessary inferential gaps," *id.* at 582, with conclusory (and contradictory) allegations about cost-sharing ratios or COBRA premiums likewise falls flat.

#### 1. J&J's broad discretion to set premiums defeats standing under *Knudsen*.

Start with *Knudsen*, a case in which this Court affirmed dismissal by rejecting a materially indistinguishable theory of standing—and which the District Court correctly concluded was "controlling and dispositive." App. 31. In *Knudsen*, a putative class of plan participants claimed that a health plan sponsor violated ERISA by keeping $65 million in prescription drug rebates for itself instead of allocating them

30

to the plan. 117 F.4th at 580. This loss in plan assets allegedly led to higher costs, "mainly in the form of insurance premiums." *Id.* at 573. Notwithstanding plaintiffs' allegation that participants annually paid "around 30% of overall contributions to the Plan," they failed to demonstrate that either the rebates or "total value of plan assets[] [we]re, under the Plan documents, used to calculate Plan participants' [premiums] and that the effect of these inputs would decrease costs." *Id.* at 574, 582. The plan sponsor "*may*" have reduced participant premiums based on an increase in plan assets—or "it *may not* have." *Id.* at 582. Plaintiffs therefore failed to "show that they ha[d] an 'individual right' to the withheld rebate monies" such that the alleged misallocation of plan assets plausibly caused them harm in the form of increased out-of-pocket expenses. *Id.*

The allegations here similarly fail to establish that Lewandowski held a cognizable expectation or "individual right" to pass-through savings due to fluctations in Plan assets. Not one paragraph in the complaint alleges that J&J was obligated by law or Plan documents to set employee contributions using a formula tying "plan assets" to "participants' out-of-pocket costs." *Id.* To the contrary, and as

Lewandowski acknowledges (Opening Br. 41), the Plan documents confer discretion on J&J to set annual premiums as it deems appropriate. "No formula or agreement governs the setting of premiums." App. 218; *cf. Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996) ("[E]mployers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans."). As such, even if this Court assumed that the Plan would have obtained net savings but for J&J's conduct, the complaint's allegations "readily permit an inference" that premiums could have remained the same. *Knudsen*, 117 F.4th at 582; *see also Horvath*, 333 F.3d at 457 (rejecting as an implausible and "troublesome assumption" that, but for a firm's alleged misconduct, it "would have passed … savings on to its employees"). That defeats Lewandowski's premium-overcharge theory of injury.

That result under *Knudsen* harmonizes with the fundamental principles of both Article III and ERISA: Lewandowski can establish injury only by tracing her harm to J&J's unlawful conduct—here, an alleged breach of fiduciary duty. But under ERISA, "fiduciary status is not an all or nothing concept," *Santomenno v. John Hancock Life Ins.*

32

*Co.*, 2013 WL 3864395, at *4 (D.N.J. July 24, 2013) (citation omitted), *aff'd*, 768 F.3d 284 (3d Cir. 2014), and a "threshold question" thus is whether the plan sponsor was "performing a fiduciary function[] when taking the action subject to complaint," *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000). Setting premiums is an unequivocally *non-fiduciary* action relating to "the form or structure of the Plan" and the "amounts" for which benefits are provided. *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 444 (1999); *see also Bator v. Dist. Council 4*, 972 F.3d 924, 932 (7th Cir. 2020) ("setting the contribution rates" is a settlor, i.e., non-fiduciary, function); *Argay v. Nat'l Grid USA Serv. Co.*, 503 F. App'x 40, 42 (2d Cir. 2012) (same). Lewandowski complains that her premiums were too high, but the thrust of J&J's non-fiduciary discretion is—as the District Court recognized—that J&J can "increase Plan participants' contribution amounts … *without any violation of ERISA having occurred*." App. 19–20 (emphasis added). Lewandowski cannot establish standing for fiduciary claims by pointing to J&J's non-fiduciary acts, just as she cannot rely on "the independent action of some third party." *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 247 (3d Cir. 2012).

33

Lewandowski's contrary arguments rest on a misreading of *Knudsen*. According to Lewandowski, *Knudsen* stands for the proposition that, once a plan participant "allege[s] that participant premiums were calculated as a percentage of plan expenses," then she has demonstrated standing "to recover plan-wide overpayments." Opening Br. 42–43. To that end, she stakes her Article III standing on "historical data" she reads to suggest "that Defendants charged employees a consistent … percentage of the Plan's total expenses each year," Opening Br. 41–42—allegedly around 17–18%, App. 130 (SAC ¶¶ 195–96). This 17–18% figure, Lewandowski claims, was the missing link in *Knudsen* and entitles her to a "proportional share" of Plan asset fluctuations. Opening Br. 43. Not so.

Lewandowski's alleged "17–18%" participant contribution ratio of prior years is not "exactly what *Knudsen* requires" to establish standing (Opening Br. 38); it is exactly what *Knudsen* already *rejected* as insufficient.[4] Like Lewandowski, the *Knudsen* plaintiffs *also* claimed

---

[4] Lewandowski's only purported support for this premiums-ratio theory comes from out-of-circuit rulings *also* rejecting standing, *see* Opening Br. 43; *infra*, pp. 38–39 nn.7–8 (discussing *Winsor* and *Loren*), though this Court need look no further than its own decision in *Knudsen*.

that premiums were set as a function of total costs, alleging that "[d]uring the last five years, Plan participants ha[d] paid … around 30% of overall contributions to the Plan." 117 F.4th at 574. Like Lewandowski, the *Knudsen* plaintiffs *also* defined their monetary injury (and corresponding entitlement to relief) as the would-be savings they might have obtained "in proportion to their contributions." 117 F.4th at 575 (quoting the *Knudsen* complaint); *accord* App. 131 (SAC ¶ 197). Such allegations were inadequate then; they are just as inadequate now.

