No. 26-1107

# In the United States Court of Appeals
## FOR THE THIRD CIRCUIT

ANN LEWANDOWSKI, on her own behalf and on behalf of all others similarly situated; ROBERT GREGORY

v.

JOHNSON & JOHNSON; THE PENSION AND BENEFITS COMMITTEE OF JOHNSON & JOHNSON; PETER FASOLO; WARREN LUTHER; LISA BLAIR DAVIS; DOES 1-20

ANN LEWANDOWSKI,

*Appellant*

On Appeal from the United States District Court for the District of New Jersey, No. 24-cv-00671 (Hon. Zahid N. Quraishi)

**BRIEF OF THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA AND THE AMERICAN BENEFITS COUNCIL AS AMICI CURIAE IN SUPPORT OF APPELLEES AND AFFIRMANCE**

JANET GALERIA
JORDAN L. VON BOKERN
U.S. CHAMBER LITIGATION CENTER
1615 H Street, NW
Washington, DC  20062

*Counsel for the Chamber of Commerce of the United States of America*

KATY JOHNSON
MATT MUMA
AMERICAN BENEFITS COUNCIL
1250 H Street NW, Suite 605
Washington, DC 20005

*Counsel for the American Benefits Council*

MICHAEL E. KENNEALLY
ANDREW R. HELLMAN
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 739-3000

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

The Chamber of Commerce of the United States of America and American Benefits Council are not publicly traded corporations. They have no parent corporation, and no publicly held company has 10% or greater ownership of their stock.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ............................................. i

TABLE OF CITATIONS ...................................................................... iii

INTEREST OF AMICI CURIAE .......................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ......................... 3

ARGUMENT ...................................................................................... 7

I.     ERISA encourages employers to sponsor plans and protects their discretion to tailor benefits to employees' needs. .................. 7

II.    Employers contract with PBMs to assist with the complex challenge of providing prescription drug benefits. ...................... 10

III.   Plaintiff's theory of standing ignores the complex reality of health plan administration. ...................................................... 16

IV.   Article III requirements help guard against baseless ERISA litigation, which harms employers and employees alike. ........... 22

CONCLUSION ................................................................................. 27

COMBINED CERTIFICATES OF COMPLIANCE ............................. 28

CERTIFICATE OF SERVICE ............................................................ 29

# TABLE OF CITATIONS

**Page(s)**

**CASES**

*Aetna Health Inc. v. Davila,*
538 U.S. 200 (2004)...................................................................... 7, 8

*Alessi v. Raybestos-Manhattan, Inc.,*
451 U.S. 504 (1981)......................................................................9

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007)....................................................................17

*Black & Decker Disability Plan v. Nord,*
538 U.S. 822 (2003)......................................................................9

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013)....................................................................17

*Conkright v. Frommert,*
559 U.S. 506 (2010)......................................................................8

*Crawford Prof. Drugs, Inc. v. CVS Caremark Corp.,*
748 F.3d 249 (5th Cir. 2014)......................................................15

*Cunningham v. Cornell Univ.,*
604 U.S. 693 (2025)................................................................24, 25

*Dura Pharm., Inc. v. Broudo,*
544 U.S. 336 (2005)....................................................................24

*Egelhoff v. Egelhoff ex rel. Breiner,*
532 U.S. 141 (2001)....................................................................23

*Fifth Third Bancorp v. Dudenhoeffer,*
573 U.S. 409 (2014)..................................................................7, 25

*Finkelman v. Nat'l Football League,*
810 F.3d 187 (3d Cir. 2016).......................................................17

iii

## TABLE OF CITATIONS
(continued)

**Page(s)**

*FMC Corp. v. Holliday,*
   498 U.S. 52 (1990)........................................................................23

*Fort Halifax Packing Co. v. Coyne,*
   482 U.S. 1 (1987)......................................................................8, 22

*Gaither v. Aetna Life Ins. Co.,*
   394 F.3d 792 (10th Cir. 2004)........................................................9

*Hughes v. Nw. Univ.,*
   595 U.S. 170 (2022)......................................................................22

*Ingersoll-Rand Co. v. McClendon,*
   498 U.S. 133 (1990)...................................................................8, 22

*Knudsen v. MetLife Grp., Inc.,*
   117 F.4th 570 (3d Cir. 2024).............................................. 16, 20, 26

*Lockheed Corp. v. Spink,*
   517 U.S. 882 (1996)......................................................................7, 9

*Mass. Ret. Sys. v. CVS Caremark Corp.,*
   716 F.3d 229 (1st Cir. 2013) .........................................................15

*Mator v. Wesco Distrib., Inc.,*
   102 F.4th 172 (3d Cir. 2024)..........................................................22