What's more, there *is* no 17–18% ratio—or any other ratio—used to set participant premiums "*under the Plan documents*." *Knudsen*, 117 F.4th at 582 (emphasis added). Instead, J&J's premium-setting discretion is influenced by multiple complex factors—not just the "costs of [] prescription drugs" (the sole factor Lewandowski acknowledges, *see* Opening Br. 4), but also "group health plan market trends, administrative expenses, non-drug medical costs, … historical cost-sharing levels under the Plan, and other internal or external factors impacting employees." App. 217–18. For example, J&J's Committee elected not to increase participants' premiums in 2022 relative to 2021

in light of impacts that year from a significant external factor: "the COVID-19 pandemic." App. 218. J&J's discretion "cannot be squared with plaintiff['s] mechanistic assertion" about employee contribution ratios. *Winsor*, 62 F.4th at 525. In fact, the only Plan year for which Lewandowski offers details (2022) reveals employee contributions totaled only about 15% of total plan spending.[5] That directly contradicts her claim that her purported 17–18% cost-sharing percentage is "steadfastly maintained." App. 131 (SAC ¶ 197).

Lewandowski nonetheless repeatedly insists that J&J "recognized" a connection between healthcare costs and participant contributions. Opening Br. 4, 41. But that observation does not advance her standing theory. As above, J&J does not dispute that drug costs may be one consideration. But there are many other factors too. App. 217–18. And J&J sets contribution levels at its discretion, based on numerous internal and external considerations, and "[n]o formula …

---

[5] The SAC alleges that, in 2022, Plan spending totaled $949.4 million and employee contributions totaled $149.2 million (~15.7%). App. 60, 130 (SAC ¶¶ 16, 196). The Plan's summary annual report for the same year reports Plan spending of $962 million and employee contributions of $148.2 million (~15.4%). App. 185.

governs" the premium setting. App. 218. Thus, the fact that prescription drug costs may be considered says nothing about whether any particular reduction in those costs would have translated into lower participant premiums. That is precisely the inferential leap *Knudsen* rejected.[6]

Because there is no inevitable correlation between plan spending and participant premiums, Lewandowski's attacks on the District Court miss the mark. It may be true that, as she notes, an increase in the costs of individual groceries—"eggs, milk, and butter"—generally increases the "aggregate cost" of a customer's grocery bill. Opening Br. 47. But health plans are not like grocery stores. The "mathematical relationship" would "fundamentally change" (*id.*) if the grocery store (J&J) had discretion to set the customer's annual grocery bill (participant premiums) at whatever level it deemed appropriate and

---

[6] Lewandowski also points to a company survey stating that employee contributions may need to increase to cover healthcare costs. Opening Br. 41. That statement merely reflects the unremarkable proposition that healthcare benefits cost money. It does not suggest that participant contributions are mechanically tied to prescription drug spending, much less that they are tied to the particular prescription drug expenses challenged here.

then allowed customers to make unlimited grocery purchases in exchange for capped additional contributions (cost-sharing). J&J's premium-setting discretion likewise defeats Lewandowski's reliance on a handful of articles and reports that supposedly suggest a correlation between increased prescription drug costs and increased premiums. Opening Br. 4. None of those studies relate to J&J's Plan—much less to the Premier HSA Individual option that Lewandowski selected within the Plan—nor do they suggest that J&J lacks discretion to raise, lower, or leave premiums unchanged as it sees fit.

Other courts of appeals are aligned: allegations that contradict or otherwise fail to "solve the variable of [sponsor] discretion" cannot support an ERISA plaintiff's pass-through-savings theory of standing. *Winsor*, 62 F.4th at 524;[7] *Glanton ex rel. ALCOA Prescription Drug Plan*

---

[7] Lewandowski attempts to distinguish *Winsor* by suggesting that the plaintiffs in that case "*would have* had standing if—as is true here— 'employee contributions [were] calculated as a *pro rata* share of the total benefits cost.'" Opening Br. 43 (quoting 62 F.4th at 525). What Lewandowski fails to mention is that the *Winsor* plaintiffs alleged *exactly that,* pointing to cost-sharing percentages and examples of prior, "roughly proportionate" fluctuations in costs. 62 F.4th at 524–25. The Ninth Circuit still rejected the "*pro rata* shar[ing]" allegation as "conclusory and not entitled to be assumed true" because—*as is true*

*v. AdvancePCS Inc.*, 465 F.3d 1123, 1125 (9th Cir. 2006) (rejecting standing theory that if costs "decrease … the plans might then reduce contributions" because "nothing would force [the plan sponsor] to do this"); *Gonzalez de Fuente v. Preferred Home Care of N.Y. LLC*, 858 F. App'x 432, 433 (2d Cir. 2021) (rejecting standing theory that misappropriation of "millions of dollars" from plan deprived plaintiffs of superior benefits given plan sponsor's discretion over benefits).[8]

### 2.   The premiums theory relies on an attenuated chain of contingencies involving independent third parties.

Even setting aside the variable of sponsor discretion, Lewandowski's premium-overcharge theory is too speculative. The

---

*here*—it contradicted the plan sponsor's undisputed "broad discretion" and "lack of set formula … in setting employee contributions." *Id.*

[8] Lewandowski cites *Loren v. Blue Cross & Blue Shield of Michigan*, 505 F.3d 598 (6th Cir. 2007), for the proposition that standing is plausible under these circumstances whenever plaintiffs have "paid percentage contributions." Opening Br. 43. In fact, *Loren* held that (i) "injury would only be *possible* if Plaintiffs paid percentage contributions," and (ii) the plaintiffs would still need to show that their employers "would pass on any increase in reimbursements or administrative fees" resulting from the insurer's misconduct. *Loren*, 505 F.3d at 608 (emphasis added). Here, Lewandowski has not plausibly alleged (i) that she "paid percentage contributions" or (ii) that J&J "would"—as opposed to *could*—pass on increased plan costs.

theory proceeds as follows: Defendants should have chosen their PBM differently or "used their bargaining power" to request "better rates" with their PBM (App. 56–57 (SAC ¶ 9)); faced with a request for "better rates," either ESI (or a hypothetical, unidentified alternative PBM) would have conceded (App. 56–57 (SAC ¶ 9)); these unquantified "better rates" would have saved the Plan an unknown amount somewhere in the "millions of dollars" (App. 57 (SAC ¶ 10)); these unquantified savings would have led to lower premiums (App. 134–35 (SAC ¶ 209)); and, thus, Lewandowski was injured by a premium overcharge.