*McKee Foods Corp. v. BFP Inc.,*
   173 F.4th 242 (6th Cir. 2026) .......................................................13

*Mertens v. Hewitt Assocs.,*
   508 U.S. 248 (1993).......................................................................23

*Metro. Life Ins. Co. v. Massachusetts,*
   471 U.S. 724 (1985).........................................................................9

# TABLE OF CITATIONS
### (continued)

**Page(s)**

*Monsanto Co. v. Geertson Seed Farms,*
  561 U.S. 139 (2010)......................................................17

*PBGC ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.,*
  712 F.3d 705 (2d Cir. 2013) ........................................24

*PCMA v. District of Columbia,*
  613 F.3d 179 (D.C. Cir. 2010) ....................................12

*PCMA v. Mulready,*
  78 F.4th 1183 (10th Cir. 2023) ............................... *passim*

*Pegram v. Herdrich,*
  530 U.S. 211 (2000)......................................................24

*Pilot Life Ins. Co. v. Dedeaux,*
  481 U.S. 41 (1987)..........................................................7

*Rutledge v. PCMA,*
  592 U.S. 80 (2020)........................................................14

*Shaw v. Delta Air Lines, Inc.,*
  463 U.S. 85 (1983).....................................................9, 22

*Thole v. U.S. Bank N.A.,*
  590 U.S. 538 (2020)...................................................16, 23

*Varity Corp. v. Howe,*
  516 U.S. 489 (1996)....................................................8, 23

**RULES**

FED. R. APP. P. 29 ...........................................................1

FED. R. CIV. P. 12(b)(6)....................................................25

v

**TABLE OF CITATIONS**
(continued)

**Page(s)**

OTHER AUTHORITIES

Georgetown Univ. Health Pol'y Inst., *Prescription Drugs*,
    https://archive.ph/ypzA4 ....................................................................12

Kaiser Family Found., *Employer Health Benefits: 2025 Annual Survey*,
    (Oct. 2025), https://files.kff.org/attachment/Employer-Health-
    Benefits-Survey-2025-Annual-Survey.pdf .........................................10

Lori Chavez-DeRemer, Sec'y of Lab., *Report to Congress: Annual Report
    on Self-Insured Group Health Plans* (Mar. 2026), https://beta.dol.gov/
    system/files/research-data/2026-03/ebsa-annual-report-on-self-
    insured-group-health-plans-2026.pdf.................................................11

U.S. Census Bureau, *Health Insurance Coverage in the United States:
    2024*, (Sept. 9, 2025), https://www2.census.gov/library/publications/
    2025/demo/p60-288.pdf.....................................................................10

## INTEREST OF AMICI CURIAE[1]

**The Chamber of Commerce of the United States of America** (the "Chamber") is the world's largest business federation. As the nation's leading advocate for business, the Chamber represents companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files amicus curiae briefs in cases, like this one, that raise issues of concern to the nation's business community.

**The American Benefits Council (the "Council")** is a Washington, D.C.–based employee benefits public policy organization. The Council advocates for employers dedicated to the achievement of best-in-class solutions that protect and encourage the health and financial well-being of their workers, retirees, and families. Council members include over 220 of the world's largest corporations and collectively either directly

---

[1] All parties have consented to the filing of this brief. *See* FED. R. APP. P. 29(a)(2). No counsel for a party authored this brief in whole or in part. No party, no counsel for a party, and no person other than amici, their members, or their counsel made a monetary contribution to fund the preparation or submission of this brief.

1

sponsor or administer health and retirement benefits for virtually all Americans covered by employer-sponsored plans. The Council regularly participates as amicus curiae in cases affecting employee benefit plans.

*    *    *

This case raises issues of profound importance to amici and their members. Many of amici's members are employers that sponsor ERISA-governed health plans that include prescription-drug benefits. Chief among the goals of these plan sponsors is providing cost-effective benefits that address the healthcare needs and preferences of plan participants and beneficiaries. Many employers lack the nuts-and-bolts infrastructure necessary to independently administer health plans and thus rely on third-party administrators, including pharmacy benefit managers ("PBMs"), to handle certain aspects of day-to-day plan operations. Plaintiff here seeks to capitalize on this common arrangement to extract further payments from plan sponsors based on an ill-defined theory of ERISA liability that just attaches legal labels to barely disguised general complaints about healthcare costs. Members of both the Chamber and the Council are not universally supportive of PBM business models in all circumstances, and understand that different plans may follow different

2

designs for PBM compensation. Indeed, certain aspects of PBM activity may sometimes be at odds with the interests of plan sponsors. But amici are united in their commitment to the strong ERISA principles long recognized by this Court's jurisprudence, and are also united in opposing the efforts by certain plaintiffs' firms to reduce ERISA fiduciary analysis to a drug-by-drug or claim-by-claim assessment of plan pricing decisions. Instead of furthering sound plan design, these lawsuits undermine plan sponsors' efforts to furnish employees and their families high-quality, affordable, health coverage.