This daisy chain of conjectures starts a full step behind the already-too-speculative theory rejected in *Knudsen*. There, the pass-through-savings narrative began with a well-pled allegation that the plan sponsor took a discrete, unilateral, and quantifiable decision to deprive the plan of $65 million of prescription drug rebates. Here, to reach that starting point (i.e., to demonstrate that Plan assets were impacted by J&J's conduct at all), Lewandowski must establish that J&J could have negotiated its way to "better [drug] rates" (App. 56–57 (SAC ¶ 9))—while keeping *all* other Plan costs and benefits unchanged—sufficient to yield savings. However, even one dollar of

40

Plan savings (let alone millions) depends on the hypothetical conduct of ESI and multiple other nonparties.

No allegations support the inference that these third parties, which are paid to administer Plan benefits, are mere conduits of J&J's will. To the contrary, Lewandowski herself alleges that PBMs—including the "Big 3 PBMs" that dominate the market (App. 82 (SAC ¶ 79))—are powerful, "profit-driven entities" (App. 68 (SAC ¶ 40)), and her own amici contend that "the incentives of plan fiduciaries and PBMs do not align." PatientRightsAdvocacy.org, Inc. Amicus Br. 19; *see also* C. Deacon Amicus Br. 6 ("PBMs are not merely neutral claims processors."). Not only is it not "predictable," *All. for Hippocratic Med.*, 602 U.S. at 383, it defies "commonsense economic realities" to think that ESI—or whatever hypothetical PBM, broker, or online pharmacy Lewandowski envisions—would simply acquiesce to a materially better deal for J&J, *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 116 (2025).

Moreover, J&J had every incentive to negotiate the best deal it could, because it bore the vast majority of Plan costs—for example, it contributed nearly $820 million (85% of Plan costs) in 2022. App. 185.

41

Lewandowski has suggested otherwise, alleging that J&J generally "profits from high drug prices." App. 57 (SAC ¶ 9). But that allegation lends no plausibility to her theory because the Plan generally "pays *100%* for drugs that are manufactured or marketed by" J&J. App. 240 (emphasis added). At bottom, her vague assertion that "companies like Johnson and Johnson" possess "bargaining power" (App. 79 (SAC ¶ 72)) is too speculative to show that any PBM would have in fact agreed to lower Plan costs overall. Article III "require[s] a firmer foundation" than the one she has offered. *Finkelman*, 810 F.3d at 201.

### 3. COBRA does not save Lewandowski's speculative premiums theory.

Lewandowski's COBRA argument does not change the result under *Knudsen*. Lewandowski says that increased costs must have been passed down to her during her five-month post-employment coverage because she paid "102 percent" of her "applicable premium," which is generally calculated based on actual or estimated costs under COBRA. Opening Br. 53–54. Setting aside the oddity of Lewandowski choosing to continue coverage through COBRA three months after filing a lawsuit complaining that her J&J Plan was injuriously expensive, this attempt to manufacture standing fails.

42

*First*, this variation on her premium-overcharge theory still rests on the same "highly attenuated chain of possibilities" and "speculation about the decisions of independent actors," *Clapper*, 568 U.S. at 410, 414, regarding the supposed "better contractual terms" (App. 111 (SAC ¶ 142)) J&J could have extracted from third parties, *see supra,* Section I.B.2; *see also Navarro v. Wells Fargo & Co.*, 2026 WL 591454, at *10 (D. Minn. Mar. 3, 2026) (rejecting COBRA theory as speculative).

*Second*, it does not overcome the Plan-sponsor discretion to set premiums that is fatal to Lewandowski's premiums theory under *Knudsen*. Lewandowski invokes the statutory provision establishing the mechanisms for calculating the COBRA "applicable premium." Opening Br. 54; *see* 29 U.S.C. § 1164. But she misses that the "applicable premium" is simply the *maximum* a participant can be required to pay; a plan sponsor retains discretion over how much of that premium it wishes to pass on to former participants. *See* 29 U.S.C. § 1162(3) (providing that "[t]he plan *may* require payment of a premium for any period of continuation coverage" up to "102 percent of the applicable premium for such period" (emphasis added)). Thus, the amount of her COBRA premium—just like her employee premium—rested on J&J's

discretion, and, even under COBRA, there is no necessary connection between "increased costs" and "increased premiums." *Accord Geissal v. Moore Med. Corp.*, 524 U.S. 74, 80–81 (1998); *see also FAQs on COBRA Continuation Health Coverage for Employers and Advisors*, U.S. DEP'T OF LABOR (Sept. 2025), https://tinyurl.com/yuh5ct86 ("Q6 ... employers may choose to cover part or all of the cost.").

*Third*, her arguments about COBRA amplify the conjecture she relies on for her already-too-speculative premium theory. Lewandowski says federal law requires "applicable premium[s]" under COBRA to "be calculated on either an 'actuarial basis' or 'past cost' basis." App. 134 (SAC ¶ 209). But she omits that this calculation is not tied to the "cost to the plan" for *everyone* but rather to "the cost of providing coverage for *similarly situated beneficiaries*." 29 U.S.C. § 1164(2)(A) (emphasis added); *accord id.* § 1164(2)(B)(i). That is, the applicable premium reflects the cost to cover the "subset of beneficiaries … [who] elected the same policy and level of coverage" as the participant. *Draper v. Baker Hughes Inc.*, 892 F. Supp. 1287, 1297 (E.D. Cal. 1995).