Baseless ERISA lawsuits saddle plan sponsors with litigation expenses that harm plans and their participants. Greenlighting novel and tenuous theories of standing, like Plaintiff's theory here, would make matters worse. Amici therefore have a strong interest in ensuring that the guardrails against such baseless litigation, including Article III standing requirements, are enforced.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Congress enacted ERISA in relevant part to encourage employers to offer healthcare and other benefits to their employees. The statute codifies a policy of encouraging employers to choose to sponsor benefit

3

plans, including by providing for predictable procedures and liabilities. Key to this predictability is ERISA's emphasis on prudent processes, rather than optimal outcomes. Congress recognized that excessive regulatory burdens and litigation risks would discourage employers from creating benefit plans and offering robust benefits through them. ERISA thus allows employers to choose whether to offer benefits and to tailor the benefits they choose to offer.

Employers, including amici's members, greatly value the flexibility that ERISA gives them to tailor their benefit plans to the needs and preferences of their workforces. Customizing benefit plans allows employers to promote the health of their employees and their families through cost-effective structures, which in turn helps employers attract and retain talent. Prescription drugs are an essential component of modern healthcare, so employers must contend with an incredibly complex prescription drug supply chain. That complexity results partly from the fact that a constellation of stakeholders must come together to fill any given prescription—ranging from the manufacturers to the individual patient, with many intermediaries, including wholesalers, pharmacies, prescribing doctors, and often others, in between. Each of these actors has

different incentives that can be difficult to harmonize. Plaintiff vastly oversimplifies this picture, which illustrates some of the challenges that employers face to sponsor a prescription drug plan.

Employers have developed innovative strategies to manage costs in this environment while ensuring that employees and families maintain access to needed drugs and services. Many of these strategies have been developed by, or in concert with, PBMs and other service providers. PBMs offer a wide range of services to plans, ranging from establishing pharmacy networks to adjudicating benefits at the point of sale, whether at a retail pharmacy or otherwise, to assisting plan sponsors with the complexities of formulary development and pharmacy benefit design. The contracts between plans and PBMs govern the wide range of services that PBMs provide to plans and their participants and naturally include terms governing compensation.

Plaintiff's lawsuit ignores this system-level complexity. As the district court recognized, her allegations require too much speculation to support the inferences necessary to plausibly show that she has standing. She purports to assert pocketbook injuries but does not allege any concrete losses. Rather, she complains generally that the Plan paid too much

and that she did as well. But she alleges no facts to support a nonspeculative inference that she paid more than she should have—let alone that such overcharges were caused by Defendants' alleged violation of ERISA.

Health benefit plan sponsorship for an entire population of employees and their dependents is an enormous undertaking for any plan sponsor. Yet Plaintiff aims to pick-and-choose specific aspects of this complex arrangement that she wants to criticize while ignoring everything else that goes into a plan sponsor's decisionmaking. Employers do not offer access to a small number of specific drugs. Rather, plans broadly offer pharmacy benefits subject to specified terms. A plan's drug benefit can commonly encompass hundreds, if not thousands, of unique pharmaceuticals. And the price for many of the covered drugs can vary by the day (as they are typically based on certain market benchmarks or acquisition costs). When contracting for PBM services, plan fiduciaries generally consider the drug benefits and related PBM services holistically, not on a cherry-picked basis as Plaintiff seeks to do.

This case is just the latest entry in the voluminous playbook of baseless ERISA lawsuits. Economically burdensome ERISA class actions, like the one Plaintiff seeks to pursue, harm countless employees and

6

families who receive health benefits through employer-sponsored prescription benefit plans by depleting employer resources that could otherwise be used to fund benefits. Motions to dismiss are an important mechanism for weeding out such baseless and harmful suits. *See Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014). The district court rightly used this mechanism to dismiss this case for lack of standing, and this Court should affirm.

## ARGUMENT

### I. ERISA encourages employers to sponsor plans and protects their discretion to tailor benefits to employees' needs.

ERISA serves "to provide a uniform regulatory regime over employee benefit plans." *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004). But "[n]othing in ERISA requires employers to establish employee benefits plans." *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996). ERISA instead furthers "the public interest in encouraging the formation of employee benefit plans" by leaving the decision whether to sponsor a plan up to employers. *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 54 (1987). Given the statute's reliance on the voluntary provision of benefits, the Supreme Court has repeatedly "recognized that ERISA represents a 'careful balancing between ensuring fair and prompt enforcement

7

of rights under a plan and the encouragement of the creation of such plans.'" *Conkright v. Frommert*, 559 U.S. 506, 517 (2010) (quoting *Davila*, 542 U.S. at 215).