Here, that means the complaint must plausibly allege that J&J's conduct increased costs for those under *Lewandowski's* plan of choice

(the Premier HSA Individual plan). It does not. Her allegations fail to identify whether her Premier HSA Individual plan premiums "increased, in what years, or by how much." *Knudsen*, 117 F.4th at 582. The COBRA allegations thus compound the speculative nature of the premium theory. They do not render it plausible.

### C.    The Prescription-Overcharge Theory Fails for Multiple Independent Reasons.

Lewandowski claims she paid an "inflated amount" for two generic-drug prescriptions: tizanidine and valacyclovir. App. 137–38 (SAC ¶¶ 220–21). To survive dismissal on this theory, Lewandowski must plausibly allege a "difference between the … price" she would have been charged "with and without" J&J's alleged imprudence. *Finkelman*, 810 F.3d at 200. She fails to do so. Critically, her covered medical expenditures far exceeded her out-of-pocket maximum. So the prices she paid for these two drugs had *no impact* on her out-of-pocket costs in 2023. That independently defeats her prescription theory of injury. In all events, her prescription theory also fails for the same reason as her premium theory: it too rests on speculation and conjecture.

### 1. Lewandowski's total expenses far exceeded her out-of-pocket maximum, foreclosing her claim of injury from alleged prescription overcharges.

Even if a prescription-overcharge theory like Lewandowski's could be tenable in some cases, Lewandowski could not invoke it given her unique circumstances—namely, her plan's out-of-pocket maximum and her medical expenses that far exceeded that limit.

Lewandowski chose a health plan that carries a $3,500 annual out-of-pocket maximum. *See* App. 194–214 (describing "Premier HSA Medical Plan Features"). The Plan terms guaranteed Lewandowski would never pay more than $3,500 out of pocket in any given year, and she never did. *See* App. 221 (listing Lewandowski's "Total Patient Responsibility" as $3,500, and "Total Plan Responsibility" as $168,035, $197,882, and $88,789, for 2022, 2023, and 2024, respectively). The same year she purchased tizanidine for $18.72 and valacyclovir for $303.68, Lewandowski underwent an approximately $79,000 medical procedure that, given her co-insurance obligations, would have resulted in her hitting her out-of-pocket maximum even if it had been her *only* healthcare expense that year. *See* App. 138 (SAC ¶ 223).

Lewandowski's receipt of benefits far in excess of her out-of-pocket maximum defeats her prescription-overcharge theory of standing. This is not because those benefits "offset" or "negate[]" her costs. Opening Br. 32. Lewandowski attributes that "novel offset theory" to the District Court (*id.* at 3), but the District Court said nothing of the sort. And Lewandowski cannot escape that, even assuming J&J could have negotiated lower prices for prescription drugs, the total amount she was *actually charged* ($3,500) would not have changed. In fact, J&J could have priced tizanidine, valacyclovir, and every other drug covered by the Plan at $0, and Lewandowski's out-of-pocket costs would have been unchanged in 2023.[9]

Paradoxically, Lewandowski seeks to avoid this straightforward conclusion by alleging that she actually paid only a third of her out-of-pocket maximum while still reaping the full benefits of this annual cap

---

[9] For this reason, Lewandowski cannot rely on the overgeneralization that, under a coinsurance arrangement, "[t]he higher the price of the drug, the more the participant pays." *See* Opening Br. 9. The question is not whether a higher drug price can theoretically increase a participant's coinsurance obligation in the abstract. The question is whether it in fact increased Lewandowski's ultimate financial obligation. The complaint demonstrates that it did not.

on her expenses. App. 139 (SAC ¶ 227). As alleged, Lewandowski achieved this by using a third-party copay assistance card to cover $2,520 for an infusion procedure. App. 138–39 (SAC ¶ 224). J&J was not required to credit this third-party payment towards Lewandowski's deductible or annual out-of-pocket maximum.[10] But it did so anyway, meaning Lewandowski reached her $3,500 out-of-pocket maximum despite paying only $980. App. 139 (SAC ¶ 225). Not only was this plainly a financial *benefit* (rather than a financial injury), it also has nothing to do with J&J's alleged Plan mismanagement.

Lewandowski nonetheless points to these savings conferred on her by a third party as evidence of a financial injury inflicted by J&J. In effect, she claims that she should have reached her $3,500 out-of-pocket maximum by paying even *less* than $980. But the fact that a third party voluntarily assumed a portion of Lewandowski's copayment—and allegedly would have assumed an even greater portion if the cost of Lewandowski's two prescriptions had been lower—is wholly unrelated

---

[10] *See* HHS Notice of Benefit & Payment Parameters for 2021, 85 Fed. Reg. 29164, 29233 (May 14, 2020) ("[I]ssuers have flexibility … to determine if and how to factor in direct drug manufacturer [i.e., 'copay assistance'] amounts towards the annual limitation on cost sharing.").

48

to J&J's challenged conduct. Nor does J&J's alleged decision to credit $2,520 in third-party payments to Lewandowski's cost-sharing limit establish that J&J should or would have credited even *more. See In re Schering Plough*, 678 F.3d at 247 ("[T]he injury has to be fairly traceable to the *challenged action* of the defendant, and not the result of the independent action of some third party not before the court." (emphasis added)).

In short, because Lewandowski's out-of-pocket costs were capped regardless of the prices charged for tizanidine and valacyclovir, and because any reduction below that cap would have resulted from the independent actions of a third party rather than J&J's alleged misconduct, she cannot establish the concrete, traceable injury required for Article III standing.

### 2. Lewandowski's prescription-overcharge theory rests on speculation and conjecture.

Putting aside that Lewandowski's out-of-pocket maximum forecloses her prescription-overcharge theory of standing, that theory is also irredeemably speculative for many of the same reasons that defeat her premium-overcharge theory.

### a. Lewandowski provides no basis to conclude that more "prudent" negotiations would have lowered the two drug prices at issue.