Congress recognized, moreover, "that employers establishing and maintaining employee benefit plans are faced with the task of coordinating complex administrative activities." *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 11 (1987). Adding an overly burdensome regulatory regime on top of those unavoidable complexities "would introduce considerable inefficiencies" with counterproductive consequences. *Id.*; *see also Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 142 (1990) (recognizing that such "inefficiencies . . . could work to the detriment of plan beneficiaries"). Congress therefore sought "not to create a system that is so complex that administrative costs, or litigation expenses, unduly discourage employers from offering welfare benefit plans in the first place." *Varity Corp. v. Howe*, 516 U.S. 489, 497 (1996). In other words, ERISA strikes a "careful balanc[e]" to ensure that employers are not deterred from offering benefit plans in the first place. *See Davila*, 542 U.S. at 215 (quotation marks and citation omitted).

For similar reasons, ERISA generally does not "mandate what kind of benefits employers must provide if they choose to have such a plan." *Lockheed*, 517 U.S. at 887; *see also Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 732 (1985) ("ERISA thus contains almost no federal regulation of the terms of benefit plans."); *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 91 (1983) (reiterating that "ERISA does not mandate that employers provide any particular benefits"). "Rather, employers have large leeway to design . . . welfare plans," such as health benefit plans, "as they see fit." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 833 (2003); *see also Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 511 (1981) ("ERISA leaves this question" of "the content of the benefit . . . largely to the private parties creating the plan."). ERISA in this fashion gives "employers considerable discretion to fashion private benefit plans tailored to their own (and their employees') needs." *Gaither v. Aetna Life Ins. Co.*, 394 F.3d 792, 804 (10th Cir. 2004).

In the modern economy, employers can and do design benefit packages, including healthcare benefits, as a tool to attract and retain talented employees. This market-oriented framework promotes the interests of both employers and employees by encouraging employers to offer

9

robust benefits, and by avoiding regulatory burdens and inefficiencies that would have the opposite effect.

## II.   Employers contract with PBMs to assist with the complex challenge of providing prescription drug benefits.

These incentives for employers to provide benefits have had their intended effect. Most working-age American adults have health insurance coverage through employer-sponsored plans. U.S. Census Bureau, *Health Insurance Coverage in the United States: 2024*, at 5 (Sept. 9, 2025).[2] In all, some 154 million Americans rely on employer-sponsored health insurance plans. Kaiser Family Found., *Employer Health Benefits: 2025 Annual Survey*, at 6 (Oct. 2025).[3] Employees broadly prefer this option: more than 75% of eligible workers who are offered health coverage through their employers accept it. *Id.* at 67.

"Employer-sponsored plans can be fully insured, meaning the plans buy health insurance for their employees, or they can be self-insured, meaning the employers collect premiums from employees, pay those employees' medical claims, and bear the insurance risk." *PCMA v.*

---

[2]   https://www2.census.gov/library/publications/2025/demo/p60-288.pdf.

[3]   https://files.kff.org/attachment/Employer-Health-Benefits-Survey-2025-Annual-Survey.pdf.

*Mulready*, 78 F.4th 1183, 1188 (10th Cir. 2023).  More than two-thirds of covered workers who have health coverage through employer-sponsored plans are enrolled in self-funded plans (like the Johnson & Johnson Plan).  Kaiser Family Found., *Employer Health Benefits, supra*, at 165. Many larger employers prefer self-funding (or "self-insurance"), "in part because the health expenses of larger group health plans are more predictable, and therefore, larger plan sponsors can manage those risks internally while avoiding costs associated with state taxes and insurance fees."  Lori Chavez-DeRemer, Sec'y of Lab., *Report to Congress: Annual Report on Self-Insured Group Health Plans*, at 4 (Mar. 2026).[4]  Self-funded plans also pay only for the health benefits that participants ultimately use, while fully insured plans must pay the same amount for insurance policies regardless of usage.  But many employers that wish to self-fund health benefit plans lack the expertise or resources necessary to administer those plans and contract with third parties to assist with plan administration.

---

[4]  https://beta.dol.gov/system/files/research-data/2026-03/ebsa-annual-report-on-self-insured-group-health-plans-2026.pdf.