Lewandowski's theory is inextricably intertwined with the question of what would have happened in a but-for world where "Defendants *prudently* negotiated" or "conducted a *prudent* process" in managing its pharmacy benefit plan. App. 89 (SAC ¶ 101) (emphases added). But as discussed above, this Court cannot simply *assume* that a more "prudent" PBM negotiation would have produced lower prices for the tizanidine and valacyclovir prescriptions she purchased once each in 2023. Here, the sparse and conclusory allegations in the complaint reveal that this theory depends on speculation rather than well-pled facts.

Like the premium theory, the prescription theory depends on a series of unsupported assumptions about how independent third parties would have responded to a different negotiating strategy by J&J. Lewandowski's theory is that a "prudent" fiduciary *would* necessarily have chosen a different PBM (or negotiated differently with ESI), which *would* definitively have acceded to J&J's request for lower prescription drug prices (while keeping all other benefits equal), which *would*

conclusively have yielded lower prices for tizanidine and valacyclovir *without* incurring equivalent (or higher) cost increases for any other benefits or fees under the Plan. But those required assumptions are unexplained—and they are both speculative and implausible, given the numerous "unfettered choices made by independent actors" that impact the outcome of complex health benefit negotiations. *All. for Hippocratic Med.*, 602 U.S. at 383 (quoting *Clapper*, 568 U.S. at 415).

In essence, Lewandowski reduces a complex, multifaceted PBM negotiation to a claim that a prudent fiduciary would necessarily have secured lower prices for two particular drugs. That claim has no basis in the reality of health plan negotiations. Nor does the pleading standard require the Court to suspend "judicial experience and common sense" when evaluating what could plausibly happen in arm's-length negotiations between sophisticated commercial parties. *In re Schering Plough*, 678 F.3d at 243–44 (quoting *Iqbal*, 556 U.S. at 679). Lewandowski concedes—as she must—that it is *not* imprudent to negotiate "prices for *groups* of drugs." App. 69 (SAC ¶ 43) (emphasis added). And she has no plausible allegations to suggest that J&J should have strived to set a "separate price" for her two prescriptions out of the

51

thousands of medications covered by the Plan. *Id.* To the contrary, a more "prudent" negotiation may well have prioritized savings for drugs that are more expensive or more commonly used than tizanidine and valacyclovir. Indeed, the complaint notes that J&J obtained a "2% markup over pharmacy acquisition cost" for "the 50 most common high-cost branded drugs." App. 104 (SAC ¶ 129) (emphasis omitted). It likewise concedes that for certain drugs, J&J obtained prices below the pharmacy acquisition cost benchmark that Lewandowski treats as critical. *See* App. 100–01 (SAC ¶ 118).

And of course, PBM negotiations impact more than just drug prices. Far from attending only to the prices of tizanidine and valacyclovir—or the prices of generics or prescription drugs more generally—a plan sponsor must consider a host of factors in PBM negotiations, including which drugs to cover, participants' available pharmacy network and services, the efficiency and accuracy of claims processing, access to prescription delivery, and more. App. 67–68 (SAC ¶¶ 38–39); App. 245–46. Lewandowski waves these issues away. But no well-pled allegations suggest that J&J could have unilaterally dictated lower prices for tizanidine and valacyclovir to ESI or any other

sophisticated counterparty while retaining identical coverage, networks, services, rebates, fees, and other pricing terms.

On this point, Lewandowski treats a switch to a passthrough PBM like SmithRx as a cure-all. But no allegations plausibly suggest that such a switch would have reduced the cost of these two drugs for Lewandowski. The complaint leans on a set of 42 drugs (out of thousands covered by the Plan) that allegedly are generic drugs classified as specialty drugs on an unknown ESI formulary located by plaintiffs. Allegedly, some of these drugs are available through SmithRx. *Cf.* App. 114 (SAC ¶ 147) (repeating entries for "fingolimod," "fosamprenavir," and "etravirine" between two and six times). The drugs on which Lewandowski's prescription theory rests—tizanidine and valacyclovir—are *not* on that list. As Lewandowski concedes, tizanidine and valacyclovir are in a different category: "generic *non-specialty* drugs." App. 103 (SAC ¶ 126) (emphasis added). So Lewandowski's SmithRx list does nothing to advance her contention that she would have paid less for tizanidine and valacyclovir if J&J had switched to SmithRx or another passthrough PBM.

In fact, three of the listed drugs are *more* expensive on the SmithRx plan than on J&J's Plan. *See* App. 114 (SAC ¶ 147). That at least three drugs—and surely many more of the thousands available through SmithRx—were *more* expensive undercuts Lewandowski's inference that switching to a passthrough PBM would have necessarily lowered the prices of the two drugs that she purchased. In sum, even if J&J had engaged in supposedly more "prudent" negotiations, it remains wholly speculative that her tizanidine and valacyclovir prescriptions would have been cheaper.

### b.    Lewandowski's reliance on inapposite comparators cannot save her prescription-overcharge theory.

Lewandowski seeks to make her prescription-overcharge theory of standing seem more plausible by pointing to comparator pricing. And to be sure, price comparators may sometimes support an overcharge standing theory. *See Boley v. Universal Health Servs., Inc.*, 36 F.4th 124, 131 (3d Cir. 2022) (standing established where defined-contribution plan paid "total investment management fees nearly double those paid by comparable Plans"). But here, none of her

comparator allegations reflect the prices of those drugs in a similarly situated plan.

Lewandowski does not identify—presumably because she *cannot* identify—a similarly situated plan under which the prices for tizanidine and valacyclovir are lower than they are on J&J's Plan. Unable to make that showing, Lewandowski relies on two categories of expenses incurred by dissimilarly situated persons and entities. First, she points to the average "costs for pharmacies to acquire [her] same drugs" according to the NADAC database. App. 89–90 (SAC ¶¶ 101, 103); *see* App. 137–38 (SAC ¶¶ 220–21). Second, she points to the price at which retail pharmacies—such as Walmart, CVS, Walgreens, and Cost Plus Drugs—sell tizanidine and valacyclovir to persons paying without insurance. App. 137–38 (SAC ¶¶ 220–21). Neither set of data points demonstrates that Lewandowski "paid excessive amounts" for her prescriptions *under her Plan*. App. 137 (SAC ¶ 219).