11

A classic example of this dynamic plays out with prescription drug benefits. More than 131 million people, about two-thirds of adults in the United States, rely on prescription drugs, which are particularly important treatments for chronic (and often common) conditions. Georgetown Univ. Health Pol'y Inst., *Prescription Drugs*.[5] "Access to prescription drugs," then, is an "important—and expensive—benefit for a health care plan to offer its beneficiaries." *PCMA v. District of Columbia*, 613 F.3d 179, 183 (D.C. Cir. 2010). Yet even as "[f]illing doctors' prescriptions is a part of everyday life," "beneath these commonplace transactions lies a complex web of contracts and business relationships," involving "drug manufacturers, wholesalers, [and] pharmacies" on one end and patients and payors (like plans) on the other. *Mulready*, 78 F.4th at 1188. Most employers have no real background in navigating this world as a drug payor. For instance, companies that develop software or sell consumer goods typically do not also have experience negotiating drug purchases on behalf of patients. Facilitating these transactions is a critical task for any plan sponsor but an unfamiliar one for most.

---

[5]    https://archive.ph/ypzA4.

This challenge explains why PBMs often "play a pivotal role in American healthcare." *McKee Foods Corp. v. BFP Inc.*, 173 F.4th 242, 250 (6th Cir. 2026). PBMs are paid to handle the many tasks that most employer plan sponsors cannot: "They oversee prescription-drug benefits for health plans, perform administrative services, help negotiate drug rebates, and set up pharmacy networks, working with health plans, drug manufacturers, and pharmacies along the way." *Id.* "PBMs . . . offer options for health plans to structure their [prescription-drug] benefits," enabling the customization that is usually preferable and often necessary for employers. *Mulready*, 78 F.4th at 1188.

It "would be prohibitively expensive for plans, which must control costs," to offer a benefit that would grant a blanket allowance for participants to "access every drug at every pharmacy." *Id.* So plans must offer prescription benefits on defined terms, which "include what drugs the plan covers (the formulary), how much the plan will pay for those drugs (the cost-sharing terms), and at which pharmacies beneficiaries can have prescriptions filled (the pharmacy network)." *Id.* Different plans may prefer different terms, based on the different needs and preferences of their participants and beneficiaries. *See McKee Foods*, 173 F.4th at 252.

An employer with a geographically dispersed workforce might prefer to offer a wider pharmacy network, even if that in turn might raise premiums or prescription copays, while a different employer might find that its workforce would prioritize lower costs over network breadth. "[M]ost plans do not," and realistically cannot, "assemble their own pharmacy networks," so "hiring a PBM to fine-tune its network" allows a plan to "promote a higher quality of care and can reduce other costs to beneficiaries, such as insurance premiums." *Mulready*, 78 F.4th at 1189. And PBMs provide additional services, too, including operating plans' pharmacy claims administration process, determining how much the patient and the plan pay, respectively, for a given prescription.

All those services come at a cost. Contracts between plans and PBMs must account for the wide variety of services that PBMs provide to plans and frequently include varied and highly detailed arrangements for PBM compensation. *See, e.g.*, *Mulready*, 78 F.4th at 1189 (explaining that a health plan does not provide "dollar-for-dollar reimbursement" for PBM payments to pharmacies for prescriptions; instead, "per its contract with the plan, the PBM derives a profit from charging the plan more than the PBM pays the pharmacy"); *Rutledge v. PCMA*, 592 U.S. 80, 84 (2020)

(similarly describing how "the amount that prescription-drug plans reimburse PBMs is a matter of contract" and an aspect of PBM compensation); *Mass. Ret. Sys. v. CVS Caremark Corp.*, 716 F.3d 229, 231 (1st Cir. 2013) ("The sponsors pay fees to the PBM under a contract for its services, which include managing prescription drug claims submitted by those enrolled in the plan."); *Crawford Prof. Drugs, Inc. v. CVS Caremark Corp.*, 748 F.3d 249, 254 n.1 (5th Cir. 2014) ("PBMs generally make money through service fees from large customer contracts for processing prescriptions." (citation and quotation marks omitted)).

As this discussion illustrates, virtually every aspect of sponsoring and administering a prescription-drug benefit plan entails complex challenges and tradeoffs. Furnishing even one prescription to one patient requires a series of transactions across a web of contractual relationships. The complexity multiplies by orders of magnitude for sponsoring or administering a prescription-drug benefit plan for an entire population of employees and their families. This lawsuit thus concerns an enormously complicated system that is full of interconnected moving parts.