Lewandowski accepts—as she must—that markups above pharmacy acquisition cost are not *per se* injurious. App. 57, 89 (SAC ¶¶ 9, 101). But that means she must allege facts showing that any such markups on tizanidine and valacyclovir were injuriously "higher-than-

55

reasonable." App. 141 (SAC ¶ 232). To do this, she relies on NADAC prices, but those numbers simply reflect the average pharmacy acquisition cost. App. 90 (SAC ¶ 103). They do not suggest that "the markup to which [Lewandowski's] plan's fiduciaries ha[d] agreed" exceeded the unidentified "reasonable" markup she would have paid under a supposedly more prudently managed plan. App. 90, 139 (SAC ¶¶ 103, 227).

Lewandowski's reliance on lower retail prices is equally misplaced. Due to market competition for cash-pay customers, a desire to meet the needs of uninsured Americans, or other policy or business objectives, a pharmacy's choice to set prices for insurer-free transactions at or below average acquisition costs says nothing about whether a Plan participant overpaid for a drug. In fact, Lewandowski's only cited support for her prescription theory—a single, unpublished district court order—confirms the deficiency of her comparators. *See* Opening Br. 28, 33 (citing *Stern v. JPMorgan Chase & Co.*, 2026 WL 654714 (S.D.N.Y. Mar. 9, 2026)). In *Stern*, the district court deemed a prescription-overcharge theory sufficient to "satisfy Article III standing." *Stern*, 2026 WL 654714, at *9. Yet after finding standing, the court went on to

56

explain that "merely plead[ing] that the Plan beneficiaries paid more for drugs than did *pharmacies*—not similarly situated plan beneficiaries"—is inadequate to "plead actual overpayment." *Id.* at *9 n.5. That is exactly the deficiency with Lewandowski's pleading.

To be sure, a plaintiff need not "allege the *exact* value of her economic injury at the pleading stage," but she still "must set forth sufficient factual allegations that, if proven true, would permit a factfinder to determine that she suffered at least *some* economic injury." *In re J&J*, 903 F.3d at 288 (affirming dismissal for lack of standing). Even if one accepts it is conceivable that Lewandowski might have paid less for tizanidine and valacyclovir under a differently managed plan, a "conceivable" injury is not an injury-in-fact, *United States v. Students Challenging Regul. Agency Procs.*, 412 U.S. 669, 688 (1973), and the complaint fails to explain why the average prices paid by pharmacies or cash-pay customers are proxies for expected prices under a "prudent" version of *this* Plan. Indeed, as another court recently observed in a similar ERISA case brought by the same counsel representing Lewandowski, "it fundamentally cannot be the case that participants in a plan like the one at issue here are injured any time the contractually

57

defined benefits to which they are entitled are available at a lower cost to non-participants." *Navarro*, 2026 WL 591454, at *11.[11]

In sum, the complaint provides neither a plausible basis to conclude that prudent fiduciary conduct would have lowered the prices of tizanidine and valacyclovir, nor a meaningful comparator showing those drugs were overpriced. The District Court correctly rejected Lewandowski's prescription-overcharge theory as too speculative.

## II. PLAINTIFF'S ALLEGED INJURIES ARE NOT REDRESSABLE.

Lewandowski fails to plausibly allege that there is a "*substantial likelihood of remedy*—rather than mere speculation—that the requested relief will remedy the alleged injury." *Pa. Prison Soc'y v. Cortes*, 508 F.3d 156, 161 (3d Cir. 2007). Because "standing is not dispensed in gross," *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996), Lewandowski must

---

[11] Lewandowski devotes substantial real estate in her brief to criticizing the District Court's reliance on *Navarro*. Opening Br. 31–34. But *Navarro*—decided in between the District Court's two dismissal orders below—accords with *Knudsen* and with the decisions of numerous courts that have rejected similarly attenuated theories of overcharge injury. And given the similar theories advanced simultaneously in this case and in *Navarro*, it is hardly surprising that the District Court found *Navarro* instructive in reaching its second dismissal order.

"demonstrate standing for each claim [s]he seeks to press and for each form of relief that is sought," *Davis v. FEC*, 554 U.S. 724, 734 (2008) (cleaned up). Lewandowski requested three forms of relief to remedy her supposed "overcharge" injuries: prospective changes to the Plan, a monetary award to the Plan, and a monetary award to herself. *See* App. 155 (SAC ¶¶ 292–99). The first two are ineffective, and the last is unavailable.

*First*, prospective changes to the Plan will not redress Lewandowski's purported injuries. Lewandowski agrees. Judicially ordered modifications to future Plan operations will have no impact on Lewandowski because "she is not even enrolled in the Plan anymore." Opening Br. 34. Though Lewandowski now lambasts the District Court for addressing the prospective relief she explicitly requested below, *see* App. 155 (SAC ¶¶ 292, 296–98) (requesting prospective relief), she concedes on appeal that "she has no personal stake in such relief" and thus has abandoned her request for it. Opening Br. 34.

*Second*, a monetary award to the Plan under 29 U.S.C. § 1132(a)(2) will not redress Lewandowski's purported injuries either. Just as Lewandowski has no interest in future changes to Plan

operations, she has no interest in future changes to Plan assets. On this point, there is a critical difference between defined-contribution plans and self-funded welfare benefit plans—one that Lewandowski overlooks. *See Winsor*, 62 F.4th at 528 (a welfare benefits plan "provides a fixed set of benefits as promised in plan documents").