15

### III.   Plaintiff's theory of standing ignores the complex reality of health plan administration.

Plaintiff advances a novel theory of ERISA liability whose standing allegations were correctly rejected by the district court as "simply . . . too speculative."  Appx18.  Plaintiff's theory is in fact impermissibly speculative on multiple independent levels.  Rather than plausibly allege "concrete facts" to show that Plaintiff paid more because of Defendants' alleged ERISA violations—as settled precedent requires, *e.g.*, *Knudsen v. MetLife Grp., Inc.*, 117 F.4th 570, 582 (3d Cir. 2024)—Plaintiff relies on conclusory assertions that wholly ignore the complexity of sponsoring and administering a prescription-drug benefit plan.  It is easy for plaintiffs to vaguely complain that defendants should have done something to lower their out-of-pocket costs.  But Article III requires more.  *Id.*

To establish standing at the pleading stage, Article III requires a plaintiff to plausibly allege "(1) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the injury was caused by the defendant, and (3) that the injury would likely be redressed by the requested judicial relief."  *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 540 (2020).  The second element, causation, more specifically requires the plaintiff to plausibly allege that her asserted injury is "fairly

traceable to the challenged action" of the defendants that purportedly violates the law. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010). "This requirement is 'akin to "but for" causation' in tort." *Finkelman v. Nat'l Football League*, 810 F.3d 187, 193 (3d Cir. 2016) (citation omitted).

As with any threshold pleading requirement, the complaint's well-pleaded "[f]actual allegations must be enough" to make a *plausible* showing, "above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted); *see also Finkelman*, 810 F.3d at 194. A plaintiff cannot rely on a "speculative chain of possibilities" to show that her asserted injury "is fairly traceable" to the alleged legal violation. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013).

Plaintiff's theory of standing here is fatally speculative. Start with the injuries that she emphasizes on appeal. First, she supposedly paid "$210 more in direct out-of-pocket charges for prescription drugs" than she thinks she should have paid. Pl. Br. 26 (citing Appx103-104 ¶¶ 126-27, Appx136-137 ¶¶ 218-21, Appx139 ¶ 227). She also asserts "that the Plan's expenses—including its overpayments for prescription drugs—were passed through to participants via higher premiums." *Id.* at 38. At

17

the same time, Plaintiff does not and could not contend that paying *any* premiums was an injury; she merely complains of "inflated" premiums." *Id.* The two asserted injuries thus collapse into one: a claim that Plaintiff paid too much.

That claim of injury is impermissibly speculative, as illustrated by the guesswork needed to reach her purportedly precise "$210" out-of-pocket figure. Pricing in the complex prescription-drug market for self-funded plans is not like pricing for mass-produced consumer goods. There is no default sticker price—like a manufacturer's suggested retail price—for filling a given prescription. Instead, a "complex web of con-tracts and business relationships" lies behind each of "these common-place transactions." *Mulready*, 78 F.4th at 1188. The complaint here illustrates that: Plaintiff's asserted basis for her claim of overpayment is comparison to drug prices from four other sources, and she affirmatively alleges a different price from each. Appx137-38 ¶¶ 220-21. Plaintiff's $210 figure is nothing but conjecture and speculation.

Both of Plaintiff's asserted prescription-drug overpayments lack the context necessary to make them concrete and nonspeculative. And were she to supply that context, it would only confirm her lack of injury.

18

Plans do not promise participants discrete lists of goods and services with itemized prices for each; nor do they set premiums in the abstract based on a whim.  Plans promise participants annual coverage in exchange for paying plan premiums—which in turn are determined based on a complex web of factors including the plan's demographics, historical experience, trends, and administrative costs—regardless of how much benefits the participants actually use during the year.  Any individual's particular payments cannot be understood out of the context of her broader participation in the wider plan.  The facts here are particularly striking.  While Plaintiff complains that she was overcharged $210 for two prescriptions, she filled those prescriptions through Plan coverage in a year in which she admittedly received approximately $200,000 in Plan benefits.  *See* Appx19.[6]  Plaintiff's complaint about premiums is similarly speculative.  She pleads no facts to suggest that Defendants could have negotiated a cheaper PBM arrangement for the Plan given its particular

---

[6]  And Johnson & Johnson, as the Plan's sponsor, paid for a far greater share of those benefits than Plan participants did.  In 2022, for example, Johnson & Johnson contributed about $820 million to the Plan and participants about $148 million.  Appx185.  That disparity underscores how Plaintiff's allegations about overcharges are speculative: a plan sponsor bearing the lion's share of plan costs obviously has an exceptionally powerful incentive to restrain them.

circumstances, demographics, and bundle of PBM services, let alone that such savings for the Plan would have yielded lower premiums for Plaintiff herself.

Even assuming that Plaintiff has some cognizable theory of a fiduciary breach, there are no allegations plausibly suggesting that the supposed breach is the but-for cause of her asserted overpayments. As this court has explained, Plaintiff's theory of standing requires factual allegations that "show that the purported violative conduct was the but-for cause of [the plaintiffs'] . . . increase in their out-of-pocket costs above what they would have been" had the defendants not violated the statute. *Knudsen*, 117 F.4th at 582. Plaintiff makes no such showing. She pleads no facts supporting a nonspeculative inference that her purported overcharges are fairly traceable to anything Johnson & Johnson did.