In a defined-contribution plan (e.g., a 401(k) or 403(b) retirement plan), there is no separation of identity between "plan assets" and "individual benefits" to which a plaintiff is entitled. Plan assets reside in individual accounts held by participants, and all benefits owed to a participant are "based solely upon the amount contributed to the participant's account." *Hughes Aircraft Co.*, 525 U.S. at 439; *see also, e.g., Graden v. Conexant Sys., Inc.*, 496 F.3d 291, 297 (3d Cir. 2007) ("[A] participant's vested benefits are the contents of his account."). Losses to mismanaged retirement accounts and losses to plan assets in the defined-contribution context thus are one and the same; the same is true for gains. *See Sweda v. Univ. of Pa.*, 923 F.3d 320, 334 n.10 (3d Cir. 2019) (standing for claims involving defined-contribution plan existed where "named plaintiffs invested in the underperforming investment options"). As such, when a defined-contribution plan "recover[s] the

60

whole of [a] loss," it necessarily recoups assets to which (affected) participants are entitled. *Graden,* 496 F.3d at 302. That logic does not apply here, and Lewandowski's near-exclusive reliance on ERISA cases involving defined-contribution plans thus is misplaced.[12]

There is no corresponding individual right to plan assets in a self-funded welfare benefit plan like J&J's Plan. This creates a "redressability problem" not present in the defined-contribution context, in which "a successful suit leads to restoration of *individual accounts*." *Harris v. Amgen, Inc.*, 573 F.3d 728, 735 (9th Cir. 2009) (emphasis added). The Supreme Court's decision in *Thole v. U.S. Bank N.A.* confirms the point: participants whose benefits are fixed regardless of plan assets lack Article III standing to seek restoration of plan losses because, win or lose, they would receive "the exact same" benefits. 590 U.S. at 541. Welfare benefit plans function as defined-benefit plans,

---

[12] *See generally Cunningham v. Cornell Univ.*, 604 U.S. 693 (2025) (addressing "defined-contribution retirement plans"); *Hughes v. Nw. Univ.*, 595 U.S. 170 (2022) (same); *Tibble v. Edison Int'l*, 575 U.S. 523 (2015) (same); *Mator v. Wesco Distrib., Inc.*, 102 F.4th 172 (3d Cir. 2024) (same); *Boley*, 36 F.4th 124 (same); *Sweda*, 923 F.3d 320 (same); *Graden*, 496 F.3d 291 (same); *Kruchten v. Ricoh USA, Inc.*, 2024 WL 3518308 (3d Cir. July 24, 2024) (same).

not defined-contribution plans, "hold[ing] no assets in trust for any individual participant," *Smith v. Med. Benefit Adm'rs Grp., Inc.,* 639 F.3d 277, 283 (7th Cir. 2011), and instead providing a "set level of agreed-upon benefits" from a general pool, *Winsor*, 62 F.4th at 528; *see also id.* ("[Participants] do not own beneficial interests that increase or decrease depending on the management of trust assets.").

As such, adjusting Plan assets would do nothing for former participants like Lewandowski. If Plan assets doubled tomorrow, J&J would be under no obligation to adjust benefits or issue payouts unless Plan documents so required (and they do not, nor is there any allegation otherwise). *See Edmonson v. Lincoln Nat'l Life Ins.*, 725 F.3d 406, 417 (3d Cir. 2013) ("[W]e believe *Horvath* holds that a plaintiff must show she has an individual right to the defendant's profit … [otherwise] the individual plaintiff has not suffered a constitutional injury."); *Glanton*, 465 F.3d at 1125 ("[N]or would any one-time award to the plans for past overpayments inure to the benefit of participants."); *Paulsen v. CNF Inc.,* 559 F.3d 1061, 1073 (9th Cir. 2009) (award to plan assets "cannot satisfy the redressability requirement of constitutional standing" where sponsor "is under no obligation to pay" money to participants). And

because J&J "bear[s] the financial risk," Plan assets could drop to zero and J&J would remain on the hook "for paying claims" at the levels promised by the Plan documents. *Knudsen*, 117 F.4th at 578 n.51. In either case, Lewandowski's wallet would be unaffected.

*Third*, and finally, there is Lewandowski's request for direct monetary relief paid to her individually "in the form of a surcharge," Opening Br. 29, which rests on the assumption that her ERISA claims authorize the Court to award such relief. That assumption is wrong.

ERISA contains a variety of "carefully crafted" causes of action defined in 29 U.S.C. § 1132(a) that "distinguish between the plaintiffs who may sue, the conduct they may challenge, and the remedies that they may seek." *Aldridge v. Regions Bank*, 144 F.4th 828, 844 (6th Cir. 2025). Only Section 1132(a)(3), the "catchall" provision, *Varity Corp. v. Howe*, 516 U.S. 489, 512 (1996), is implicated by Lewandowski's demand for retrospective monetary relief.[13] While this provision allows

---

[13] Lewandowski's claim under Section 1132(a)(2) authorizes suits against plan fiduciaries and allows for monetary damages, but only for the purpose of restoring "losses *to the plan*." 29 U.S.C. § 1109 (emphasis added); *see id.* § 1132(a)(2) (referencing Section 1109).

some forms of monetary relief, any such remedy must qualify as "appropriate *equitable* relief." 29 U.S.C. § 1132(a)(3) (emphasis added).

A "surcharge" is not "appropriate equitable relief" under (a)(3). A "surcharge" is a remedy arising from the common law of trusts that is "essentially equivalent to money damages." *Carr v. Jefferson Defined Benefit Plan*, 2025 WL 2888014, at *2 (3d Cir. Oct. 10, 2025) (quoting *Rose v. PSA Airlines, Inc.*, 80 F.4th 488, 498 (4th Cir. 2023)). Lewandowski invokes *CIGNA Corp. v. Amara*, 563 U.S. 421, 442 (2011), to support her surcharge request, but the Supreme Court has disavowed *Amara*'s discussion of § 1132(a)(3) as dicta. *See Montanile v. Bd. of Trs. of Nat'l Elevator Indus. Health Benefit Plan*, 577 U.S. 136, 148 n.3 (2016).[14] With *Amara*'s dicta set aside, there is "no doubt" as to the meaning of "appropriate equitable relief": "those categories of relief that were *typically* available in equity," such as "injunction, mandamus, and restitution, but not compensatory damages." *Mertens*, 508 U.S. at 255–57.