The realities of PBM compensation underscore what is missing. True, a PBM's compensation "per its contract with the plan" often comes from the plan paying the PBM more for a prescription than the PBM in turn pays to the pharmacy. *Mulready*, 78 F.4th at 1189. But Plaintiff does not and cannot allege any facts to draw a causal connection between the prescription charge she objects to—or her premiums—and the alleged

20

ERISA violation. Plans rely on PBMs to perform a wide variety of services, from developing pharmacy networks in the first place to keeping the entire claims adjudication system running—and plan-PBM contracts rely on various forms of compensation in exchange for that suite of services, not just the cost of a particular drug. *See supra* Section II. Plaintiff offers no allegations to make an inference that her purported overpayments resulted from Defendants' alleged failure to monitor the PBM or negotiate more successfully.

Part of the problem with Plaintiff's theory of standing is that she does not have a concrete theory of fiduciary breach in the first place. Health plan sponsorship and administration are complicated, especially when it comes to prescription drug benefits. By theorizing that Defendants should have done something more to reduce her specific share of plan costs, Plaintiff oversimplifies these complexities beyond recognition. ERISA requires prudence, not magic. And no one would sponsor employee benefit plans if they gave rise to liability based on generic complaints about healthcare costs—much less the costs of a particular prescription. "The circumstances confronting a fiduciary sometimes require 'difficult tradeoffs,' so 'courts must give due regard to the range of

21

reasonable judgments a fiduciary may make based on her experience and expertise.'" *Mator v. Wesco Distrib., Inc.*, 102 F.4th 172, 184 (3d Cir. 2024) (quoting *Hughes v. Nw. Univ.*, 595 U.S. 170, 177 (2022)).[7] Difficult tradeoffs abound in designing and operating a health benefit plan. Plaintiff does not grapple with these tradeoffs, and her theory of standing shows it.

## IV.   Article III requirements help guard against baseless ERISA litigation, which harms employers and employees alike.

A fundamental purpose of ERISA, as discussed, is to encourage employers to make the voluntary decision to create employee benefit plans and offer robust benefits through them. *See supra* Section I. Congress sought to avoid introducing regulatory "inefficiencies" that "might lead those employers with existing plans to reduce benefits, and those without such plans to refrain from adopting them." *Fort Halifax Packing*, 482 U.S. at 11. Such "inefficiencies" may "work to the detriment of plan beneficiaries" in many ways. *Ingersoll-Rand*, 498 U.S. at 142; *see Shaw*, 463

---

[7] "To plead a breach of the duty of prudence under ERISA, . . . a plaintiff must plausibly allege fiduciary decisions outside a range of reasonableness." *Mator*, 102 F.4th at 184. The district court properly fulfilled its duty to start by assessing its subject matter jurisdiction—but if Plaintiff somehow had standing, she would fail to state a claim for many of the same reasons.

U.S. at 105 n.25 (explaining how regulatory "inefficiency . . . presumably would be paid for by lowering benefit levels," or alternatively by "reduc[ing] wages" to "offset the additional expenses").

The Supreme Court has repeatedly recognized that these counterproductive risks include "litigation expenses" borne by plans—and, thus, ultimately by beneficiaries. *Varity Corp.*, 516 U.S. at 497; *accord, e.g.*, *Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 149-50 (2001) ("burdens ultimately borne by . . . beneficiaries" include the costs "to contend with litigation"); *FMC Corp. v. Holliday*, 498 U.S. 52, 65 (1990) ("employee benefit plans' expenditure of funds in . . . litigation" frustrates ERISA's purposes). ERISA is "an enormously complex and detailed statute that resolved innumerable disputes between powerful competing interests—and not all in favor of potential plaintiffs." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993).

Still less does ERISA resolve all disputes in favor of plaintiffs' attorneys. Yet ERISA class-action litigation can sometimes serve the interests of the attorneys more than the putative class members. *See, e.g.*, *Thole*, 590 U.S. at 541 (in case where "the plaintiffs' attorneys requested at least $31 million in attorney's fees," the "plaintiffs [themselves] ha[d]

23

no concrete stake in th[e] lawsuit"—but, "[t]o be sure, their attorneys" did); *Pegram v. Herdrich,* 530 U.S. 211, 237 (2000) (asking "what would be gained by opening the federal courthouse doors for a" certain novel fiduciary "claim, save for possibly random fortuities . . . or the ancillary opportunity to seek attorney's fees").

Abusive ERISA litigation has flourished in part because "the prospect of discovery in a suit claiming breach of fiduciary duty is ominous, potentially exposing the ERISA fiduciary to probing and costly inquiries." *PBGC ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.,* 712 F.3d 705, 719 (2d Cir. 2013). That prospect "elevates the possibility that 'a plaintiff with a largely groundless claim will simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value.'" *Id.* (brackets omitted) (quoting *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 347 (2005)). "When that happens . . . , the few plan participants named as plaintiffs and their attorneys get a windfall, and a cost that the administrator incurs may be passed on to the other plan participants." *Cunningham v. Cornell Univ.,* 604 U.S. 693, 711 (2025) (Alito, J., concurring).