---

[14] Justice Scalia predicted this in his separate writing in *Amara*, cautioning that the Court "may very well reverse" if a lower court were to implement the majority's "discussion of the relief available under § [1132](a)(3)." 563 U.S. at 449 (Scalia, J., concurring in the judgment).

A "surcharge" is not available under (a)(3) because it is not typical "equitable relief" as the Supreme Court has defined (and reaffirmed) the term in *Mertens v. Hewitt Associates*, 508 U.S. 248 (1993), *Great-West Life & Annuity Insurance Co. v. Knudson*, 534 U.S. 204 (2002), and *Sereboff v. Mid Atlantic Medical Services, Inc.*, 547 U.S. 356 (2006). *See Montanile*, 577 U.S. at 148 n.3 (citing these cases). As these rulings have made clear, the fact that a pre-merger equity court could grant certain relief in *some* contexts does not mean such relief was *typically* available. *See Mertens*, 508 U.S. at 257. A "surcharge" is a prime example of the "special equity-court powers applicable to trusts" that fall outside "the reach of § [1132](a)(3)." *Great-West*, 534 U.S. at 219.

Granting Lewandowski's request for "surcharge" would disregard the boundary between law and equity mandated by the text of Section 1132(a)(3). Typical equitable remedies are "directed against some specific thing" and do not establish "a right to recover a sum of money generally out of the defendant's assets." *Montanile*, 577 U.S. at 145. As the majority of courts of appeals to address the issue have held, plaintiffs who "seek merely personal liability upon the defendants to pay a sum of money"—even when waving the banner of "equity"—"ask

65

for legal, not equitable, relief under § [1132](a)(3)." *Rose*, 80 F.4th at 504 (citation omitted); *see also Aldridge*, 144 F.4th at 849 ("[N]o matter the name for this money remedy … courts may not grant a monetary award under § 1132(a)(3) to compensate a plan participant for losses caused by a fiduciary."), *petition for cert. filed*, No. 25-590 (U.S. Nov. 14, 2025).[15]

While restitution, in contrast, is a classic equitable monetary remedy available under Section 1132(a)(3), Lewandowski abandons her request for restitution. That is for good reason: Lewandowski comes nowhere close to pleading a right to this remedy, which requires pointing to a *res*, or "'specifically identifiable funds that [a]re within the possession and control' of [defendants]." *Montanile*, 577 U.S. at 144 (quoting *Sereboff*, 547 U.S. at 362–63).

---

[15] One court of appeals has upheld the availability of a surcharge remedy by relying on the "dicta" of *Amara* without even once citing *Montanile. Gimeno v. NCHMD, Inc.*, 38 F.4th 910, 915 (11th Cir. 2022). But, as the Fourth Circuit has explained, "the Supreme Court" in *Montanile* "rejected the turn that it contemplated in *Amara*" and "revived *Mertens* and *Great-West.*" *Rose*, 80 F.4th at 504–05. While "[r]esorting to trust law" to pluck out an *atypical* remedy—as the *Gimeno* court did—"might have made sense in the immediate aftermath of *Amara*, it no longer does." *Id.* at 505.

In sum, across each claim asserted and every form of relief requested, Lewandowski fails to establish a possibility—let alone the requisite "*substantial likelihood*"—that a victory in this lawsuit would "remedy [her] alleged injury in fact." *Pa. Prison Soc'y*, 508 F.3d at 161. As the District Court correctly held, that is another basis to affirm.

## CONCLUSION

For these reasons, Lewandowski lacks standing, and the judgment of the District Court should be affirmed.

Dated: July 10, 2026                                      Respectfully submitted,

                                                          */s/ Kwaku Akowuah*

| David Kott | Kristen Seeger | Kwaku Akowuah |
|---|---|---|
| MCCARTER & ENGLISH, LLP | Scott Stein | Manuel Valle |
| 100 Mulberry Street | Caroline Wong | Victor Hiltner |
| Four Gateway Center | SIDLEY AUSTIN LLP | SIDLEY AUSTIN LLP |
| Newark, NJ 07102 | One South Dearborn | 1501 K Street NW |
| (973) 622-7444 (tel.) | Chicago, IL 60603 | Washington, DC 20005 |
| (973) 624-7070 (fax) | (312) 853-7000 (tel.) | (202) 736-8000 (tel.) |
| dkott@mccarter.com | (312) 853-7036 (fax) | (202) 736-8711 (fax) |
|  | kseeger@sidley.com | kakowuah@sidley.com |

*Counsel for Appellees*

67

## COMBINED CERTIFICATIONS OF COMPLIANCE

***Bar Membership****.* Pursuant to Third Circuit Local Appellate Rules 28.3(d) and 46.1(e), I certify that I am a member in good standing of the Bar of this Court.

***Word Count & Typeface****.* This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,965 words (as determined by Microsoft Word 365), excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface and type-style requirements of Rules 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally spaced 14-point typeface, Century Schoolbook, using Microsoft Word 365.

***Identicality & Virus Check****.* Pursuant to Third Circuit Local Appellate Rule 31.1(c), I certify that the text of the electronic version of this brief is identical to the text in the paper copies, and that the electronic version of this document was scanned with Crowdstrike, version 7.38.21003.0, and no viruses were detected.

Dated: July 10, 2026                    Respectfully submitted,

                                        /s/ *Kwaku Akowuah*
                                        Kwaku Akowuah
                                        *Counsel for Appellees*

# CERTIFICATE OF SERVICE

I hereby certify that, on this 10th day of July 2026, I electronically filed the foregoing brief with the Clerk for the United States Court of Appeals for the Third Circuit using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated: July 10, 2026                    Respectfully submitted,

/s/ *Kwaku Akowuah*

Kwaku Akowuah
*Counsel for Appellees*