24

Based on concerns like these, the Supreme Court has stressed that the pleading stage is an important moment for courts in ERISA class actions to "divide the plausible sheep from the meritless goats." *Dudenhoeffer*, 573 U.S. at 425. Although the Court in *Dudenhoeffer* was specifically talking about motions under Rule 12(b)(6), the Court has highlighted that lower courts also have other "tools at their disposal to screen out meritless claims before discovery," including, most relevant here, dismissals based on lack of "Article III standing." *Cunningham*, 604 U.S. at 708 (majority opinion).

The facts of this case illustrate the importance of upholding Article III's requirements and not opening the floodgates to suits like this. Johnson & Johnson employs more than 130,000 people and provides healthcare benefits to many of these employees and their dependents. Appx59 ¶ 14. In doing so, it bears the vast majority of these participants' and beneficiaries' medical expenses: for example, in 2022, Johnson & Johnson contributed about $820 million to the Plan and participants contributed about $148 million. Appx185. The following year, Plaintiff hit her out-of-pocket maximum of $3,500—and the Plan paid almost $200,000 for her medical expenses. Appx221-22. Yet Plaintiff seeks to

subject Defendants to suit based on a $210 overpayment for prescription drugs, Pl. Br. 26, and premiums that were purportedly "inflated" by some unspecified amount, *id.* at 38. Her complaint has little to do with redressing that asserted injury and more to do with challenging healthcare costs more generally. Appx70-71 ¶¶ 47-49 (complaining about spread pricing); Appx72-73 ¶¶ 52-53 (complaining about PBM rebate practices); Appx73-74 ¶ 55 (complaining about PBM vertical integration).

Contrary to the hyperbole of Plaintiff's amici, *see* PRA Br. (Dkt. 37) at 20-21, dismissing this lawsuit on standing grounds does not broadly foreclose plan participants' "standing to challenge" *actual* "mismanagement of their plans." The district court applied established precedent to properly reject Plaintiff's "speculative" attempt to manufacture a novel mismanagement claim. Appx18; *see, e.g.*, *Knudsen*, 117 F.4th at 582 (affirming dismissal for lack of standing where plaintiffs relied on similarly "speculative allegations"). Affirming that dismissal would promote, not undermine ERISA's statutory policies, which encourage plan sponsors to devote their resources to providing substantive benefits rather than defending against baseless claims.

## CONCLUSION

For these reasons and those in Defendants' brief, this Court should affirm the judgment of the district court.

Dated: July 17, 2026

JANET GALERIA
JORDAN L. VON BOKERN
U.S. CHAMBER LITIGATION CENTER
1615 H Street, NW
Washington, DC  20062

*Counsel for the Chamber of Commerce of the United States of America*

KATY JOHNSON
MATT MUMA
AMERICAN BENEFITS COUNCIL
1250 H Street NW, Suite 605
Washington, DC 20005

*Counsel for the American Benefits Council*

Respectfully submitted,

s/ Michael E. Kenneally
MICHAEL E. KENNEALLY
   (D.C. Bar No. 1025767)
ANDREW R. HELLMAN
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 739-3000

*Counsel for Amici Curiae*

27

## COMBINED CERTIFICATES OF COMPLIANCE

In accordance with Local Appellate Rules 28.3(d) and 46.1(e), I certify that all attorneys whose names appear on this brief are members in good standing of the bar of this Court or have filed an application for admission.

In accordance with Local Appellate Rule 31.1(c), I certify that the texts of the electronic brief and paper copies are identical and that Microsoft Defender Offline scanned the file and did not detect a virus.

In accordance with Federal Rules of Appellate Procedure 29(a)(4)(G) and 32(g)(1), I certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because it contains 5,044 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), according to the word count of Microsoft Word 365. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in Century Schoolbook 14-point font, a proportionally spaced typeface.

Dated: July 17, 2026      s/ Michael E. Kenneally
             MICHAEL E. KENNEALLY

28

# CERTIFICATE OF SERVICE

I certify that, on July 17, 2026, a copy of the foregoing was filed electronically through the appellate CM/ECF system with the Clerk of the Court. All counsel of record in this case are registered CM/ECF users. Pursuant to Local Appellate Rule 31.1, as amended by the April 29, 2013 order, seven copies of this brief were sent to the Clerk of the Court for delivery.

Dated: July 17, 2026

s/ Michael E. Kenneally
MICHAEL E. KENNEALLY